JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District (specify)
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ See attached sheet. _____

Address of Defendant: _____ See attached sheet. _____

Place of Accident, Incident or Transaction: _____ Philadelphia, Pennsylvania _____

---

***RELATED CASE, IF ANY:***

Case Number: __20-cv-03336__     Judge: __Petrese B. Tucker__     Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?　　Yes ☐　No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?　　Yes ☑　No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?　　Yes ☐　No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?　　Yes ☐　No ☑

I certify that, to my knowledge, the within case ☑ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __07/19/2020__     _____     __PA 43545__
*Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

*A.　Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☑ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

*B.　Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):*
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __Andrew Teitelman, Esq.__, counsel of record *or pro se plaintiff*, do hereby certify:

- ☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: __07/19/2020__     _____     __PA 43545__
*Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**Addresses of Plaintiffs:**

Michael Melvin
c/o 380 Red Lion Road, Ste. 103
Huntingdon Valley, PA 19006[1]

Robert Bannan
c/o 380 Red Lion Road, Ste. 103
Huntingdon Valley, PA 19006

Dan Farrelly
c/o 380 Red Lion Road, Ste. 103
Huntingdon Valley, PA 19006

Jesus Cruz
c/o 380 Red Lion Road, Ste. 103
Huntingdon Valley, PA 19006

Brion Milligan
c/o 380 Red Lion Road, Ste. 103
Huntingdon Valley, PA 19006

Steven Hartzell
c/o 380 Red Lion Road, Ste. 103
Huntingdon Valley, PA 19006

Mark Palma
c/o 380 Red Lion Road, Ste. 103
Huntingdon Valley, PA 19006

Joseph Fox
c/o 380 Red Lion Road, Ste. 103
Huntingdon Valley, PA 19006

**Addresses of Defendants:**

City of Philadelphia
1515 Arch Street, Floor 17
Philadelphia, PA 19102

Injustice Watch NFP, dba The Plain View
Project
55 E. Jackson Boulevard, Suite 640
Chicago, IL 60604

---

[1] Plaintiffs' home addresses are being withheld for security purposes, as they have been threatened and their safety would be compromised if their addresses were made public.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Michael Melvin, Dan Farrelly, Brion Milligan, Mark Palma, Robert Bannan,  Jesus Cruz Steven Hartzell and Joseph Fox | : : : | CIVIL ACTION |
| v. | : | |
| The City of Phildadelphia and Injustice Watch NFP, dba The Plain View Project | : : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court.  (See reverse side of this form for a detailed explanation of special
management cases.)                    ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.        ( X )

| | | |
|---|---|---|
| 07/19/2021 | Andrew Teitelman | Plaintiffs |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 267-255-6864 | 215-434-7491 | ateitelman@teitelaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

## Civil Justice Expense and Delay Reduction Plan
### Section 1:03 - Assignment to a Management Track

(a)        The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)        In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)        The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)        Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)        Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

### SPECIAL MANAGEMENT CASE ASSIGNMENTS
#### (See §1.02 (e) Management Track Definitions of the
#### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**(Philadelphia Division)**

|  |  |
|---|---|
| **MICHAEL MELVIN, DANIEL FARRELLY, BRION MILLIGAN, MARK PALMA, ROBERT BANNAN, JESUS CRUZ, STEVEN HARTZELL, and JOSEPH FOX** <br> c/o 380 Red Lion Road Ste. 103 <br> Huntingdon Vly., PA 19006[1] <br><br> Plaintiffs, <br><br> v. <br><br> **THE CITY OF PHILADELPHIA** <br> 1515 Arch Street,  Floor 17 <br> Philadelphia, PA 19102 <br><br> and <br><br> **INJUSTICE WATCH NFP, d/b/a THE PLAIN VIEW PROJECT** <br> 55 E. Jackson Boulevard, Suite 640 <br> Chicago, IL 60604 <br><br> Defendants. | **COMPLAINT – CIVIL ACTION** <br><br> Civil Action No. |

## **COMPLAINT**

Plaintiffs Michael Melvin, Daniel Farrelly, Brion Milligan, Mark Palma, Robert Bannan, Jesus Cruz, Steven Hartzell, and Joseph Fox (collectively "Plaintiffs"), sue defendant, the City of Philadelphia, (the "City" or "Government Defendant"), acting by its duly elected, appointed officials and/or commissioned officers and/or employees, agents and representatives, all under color of federal and state law, including the Constitution of the United States, Constitution of Pennsylvania, Philadelphia Home Rule Charter, all statutes and ordinances deriving therefrom

---

[1] Plaintiffs' home addresses are being withheld for security purposes, as they have been threatened and their safety would be compromised if their addresses were made public.

and common law related thereto, or otherwise relevant hereto, including without limitation all

such constitutional rights to free speech, religion, expression, association, the right to bear arms,

equal protection, privacy and all other civil rights, as more specifically set forth herein; and also

sue defendant Injustice Watch NFP, d/b/a The Plain View Project (the "Plain View

Defendants"), acting by its agents, servants, representatives and/or employees, in concert with

the City to deprive Plaintiffs of their federal and state constitutional rights, including their rights

to freedom of speech, privacy and equal protection under the law, and for intentional interference

with contractual relations, as more specifically set forth below.

## I.    INTRODUCTION AND NATURE OF THE ACTION

1.      This complaint is for the systematic violation of Plaintiffs' civil rights under the

Constitution of the United States, including the First and Fourteenth Amendments, and pursuant

to 42 U.S.C. § 1983, as well as the Constitution of Pennsylvania, and all statutes and common

law deriving therefrom or related thereto; and for those damages and other relief arising, as

described hereafter, out of the targeted, discriminatory and illegal firing (directly and/or

indirectly by forced retirement or resignation) by the City of Philadelphia of the Plaintiffs from

their posts as sworn police officers working for the Philadelphia Police Department ("PPD"),

resulting from the hacking or other unauthorized invasion of their private Facebook accounts

without permission, by the Plain View Defendants and their collaboration and concerted action

with the City based thereon.

## II.    JURISDICTION AND VENUE

2.       Jurisdiction is vested in this Court to hear and decide all issues presented in this

case pursuant to 28 U.S.C. § 1331, 1343 and 1367, this case being predicated on a federal

question and the enforcement of certain federal constitutionally protected rights as guaranteed

under the First, Fourth and Fourteenth Amendments of the United States Constitution, federal statutes and common law, and related state claims based upon the Pennsylvania Constitution, state statutes and common law.

3.    The Court has the authority to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

4.    Venue is proper in this Court under 28 U.S.C. § 1391(b), as the Plaintiffs, excepting only plaintiff Jesus Cruz who is a resident of the State of Florida, and the Government Defendant resides or is situated within this federal district and the Government Defendant's wrongful conduct took place within this federal district. The Plain View Defendants reside or are situated in Chicago, Illinois, but their wrongful conduct took place within and/or was directed towards Pennsylvania and this federal district and is subject to this court's personal jurisdiction pursuant to the Pennsylvania long-arm statute, 42 Pa.C.S. § 5301, *et seq*.

## III.    **PARTIES**

### **Plaintiffs**

5.    Michael Melvin ("Melvin") is an adult individual who is a citizen and resident of the City of Philadelphia, Pennsylvania.

6.    Daniel Farrelly ("Farrelly") is an adult individual who is a citizen and resident of the City of Philadelphia, Pennsylvania.

7.    Brion Milligan ("Milligan") is an adult individual who is a citizen and resident of the City of Philadelphia, Pennsylvania.

8.    Mark Palma ("Palma") is an adult individual who is a citizen and resident of the City of Philadelphia, Pennsylvania.

9.    Robert Bannan ("Bannan") is an adult individual who is a citizen and resident of

the City of Philadelphia, Pennsylvania.

10.    Jesus Cruz ("Cruz") is an adult individual who is a citizen and resident of the City of Riverview, Florida.

11.    Steven Hartzell ("Hartzell") is an adult individual who is a citizen and resident of the City of Philadelphia, Pennsylvania.

12.    Joseph Fox ("Fox") is an adult individual who is a citizen and resident of the City of Philadelphia, Pennsylvania.

13.    The foregoing individuals are collectively referred to hereafter as the "Plaintiffs."

**Defendants**

14.    The City of Philadelphia, Pennsylvania ("City") is a City of the First Class pursuant to and exists under and by virtue of the laws of the Commonwealth of Pennsylvania.

15.    Injustice Watch NFP, d/b/a The Plain View Project, is an Illinois not-for-profit corporation, file number 70168839, that, as of the date hereof, is <u>not in good standing</u> in accordance with the records of Office of the Illinois Secretary of State.[2] Injustice Watch conducts business throughout the United States and, specifically, in the Commonwealth of Pennsylvania.

## IV.    FACTUAL BACKGROUND

---

[2] See https://apps.ilsos.gov/corporatellc/CorporateLlcController:

**Corporation/LLC Search/Certificate of Good Standing**

Corporation File Detail Report

| File Number | 70168839 |
|---|---|
| Entity Name | INJUSTICE WATCH, NFP |
| Status | NOT GOOD STANDING |

**Common Facts**

16.    The Plain View Project was founded by Emily Baker-White, formerly a Pennsylvania attorney, in 2016 and is a "Project" of Injustice Watch NFP, an Illinois not-for-profit corporation that is currently <u>not in good standing</u> ("Injustice Watch"), (see https://www.injusticewatch.org/), and also an IRS 501(c)(3) organization whose mission statement is: "*Injustice Watch is a non-partisan, not-for-profit journalism organization that conducts in-depth research exposing institutional failures that obstruct justice and equality."* (Emphasis in original).[3] The stated purpose of The Plain View Project, from its section of the Injustice Watch website, is:[4]

> The Plain View Project is a database of public Facebook posts and comments made by current and former police officers from several jurisdictions across the United States.
>
> We present these posts and comments because we believe that they could undermine public trust and confidence in our police. In our view, people who are subject to decisions made by law enforcement may fairly question whether these online statements about race, religion, ethnicity and the acceptability of violent policing—among other topics—inform officers' on-the-job behaviors and choices.
>
> *To be clear, our concern is not whether these posts and comments are protected by the First Amendment*. Rather, we believe that because fairness, equal treatment, and integrity are essential to the legitimacy of policing, these posts and comments should be part of a national dialogue about police. (Emphasis supplied).

17.    In furtherance of this "mission", the Plainview Defendants created a searchable database of Facebook posts and comments by police officers from eight U.S. cities (the "PV Database"), including Philadelphia, which had the second largest population (1,584,064 residents

---

[3] See https://www.injusticewatch.org/about/mission/. This statement is misleading, as it is believed, and therefore averred, that the Plain View Defendants are anything but "non-partisan", and that they are a left leaning organization that takes a very one-sided view regarding the issues and matters that they investigate and advocate.

[4] See https://www.plainviewproject.org/.

estimated by the U.S. Census Bureau as of July 1, 2019),[5] but the largest police force of the

group (approx. 6,300 sworn officers, see https://www.phillypolice.com/about/index.html).[6]

18.    To enter and search the PV Database, you are required to agree to three discreet

"Disclaimers", of which the first is most telling as it pertains to this matter:[7]

### 1.  Multiple Meanings

The Facebook posts and comments in this database concern a variety of topics
and express a variety of viewpoints, many of them controversial. *These posts were
selected because the viewpoints expressed could be relevant to important public
issues, such as police practices, public safety, and the fair administration of the
law. The posts and comments are open to various interpretations. We do not know
what a poster meant when he or she typed them; we only know that when we saw
them, they concerned us. We have shared these posts because we believe they
should start a conversation, not because we believe they should end one*.
(Emphasis supplied).

The posts and comments included in *the database comprise portions of a user's
public Facebook activity, and are therefore not intended to present a complete
representation of each person's Facebook presence, or each person's views on
any given subject. Inclusion of a particular post or comment in this database is
not intended to suggest that the particular poster or commenter shares any
particular belief or viewpoint with any other posters or commenters in the
database*. Links to the original page from which each post was obtained are
provided so you can see the context of the post if you wish. (Emphasis supplied).

19.    In its own words, the Plainview Defendants first, suggestively, tell the public (and

the governmental agencies employing the subject officers, such as City in this matter) that:

We present these posts and comments because *we believe that they could
undermine public trust and confidence in our police. In our view, people who are
subject to decisions made by law enforcement may fairly question whether these
online statements* about race, religion, ethnicity and the acceptability of violent
policing—among other topics—inform officers' on-the-job behaviors and
choices. (Emphasis supplied).

---

[5] See https://www.census.gov/quickfacts/philadelphiacitypennsylvania.
[6] The other cities in the PV Database are Dallas, TX, St. Louis, MO, Phoenix, AZ (population estimated
by the US Census Bureau as of 07/01/2019, see
https://www.census.gov/quickfacts/fact/table/phoenixcityarizona/PST045219, with approx. 3,000 sworn
officers, see https://en.wikipedia.org/wiki/Phoenix_Police_Department), York, PA, Twin Falls, ID,
Denison, TX and Lake County, FL.
[7] See https://www.plainviewproject.org/data.

See fn. 4.

20.    This is followed by a devious disclaimer, giving the superficial appearance of "protecting" Plaintiffs and the other officers similarly violated from being misinterpreted, but actually meant to insulate The Plain View Defendants and, by extension, their governmental partners like the City, from liability for their intended accusations that the officers, including Plaintiffs, whose Facebook statements are in their database, are all or some combination of: (i) racists, (ii) Islamophobic (358 of the total 362 allegedly religiously disparaging Facebook comments reported in the PV Database for Philadelphia were labeled "Islamophobic", and 4 were classified as "Anti-Semitic" by the City of Philadelphia Police Advisory Commission Report, dated 08/21/2020)[8], (iii) otherwise ethnically bigoted, and/or (iv) accepting of unnecessarily violent policing or societal violence in general,[9] as follows:

> The posts and comments included in the database comprise portions of a user's public Facebook activity, and *are therefore not intended to present a complete representation of each person's Facebook presence, or each person's views on any given subject. Inclusion of a particular post or comment in this database is not intended to suggest that the particular poster or commenter shares any particular belief or viewpoint with any other posters or commenters in the database.* Links to the original page from which each post was obtained are provided so you can see the context of the post if you wish. (Emphasis supplied).

See fn. 7.

21.    This "passive-aggressive" mechanism for characterizing Plaintiffs as bigots based on race, religious, gender, sexual orientation and/or any other metric, and that this affected their "fairness, equal treatment, and integrity" of their police work, had its desired effect - - that being the extreme discipline of Plaintiffs, all distinguished career public servants, in the form of their

---

[8] See https://www.phila.gov/media/20201015091951/PAC-Report-A-review-of-the-PPDs-Response-to-the-Plain-View-Project.pdf, at its labeled "pg. 9", which is the 15th page of the document posted at the PAC webpage shown in this URL.

[9] The irony of these accusations and the inverted bigotry they actually represent will become apparent below.

discharge, whether by firing or forced retirement, by their employer, the City, who apparently

relied exclusively on the "evidence" provided by their co-defendant - to the exclusion of giving

any meaningful due process or opportunity to respond to Plaintiffs prior to taking this extreme

action. Incredibly, in their selection of officers to sanction or fire for social media behavior, the

City did not look to any of the numerous examples of Facebook and other social media posts by

non-white officers or officers of the Islamic faith, as will be shown.

22.    The earliest notification Plaintiffs are aware of about the "investigation" by the

Plain View Defendants came during the early months of 2019, when some of the Plaintiffs and

other police officers later publicly identified in the PV Database, received identical undated form

letters from Emily Hoerner and Rick Tulsky who identified themselves as "reporters" from the

Plain View Defendants, in the name of Injustice Watch, the full text of which is shown here (the

"Injustice Watch Letter"):

Dear ,

We are reporters at a Chicago-based newsroom called *Injustice Watch*.  For the past several months we
have been working with *The New York Times* studying the use of Facebook by officers, and have focused
attention on Philadelphia.

Several officers caught our attention both because of their posts as well as a documented history of civil
rights lawsuits that were settled by the city.

Your name came up in that connection, and we're eager to talk to you about your personal use of
Facebook as well as your thoughts about social media.

We can be reached by telephone: .

Thank you.

Emily Hoerner        Rick Tulsky

23.    Those of the Plaintiffs who received the Injustice Watch Letter and, upon

information and belief, other Philadelphia police officers who were subject to the PV Database,

reported receipt of the Injustice Watch Letter to their PPD supervisors and/or Fraternal Order of

Police, Lodge No. 5 (the "FOP") representatives who, uniformly told these officers not to respond to the letters.

24.     On June 1, 2019 the Plain View Defendants went *full aggressive*, on a national scale, when they published a story about the PV Database nationally in Buzzfeed,[10] that was quickly picked up and amplified in numerous publications, online and traditional, and announced on many webcasts, radio and television broadcasts, reaching many millions of Americans, instantly and repeatedly branding Plaintiffs and the other police officers shown in the PV Database as bigots of one sort or another, destroying their reputations and, in the case of Plaintiff's, their careers, without any due process or any fair and reasonable opportunity to respond.

25.     Thereafter, during the early part of June 2019, each of Plaintiffs, as will be addressed individually below, were removed from their usual posts within the PPD, had their firearms confiscated, were transferred to "administrative duty", and prohibited from taking police action on or off duty and/or carrying a firearm on or off duty until further notice (the "Administrative Restrictions"). These restrictions, particularly those directly impacting Plaintiffs' Second Amendment rights and the rights (and duty) of every citizen to protect themselves and others, are facially unconstitutional (under the United States and Pennsylvania constitutions).

26.     However, the Administrative Restrictions did not last very long, as the City was

---

[10] A known left-leaning infotainment source and, apparently, the central point of distribution of this "news", with an article headlined "Cops Across the U.S. Have Been Exposed Posting Racist and Violent Thinks On Facebook. Here's the Proof", authored by Emily Hoerner and Rick Tulsky, the same "reporters" from the Plain View Defendants that wrote the Injustice Watch Letter, can be found at: https://www.buzzfeednews.com/article/emilyhoerner/police-facebook-racist-violent-posts-comments-philadelphia

able to complete its investigatory and disciplinary "processes" pertaining to the Plaintiffs, except for Hartzell (as will be explained below), by July 19, 2019, when they were served with written notices of Commissioner's Direct Action ("CDA"), including a Notice of Suspension Internal Affairs Division Suspension Form, informing them that they had been suspended for thirty (30) days, with "intent to Dismiss."

### The PPD Disciplinary Process

27.     From the outset of the public disclosure of the PV Database in Philadelphia, there has been a dichotomy between the City (Mayor and District Attorney in particular) and PPD leadership, with many mixed messages regarding the perceived severity of social media posts as offenses against PPD policy[11].

28.     Plaintiffs were all initially told, when they were approached by their immediate superiors in early June, not to be worried and that there wasn't a big problem, and certainly nothing that could cost them their jobs. They were all told that, at worst, they would receive short suspensions and some retraining on the use of social media.

29.     Subsequently, during the third week of July 2019, Plaintiffs were informed that after the Philadelphia Mayor James Kenney had intervened, the original determination of their PPD superiors, including then Commissioner of Police, Richard Ross, had been countermanded and they were going to be fired if they did not "voluntarily" resign or take retirement.

30.     The lack of any consistent standards and policies regarding the handling of violations of the PPD Social Media Directive or, worse, the discriminatory and bigoted application of this policy by the City to favor or disfavor officers based on their race and religion, can be shown in two ways herein; the first being by way of the City of Philadelphia Police Advisory Commission, a City

---

[11] See PPD Policy Directive 6.10. Social Media and Networking, attached hereto and made a part hereof as Exhibit 1 (the "PPD Social Media Directive").

agency, and the second by example of Facebook/social media posts by black and/or Islamic officers that neither made the PV Database nor caused their makers to receive any discipline, let alone firings.

**The City of Philadelphia Police Advisory Commission**

31.    The Philadelphia Police Advisory Commission ("PAC") is a City agency created in 1993 to provide civilian oversight of the PPD.[12] The mission of the the PPC is, in its own words:

> The Police Advisory Commission is the official civilian oversight agency of the City of Philadelphia for the Philadelphia Police Department. Our mission is to improve the relationship between the police department and the community, by representing the external point of view of the Philadelphia citizenry. *The Commission is reauthorized by Executive Order 2-17 to conduct investigations of individual citizen complaints of police misconduct, and/or studies of police department policies, procedures or practices*. Findings and recommendations made by the Commission are forwarded directly to the Mayor, the City Managing Director and the Police Commissioner for their review and appropriate action. As we enter 2017, the Commission is creating a framework to analyze, evaluate and systematically review officer-involved shootings, stop & frisk data, the police disciplinary system, recruitment, training and retention of personnel that informs the public, holds police accountable, and provides useful input for policy makers and law enforcement leadership.[13] (Emphasis supplied).

32.    As noted in the foregoing PAC mission statement, by way of Executive Order 2-17, Mayor Kenney reauthorized the Commission's role in the investigation of "citizen complaints of misconduct", and despite the apparent effort by the PPD to avoid the involvement of the PAC in the investigation of the complaints against the PPD officers identified in the PV Database, PAC undertook its own investigation of the PPD investigation, and the findings are startling admissions by one City agency, the PAC, about the complete breakdown of due process and equal protection under the law in another, the PPD.

33.    The PAC report dated August 21, 2020 and publicly released on October 14, 2020,

---

[12] See https://www.phila.gov/media/20180207164705/PAC-Annual-Report-2014-2016-Review1.pdf, at pp. 5 − 6.
[13] *Id*.

entitled <u>A Review of The Philadelphia Police Department's Response to The Plain View</u>

<u>Project</u>,[14] (the "PAC Report"), includes many admissions against interest by the City, of which

the following are notable examples (all italicized emphasis supplied):

> a.  "The PPD *developed a metric to decide whether an officer's unprotected content in the PVP database made them eligible for serious discipline*. Anyone holding the rank of *police officer was eligible for serious discipline if they had 10 or more posts*. Anyone holding a *supervisory rank was eligible for serious discipline if they had 5 or more posts*. In addition to this metric, the content of the posts and comments was also considered."[15]

This standard for discipline clearly <u>did not exist</u> prior to these enforcement proceedings against Plaintiffs and the other involved officers, so they could not have known they would someday be held to such an arbitrary metric for having their employment terminated. This, alone is a deprivation of their rights to equal protection under the law, as compared to their fellow officers identified in the PV Database, but who received lesser (or no) discipline because they had less than the heretofore secret number of "offending" posts, and as to those who were "lucky" enough not to have been included in the PV Database, despite equally offensive social media posts, as will be shown hereafter.

> b.  "**<u>Re-writing Discipline Charges After PBI Losses</u>**
> Only 7 PBI hearings occurred as of April 3, 2020. *All 7 of these hearings resulted in a not guilty finding*. After these initial PBI hearings, the PPD charging unit rewrote the charges for the remaining officers in order to make the charging language more specific to each case."[16]

This must be an example of "there, but for the grace of God" went the seven lucky officers who had their cases heard before the City developed their secret-sauce charging formula. In this instance, Plaintiffs' rights to equal protection under the law are violated where others, looked upon as having committed the same level of violations, were charged differently and received not only faster, but entirely different "justice". This is exacerbated by the ongoing fact that of the Plaintiffs in this matter, only one has had a PBI hearing as of the date hereof, a collective due process violation that even the COVID-19 event can no longer excuse.

> c.  "Serious Discipline for the Most Egregious Officers
> According to *information provided by high-ranking PPD officials, the most important factor in determining whether an officer was eligible for serious punishment (a 30-day suspension or dismissal) was the number of unprotected posts they made*. A senior PPD leader told the PAC that *the Chief Inspector called in to handle charging decisions related to the PVP database developed a numeric benchmark that was used to determine which officers were eligible for serious discipline*. A police officer became eligible for

---

[14] See fn. 8, a copy of which is also attached hereto as Exhibit 2.
[15] *Id.* at its pg. 6.
[16] *Id.* at its pg. 8.

serious punishment if they made 10 or more unprotected posts. A supervisor became eligible for serious punishment if they made 5 or more unprotected posts. *The same PPD leader noted that the number of unprotected posts was the most important factor in deciding discipline because the PPD disciplinary code section that refers to conduct unbecoming an officer requires that a course of conduct be demonstrated.*"[17]

This is more than a restatement of item (a), as it provides insight into just how arbitrary the 5/10-Post rule is. Besides being custom built for PV Database related discipline by the "Chief Inspector called in to handle charging decisions", we are given an insight into why an arbitrary standard was needed in the first place - - because the most serious charge of "*conduct unbecoming an officer requires that a course of conduct be demonstrated.*" We also learn about two other important distinctions, being (i) *that the number of unprotected posts was the most important factor in deciding discipline,* and (ii) how significant this arbitrary standard was to the PAC when the wrote this report.

This is an example of *ex post facto* creation of a legal standard that those subject to it could not have known of when they committed the acts for which they lost their jobs years later.

        d.      "When the PPD does not cooperate with Executive Order 2-17, the PAC has no authority to hold them accountable for their failure to do so. While the PAC continues to demand  access to documents and personnel, the outstanding questions about this scandal remain. The PAC is not able to provide a full accounting of the PPD's response to the PVP database without access to documents and personnel. Below are some aspects of the response that the PAC was able discern with limited access."[18]

The irony of this statement may also explain the overt candor of the PAC Report in disclosing the circus of newly invented and arbitrary rules and fumbled procedures, that were inconsistently applied to the officers subject to the PV Database and never applied to other officers, not subject to the PV Database, but for whom there is evidence of equally "offensive" (if there should be any offense at all) social media postings. It seems the PAC was, itself, upset with how it was treated by the PPD, a theme the Plaintiffs certainly identify with.

        e.      "***Investigation Oversight and Errors***
When the PPD eventually shared their discipline information with the PAC, reviews only raised more questions. For example, Officer Joseph Gillespie has 21 entries in the PVP database and received training and counseling, which is not discipline, while other officers had fewer posts, or similar posts, and received discipline. When asked about PO Gillespie's discipline, Deputy Commissioner Dennis Wilson replied that there were only 14 entries for PO Gillespie on the spreadsheet that was reviewed by Ballard Spahr, and only 1 of those posts was determined to be unprotected. Because PO Gillespie only had 1 unprotected post, he received training and counseling. Again, PO Gillespie has 21 posts in the PVP database, not only the 14 that were reviewed by Ballard Spahr."[19]

---

[17] *Id.* at its pg. 18.
[18] *Id.* at its pg. 20.
[19] *Id.* at its pg. 21. Note: The law firm of Ballard Spahr was retained by the City to review the PV Database and to make recommendations regarding the application of the First Amendment to the U.S.

This is a clear example of three essential items. First, Officer Gillespie had 21 offensive entries that made it into the PV Database, but somehow only 14 made it onto the "spreadsheet" that was reviewed by Ballard Spahr, of which they only found 1 to be "unprotected" by the First Amendment. It cannot go unnoticed that the Gillespie family has a long and storied history in the PPD and FOP Lodge 5, and Plaintiffs join the PAC in its polite questioning of the overall fairness of the City's disciplinary process, as follows:

> This is just *one small example*, and the PAC does not intend to analyze the discipline received by each individual officer. *However, this raises additional questions about the information that Ballard Spahr reviewed. Were there any other officers who did not receive a complete review by Ballard Spahr?* The PPD based their disciplinary decisions on the guidance they received from Ballard Spahr's review.[20]

> f.    "Further, in reviewing the PPD spreadsheets, the PAC found that the IAD spreadsheet had 343 names and the charging unit spreadsheet had 338 names. There were a few names listed in the PVP database that did not appear on either spreadsheet. There were 28 names that showed sustained findings at IAD, but no charges from the charging unit, and no indication on either spreadsheet as to why charges did not follow for these officers. An email exchange began in order to get answers regarding the PPD's process and the discrepancies present in the spreadsheets, but ultimately, the PPD referred the PAC to the Law Department for any additional information. The PAC is awaiting answers to these questions as of the date of this report."[21]

If we were not dealing with the reputations and livelihoods of Plaintiffs and the other officers identified in the PV Database, it would not be unreasonable to consider this comedy of errors the script for a comedy movie. All of the necessary theatrical elements are present, but we will restrain our focus to the ugliest indicators. The foregoing numerical discrepancies are *unacceptable* under any circumstances. The indications are, as implied by the PAC, that some officers are more equal than others, and got forgotten or other forms of favorable treatment that Plaintiffs did not. Even though the FOP, supposedly the representative of the subject police

---

Constitution to each of the posts of each of the PPD officers identified in the PV Database. A memorandum dated July 3, 2019, entitled "Analysis of Philadelphia Police Officers Identified in Plain View Database", resulted therefrom (the "Ballard Memo"). As noted by the PAC, the Ballard Memo was provided to the Fraternal Order of Police ("FOP"), the union that represents PPD officers. Plaintiffs are hereby disclosing that they have a copy of the Ballard Memo (although there appears to be an appendix or similar catalogue of exhibits related thereto that Plaintiffs do not possess), but will not rely on it in this complaint until a privilege determination is made by the court, even though the City clearly relied on the Ballard Memo in making its discipline decisions about Plaintiffs and other officers subject to the PV Database. It is Plaintiffs' position that if the Ballard Memo was ever subject to the attorney-client privilege, that privilege was waived first, when the memo was given to the FOP, and second, when the City took no affirmative steps to reclaim the memo after the letter referred to in the PAC Report at its pg. 21.

[20] *Id.* at its pg. 21.
[21] *Id.* at its pg. 21.

officers, including Plaintiffs, and the adversary of the PPD, somehow got the Ballard Memo (to the benefit of some, such as the lucky seven, but not all of the subject officers, such as Plaintiffs), the PAC, a sister agency of the PPD could not and was told it was subject to the "attorney client privilege". But, to make matters worse:

"*The PPD has declined to tell the PAC exactly how the Ballard Spahr document was shared with the FOP*. The PPD official who shared it may have done so without realizing it was inappropriate, or inadvertently, as the PPD maintains. *Or, they may have intended to make the Department's cases against the officers weaker by revealing PPD charging strategies*. The exact circumstances of this disclosure are beside the point, though, because *the appearance of impropriety remains. Context matters when mistakes occur, and fairly or not, people jump to conclusions and assume the worst*.[22] What is known is that the only officers who faced a PBI hearing for PVP content were found not guilty. If there is trust that the discipline process is legitimate from start to finish, these 7 not guilty verdicts are unfortunate[23] but acceptable. *However, the disclosure of the Ballard Spahr document to the FOP, paired with the questions that remain about how the Chief Inspector drafted charges, and the lack of oversight of the process in general, call the legitimacy of the process in question*.[24] The response to PVP database then begins to look like a continuation of the pattern that has led to recent public calls for increased accountability within the PPD."[25]

g.    All of this is capped by the following PAC disclosure:

"Perhaps most tellingly, almost a year after the PVP database went public, *a senior PPD leader* positioned over some of the units most responsible for the PPD's response *expressed his belief that the database was a political witch hunt meant to criticize only those officers who hold conservative political beliefs*.[26] Additionally, *another senior PPD leader told the PAC that the individual assigned to draft the charges for the officers named in the PVP database did not agree with punishing officers for their social media posts, and in some cases, fought hard to prevent certain officers with whom he had personal relationships from being disciplined*. This information came from a credible PPD insider, but the PAC recognized that this was a single source and that there was no other immediate corroboration to this claim. *The PAC intended to interview the individual who made charging decisions to get their perspective on this claim. This individual declined to be interviewed by the PAC, and the PPD did not permit the PAC to compel an interview with him*."[27]

---

[22] Perhaps like the "conclusions", before any due process, reached about Plaintiffs and the other officers involved in the PV Database, that resulted in their firings or other discipline?

[23] The PAC also appears to have taken sides against Plaintiffs and even those of the involved officers who have been "cleared." That makes the PAC Report all the more interesting under these circumstances.

[24] Plaintiffs agree, which is one of the reasons why they are bringing this action.

[25] *Id.* at its pg. 21.

[26] Once again, Plaintiffs agree, and this will be borne out by the examples of unpunished posts of equal "merit" from officers not included in the PV Database who also were clearly not making "conservative" comments in their equally "offensive" social media posts.

[27] *Id.* at its pg. 22.

Based on this series of admissions alone, Plaintiffs should be granted the relief requested in this suit. Although it is clear that the PAC is no friend to Plaintiffs' cause, *per se*, their constrained outrage at the conduct of the City and their fellow agency thereof, the PPD, is apparent from the foregoing excerpts from the PAC Report, which demonstrates the complete failure of due process and equal protection in this matter. It also substantiates Plaintiffs' claims of racial and religious bias *against them*, while permitting identical conduct from black and/or Islamic officers towards white and/or non-Islamic people, examples of which will be shown in the next section hereof.

### Examples of Reverse Racial and Religious Discrimination

34.     Plaintiffs and their counsel believe that all people are equal in their humanity and are entitled to all the rights obtained from their Creator thereby, as is so well expressed in the Declaration of Independence, the Constitution of the United States and the Constitution of Pennsylvania. Race, religion, gender and sexual orientation should *never* be a reason for unequal treatment under the law. In fact, no physical trait should *ever* be a basis for unequal treatment, unless and *only if* that trait makes the individual unqualified thereby, in the same way that the lack of a necessary skill or talent would make someone unqualified to perform a job. For example, someone who never learned how to fly should not be given a job as a pilot of an airliner (or any plane for that matter).

35.     Despite making fantastic strides from the founding of the United States towards realizing these uniquely American ideals, somehow, since the dawn of the Twenty-First century, we are stumbling backwards. Somehow, in a world where the pendulum of human behavior never seems to stay in a good zone, but seems to continually swing to extremes, we have come to a point where any perceived offense against "persons of color"[28] or those of previously discriminated religions are not only treated differently, but those very same people are permitted to discriminate against white-skinned and/or Christian people freely, as if it were some sort of

---

[28] We are all "persons of color" but this catchphrase is usually a shorthand for black and brown skinned people.

retribution or payback for the sins of the past. In other words, what we now have is reverse trait-based discrimination, but trait-based discrimination is DISCRIMINATION and is reprehensible, no matter which direction it is aimed.

36.    The below six Facebook posts from PPD Sergeant Derrick Lyles (a supervisory level officer), who explicitly identifies on Facebook as a PPD officer, are examples of racism against white people, combined with strong anti-conservative sentiments, with an anti-Christian bent as well for good measure. Sgt. Lyles was never punished by the PPD nor identified by the Plain View Project for these posts:



Jan 21, 2017  Saturday

White vs Black









This week a white man sent bombs to democrats; another white man shot and killed black patrons at Kroger; and another white man just killed 8 at a synagogue and 3 officers. We don't have a caravan problem. We have a white male domestic terrorism problem.

OCT 29 2018
Monday



OCT 21 2015
WEDNESDAY

22



37.     The following additional examples are directly excerpted from complaint filed before this court in the matter of *Fenico, et al., vs. City of Philadelphia,* USDC, EDPa, No. 20-cv-03336-PBT, which, for this purpose only, is incorporated herein:[29]

---

[29] Credit for this work is given to counsel for the Fenico plaintiffs, Larry L. Crain, Emily A. Castro, both of Crain Law Group, PLLC, and Jonathan J. Sobel, of Law Offices of Jonathan J. Sobel.

314. Kathy Caswell is an officer in the 12th District. Unlike the Plaintiffs, Officer Caswell identifies herself on her personal Facebook Page as an employee of the City of Philadelphia Police Department. Officer Caswell posted a very controversial Facebook post utilizing extremely foul, racist and inflammatory language, yet Officer Caswell was never punished by the Police Department for her publication of this post; nor was she singled out by the Plain View Project for this or any other Facebook posting.



24



**Kathy Caswell**

Yesterday at 6:52 PM · YouTube · 🌐

Fuck them racist ass crackers...we are doing more and better as a race then you guys. Excuse the language but that kind of stuff goes up my ass!



YOUTUBE.COM
**RACIST #TIKTOK MADE BY COUPLE**
Stephanie Freeman and Jeffrey Hume, senio...

 8                    6 Comments · 1 Share

315. Michelle Dennard is a police officer with the City of Philadelphia Police Department. Unlike the Plaintiffs, Ms. Dennard identifies herself as a member of the City of Philadelphia Police Department on her Facebook page.

316. The following is a copy of a Facebook post by Officer Dennard in which she engages in blatantly racist commentary:



317. Officer Dennard was never punished by the Police Department for her publication of this post; nor was she singled out by the Plain View Project for this or any other Facebook posting.

318. Glenn Holmes is an officer in the 9th District of the City of Philadelphia. Officer Holmes has posted in excess of 100 Facebook postings including the examples below, of

controversial, racially charged and inappropriate Facebook Posts. However, Glenn Holmes was not disciplined or reprimanded for his posts; nor was he ever flagged by Plain View project.



319. Lt. Jonathan Josey is an officer with the Philadelphia Police Department. The following is an example of a Facebook post by Lt. Josey. Plaintiffs allege that Lt. Josey has not been subjected to any form of discipline for his post or cited with any violation of Police Directive 6.01.



38.    These examples are not provided to bring trouble to the posters of this material, as they, like Plaintiffs, deserve the benefit of the doubt, due process and equal protection under the law; but, rather, to highlight the unequal treatment received by Plaintiffs at the hands of the City, its PPD and the Plain View Defendants who "inspired", and conspired with, the City in causing the termination of certain people based on their exercise of free speech, but not others, by selectively crying "I'm offended" where the offending material derived from white-skinned and/or Christian police officers only.

39.    Using the arbitrary and capricious standards applied to Plaintiffs in this matter, one of the best advocates for the equal treatment of all people and someone who greatly contributed to the dissipation of trait-based discrimination in the United States, Don Rickles,

would have gotten a life sentence for his humor and satirical attacks on these very matters. Fortunately for Mr. Rickles, he did not work for the City during his career, lest he be "mis-taken" for a bigot instead of a comedian shedding light on some of the more troubling aspects of our collective history as a nation.[30] Something our country has done more than any other nation in history to overcome. There is simply no other country where so many ethnicities, religions and lifestyles come together so equally and harmoniously as we in the United States do. Perfect, no, and nowhere near that - - but we were far down the right-track and doing really good before allowing ourselves to be reversed back into depths of trait-based discrimination and its attendant bigotry.

40.    Were the Plaintiffs "joking" or "venting" or otherwise simply expressing themselves freely for any legitimate or no reason at all in what they thought was a private medium? As of the date of this complaint, this has never been established because they have not been given due process and, worse, equal protection under the law.

41.    Were the Plaintiffs' expectations of privacy violated by the PV Defendants and, thereafter, the City?  As of the date of this complaint, this has never been established because they have not been given due process and, worse, equal protection under the law.

42.    Instead, from the outset, the worst possible interpretations were put on the Plaintiffs' Facebook postings, first by the Plain View Defendants and then, sequentially, by the City through the PPD and the PAC, all of whom just decided the Plaintiffs were serial bigots because they perceived them that way. Based on that, these people were publicly disgraced and

---

[30] This is not meant to imply the Plaintiffs were professional "comedians" regarding the allegedly offending Facebook posts contained in the PV Database, but they are entitled to engage in satire, nonetheless, especially when they think they are in "private". At a minimum they should have received clear training by the PPD and been made aware of what kind (and quantity) of social media posts would result in dismissal or other punishment long before what transpired in this matter. They were not.

summarily discharged from their careers, all without being provided a hearing or anything resembling due process beforehand.[31]

43.    The so-called information about and statements by the Plaintiffs and the similarly situated police officers, did not provide any basis for firing, constructively firing, and/ or disciplining them and other similarly situated PPD officers.

44.    The Government Defendant and Plain View Defendants, acting in concert as a conspiracy, did not just violate the privacy of but also misrepresented what the Plaintiffs had said and communicated and what the Plaintiffs believe, all in deprivation of their rights to free speech and equal protection under the law, resulting in their firings.

45.    The actions of the Defendants violated the civil rights of the Plaintiffs under 42 U.S.C. 1983, *et seq.,* out of intentional racial, religious, and ethnic based discrimination against Plaintiffs. Defendants violated Plaintiffs' civil rights under the U.S. and Pennsylvania constitutions.

46.     The actions of the Defendants violated the civil rights of the Plaintiffs under 42 U.S.C. 1983, *et seq.,* by denying their rights to free speech under the First Amendment, denying

---

[31] As of the date hereof, only plaintiff Farrelly has had an arbitration hearing, which was decided against him. The posts that were held against him are no worse than the posts by the non-disciplined officers shown above, except that the arbitrator does not appear to have known about them. It also appears that the arbitrator's finding against Farrelly was largely based on the opinion testimony of a senior PPD command officer and an "expert" who is a professor and an Islamic Chaplain for the PPD, who testified about his opinions on the "dehumanizing" nature of some of Farrelly's posts. Farrelly, himself, testified that he owned the Facebook account at issue, for which used a pseudonym and which he thought was limited as to who had access and was not meant for the public at large. He could not recall receiving any PPD training on the use of social media or the possible disciplinary ramifications that could arise therefrom, although he did acknowledge initialing the PPD Social Media Directive. He clearly stated that he considered his Facebook page "private." In the end, the "opinions" about what Farrelly meant, as expressed by the PPD command officer and the Chaplain, prevailed with the arbitrator over Farrelly's own statements, and his "conduct unbecoming" discharge was upheld. In comparison to the other posts that resulted in no action whatsoever against those officers by either the Plain View Defendants or the City, the justness of this finding seriously in question and as random as the entire process leading up to it was in all respects.

them the right to bear arms under the Second Amendment, and discriminating against them based on their race, religion and ethnicity.

47.    Furthermore, the hacked messages and communications, including those of the Plaintiffs, were provided to the news media creating a news campaign about "Facebook Cops.[32]"

48.    As *The New York Times* reported: "In Philadelphia, Commissioner Ross, who himself has since been forced to resign due to allegations of sexual harassment, said 72 officers had been assigned administrative duties while facing investigation for their social media posts, the largest single removal of officers from street duty that he could recall in his roughly 30-year career. He said some of the officers were likely to be fired, and many could be disciplined." [33]

49.    Defendant Ross, speaking for the City further stated that:

> ... the vast majority of Philadelphia officers performed admirably and would never engage in hateful speech. But he added, "We know that people have to feel a degree of comfort in who's in that police car behind you."
>
> He described the posts as disturbing, and said they tarnished his department's reputation. But he said that some of the posts were protected by the First Amendment. The city has hired a law firm to help determine which posts were acceptable speech and which were not, he said. Court rulings have permitted limited restrictions on the speech of public employees if it is potentially harmful.[34]

50.    The City, acting together in concert with the Plain View Defendants for political and other improper purposes, then released and continue to release private employment information of 309 Philadelphia police officers and others similarly situated, including civilian

---

[32] *See* Ryan Briggs and Max Marin, "Exclusive: Philly police release hundreds of disciplinary records for 'Facebook cops'," WHYY News, available at: https://whyy.org/articles/philly-police-release-hundreds-of-disciplinary-records-for-facebook-cops/.

[33]    Mitch Smith, "72 Philadelphia Officers Benched After Offensive Social Media Posts," *New York Times,* June 20, 2019, Accessible at: https://www.nytimes.com/2019/06/20/us/philly-cops-plain-view-project.html.

[34] *Id.*

complaints against the police officers. Plaintiffs' private employment information was among

that which was improperly released, recklessly endangering the lives of the Plaintiffs and their

families and thus intentionally causing great emotional distress and adverse physical pain and

symptoms.

51.     Civilian complaints are normally not disclosed unless they are determined to be

factually and legally well founded. This was not the case with Plaintiffs.

52.     Indeed, "Capt. Sekou Kinebrew, spokesman for the PPD, said the latest release of

disciplinary records is the largest such disclosure in departmental history.[35]"

53.     WHYY reports "[T]hey show that 153 of the officers who appeared in the

Facebook database, compiled by a group called the Plain View, accrued at least one civilian

complaint since 2015[36]."

54.     And WHYY reports: "However, 160 other officers named in the Facebook

database had not received any civilian complaints at all.[37]"

55.     The City, working under color of state law, in concert and continuing to be

working in concert with the Plain View Defendants, denied and continue to deny the Plaintiffs

anything resembling due process of law.

56.     Ironically, and in stark contrast to the treatment meted out to Plaintiffs, one of the

City's own Assistant District Attorneys, Sonam Vachhani, maliciously and despicably posted to

her Instagram account a picture of graffiti that read, "FUCK THE COPS," but has faced no

---

[35] *Id.*
[36] *Id.*
[37] *Id.*

discipline.[38]

57.     The combined actions of the Defendants as pled herein constitute racism and are unlawful discrimination against the Plaintiffs, which discrimination and other illegal and tortious acts continue and are becoming more severe and damaging with each passing day.

58.     The Defendants have treated the Plaintiffs and those similarly situate police officers who are members of the Targeted Class, as politically expedient scapegoats and thus expendable to suit their political and other illegal objectives and despicable tyrannical ends.

**Facts Specific to The Individual Plaintiffs**

**Michael Melvin**

59.     Michael Melvin, is a third generation Philadelphia Police officer, having been appointed to the Philadelphia Police Academy on June 26, 1995, and reaching the rank of Sergeant during January of 2012. Sgt. Melvin received numerous awards, commendations and decorations during his over 24 years of service with the PPD, including:

> Heroism: November 2009, when he was the first and only officer on scene of a three story apartment building fully engulfed in flames, and proceeded to evacuate as many residents as possible while other officers and fire dept were still enroute.

> Meritorious Awards: May 1997, observed and apprehended two males with guns who were robbing a third male that was carrying a baby; December 2000, apprehension of male that robbed a 7-11 point of gun; April 2011, apprehension of male that robbed a WAWA (also received a letter from Pa House of Representatives, signed by John Sabatina jr. for this arrest); and January 2012, sight stolen vehicle arrest.

> Officer of the month, December 1998, June 2002, April 2011.

> Commendatory Citations - November 1996, apprehending male that fired gun at police officer, January 1998, apprehension of two point of gun robbery suspects, January 2009,  apprehension of point of gun robbery suspect, April 2009, apprehension of robbery

---

[38] Ralph Cipriano, *Krasner ADA Posts 'F—k The Cops' on Instagram,* Big Trial, May 31, 2020, available at: https://www.bigtrial.net/2020/05/krasner-ada-posts-f-k-cops-on-instagram.html?m=1.

suspect;

Sgt. Melvin was also selected by the PPD and did complete special training known as POSIT, a course at Northwestern University in the supervision of Police personnel.

He also received various FOP awards for outstanding arrest, November 1996, June 1998 and March 2012.

60.     In the middle of January of 2019, Melvin received a copy of the Injustice Watch Letter at his residence, to which he did not respond A few weeks later he received a phone call at home from his Commanding Officer, Captain Thomas McLean, asking if he received a letter from Injustice Watch, to which he responded affirmatively. Capt. McLean then stated that Melvin was required to call Captain Kinnebrew at Police Headquarters in reference to the Injustice Watch Letter.

61.     Melvin called Capt. Kinnebrew shortly thereafter and was asked what the letter contained and asked if he spoke with anyone at Injustice Watch, to which Melvin replied that he never called or spoke to anyone there about the letter.

62.     Thereafter, in March of 2019 Melvin received a notice to report to the Internal Affairs Division, where he was interviewed by Sgt. Joanne Garvey. This meeting was also attended by an attorney named Nick Pinto who represented the FOP. Sgt. Garvey read out loud two or three sentences and asked if Melvin made that statement on his Facebook page in March of 2016. He responded that "[N]o, I don't remember saying that, but if it's on my Facebook page then it's mine I own it, you're not showing me anything you're just saying some sentences and asking if I remember two or three sentences from three years ago so no I don't know." FOP attorney Pinto reviewed my questions and answers and said everything looked fine and my interview was concluded after that.

63.     Then on June 5th, 2019, Melvin was contacted at home by Capt. McLean and was

ordered to surrender his city issued service weapon. Upon surrender of his weapon, Capt

McLean asked me if he owned a private firearm, to which Melvin responded, "[Y]es I have an

off-duty weapon that I carry." Capt. McLean then told him that he is not allowed to carry a

private weapon any longer while in off-duty status as well as on-duty during his period of

administrative restrictions. This was followed by instructions to Melvin during the last week of

June 2019, to attend a "social media update class" at the police academy for one day. Upon his

arrival there were 71 other officers assigned to the class that day.

64.    The following week, Melvin was instructed to and did attend a second interview

at IAD with Sgt. Garvey, at which FOP attorney Pinto was also present.

65.     Thereafter, while assigned to working at a desk one night during the week of July

8th, Melvin stepped out to use the men's room, and, upon returning to his desk there was a piece

of paper with a picture that looked exactly like a city of Philadelphia work email page. The email

chain appeared to be from Capt. McLean's city account. One email was titled with Melvin's

name and a second email was titled in the name of P/O Anthony Acquaviva, and both emails said

Commissioner Richard Ross decided that discipline for the facebook post was to be "command

level discipline but 3-5 day suspension is recommended". Melvin does not know who placed this

email at his desk.

66.    Notwithstanding this, on Wednesday July 17th, 2019, Melvin received a phone

call at home from Steve Weiler of the FOP stating that on Friday, July 19th, 2019, he was "being

given 30 days suspension with the intent to dismiss over the facebook investigation".

67.    On Friday July 19th, 2019, Melvin appeared at Internal Affairs Division with all

of his City issued equipment and was instructed to sign all of his termination paperwork by Capt.

Vogt. He asked Capt. Vogt "can you tell me exactly what I am being fired for, not one single

person told me yet." Capt. Vogt stated that he did not know.

68.     After speaking with his wife over the weekend, Melvin decided the only thing to do, to continue to provide income for the family, was for him to go to police headquarters on Monday July 22, 2019, and immediately retire. Melvin did not want to retire at that time but was forced to do so, or risk losing all of his accrued retirement benefits over 24 years if he tried to fight for his job and lost.

**Daniel Farrelly**

69.     Daniel Farrelly was a Philadelphia police officer for seventeen years at the time he was summarily discharged on July 19, 2019.

70.     In his 17 years of service to the department, Farrelly received 9 commendations, 3 FOP awards, and 5 Officer of the month awards. Farrelly was trusted by his commanders and fellow officers and tasked numerous times to complete difficult assignments and to help train new officers.

71.     Officer Farrelly has been falsely accused of being a racist, despite working perfectly well with all races throughout his career. In fact, Farrelly was partnered with a black officer for 3 years until that officer retired, and they continue to be great friends.

72.     In or around mid May of 2019 , Farrelly was made aware of The Plain View Project, and that some of his Facebook posts made it onto their data base . When he initially saw the posts that made it to their site, he was not at all concerned because he believed that nothing he posted was intended to be racist, homophobic, Islamophobic or violent, but only humorous and edgy. He also believed his posts were private and they were not intended for the public, for the very reason that they could be misinterpreted.

73.     On June 5th , 2019, Farrelly worked the 7am-3pm tour of duty. Later that day, and

while at the his young son's baseball game. he received a phone call from the 9th district operations room officer who stated that Farrelly needed to come back to the 9th district and meet with the captain to turn in his firearm because he was being placed on restricted duty while the Department did an investigation .

74.     On or about July 16th, 2019, Farrelly was in court when he received a phone call from his sergeant who informed him that he was needed at police headquarters immediately. When he arrived, Farrelly was notified that he was being terminated by his captain .

75.     The FOP president was adamant that they would fight these allegations vigorously through the arbitration process, and in late September 2019, Farrelly was informed by FOP vice president John McGrody that his arbitration date was set for Aril 3rd 2020, and that he would be the first of the 15 officers who were fired to have his case heard.

76.     However, about 2 weeks prior to that date, Farrelly was informed that that date was postponed due to the Covid crisis. His new date was set for July 14th 2020, but the hearing took place with the City refusing to attend in person, so they proceed via Zoom conference as to the City. The hearing lasted 3 full days over July 14th, July 22nd and August 14th, 2020 right in the heart of the rioting that began after the George Floyd killing, when anti-police sentiment throughout the country was at the highest pitch ever.

77.     December 18th, 2020, Farrelly was notified by FOP vice president McGrody that the arbitrator sided with the city and that he lost his battle to keep his job and, along with it his reputation and 17 years' worth of hard work and dedication.

78.     Farrelly describes the damage that this experience has done to his reputation as being irreversible due to all the press that the story has received and his named being linked to racism and other bigotry if anyone should google it. The stress and financial burden this

experience has put his family through will never be repaired.

**Brion Milligan**

79.    Brion Milligan was a distinguished PPD officer during his entire career with the City. That is until Saturday June 1, 2019. when  received a phone call at home from Sgt. Pete Singer.

80.    Sgt. Singer informed Milligan that a news article came out about a Facebook investigation into hundreds of cops across eight US cities, Philadelphia being one of them. He told Milligan that he wanted to give him a "heads-up" because Milligan's name and a lot of his posts were on a database set up by a group called the Plain View Project.

81.    On Wednesday June 5, Milligan received a phone call at home from his Lieutenant, Dave Marnien, who informed Milligan that when he arrived at work that night, the Lieutenant will be taking his city issued firearm and he will be placed on desk duty until further notice.

82.    When Milligan arrived to work that night at the 7th police district, Lt. Marnien took his City issued firearm and also informed him that he was not even allowed to carry my private firearm off duty.

83.    Milligan was then sent to a social media awareness class at a later date, and was also sent to EAP where he spoke to Officer Kelly Hopkins, a total waste of time for both of us.

84.    He was also interviewed by the PPD Internal Affairs Division, where he was asked 3 questions: 1. Are these your posts on FB as provided by the Plain View Project? 2. Did you post them off duty? 3. Do you have any other social media accounts?

85.    At no time did Internal Affairs ask Milligan about the contents of these posts. He was only told to sign each page of the IAD documents put in front of him (appx 85 Facebook

posts).

86.     During the afternoon of Wednesday July 17, 2019, Milligan received text messages from Scott Bradley of the FOP, and another from my Captain, Rob Ritchie. Both asked him to call them ASAP. He called Bradley first, and was informed Milligan and 13 other Philly cops are getting fired on Friday, June 19, 2019. Bradley also said that "I'm sorry to inform you you're one of them." Bradley asked Milligan to attend a meeting at the FOP the next day, June 18, where he and the other officers there were instructed to show up at Internal Affairs on Friday morning, July 19, 2019, to turn in our equipment & sign our termination paperwork.

87.     The FOP informed all of them that arbitration takes 6 months to 2 years and we (the FOP) have an over 90% success rate in getting cops their jobs back. At the time of this narrative, Milligan is aware of only 2 arbitrations that have been complete in almost 2 years since the firings.

88.     In the meantime, Milligan's reputation and ability to earn an income have been severely damaged.

**Mark Palma**

89.     Sergeant Mark Palma is a thirty-year veteran of the PPD, with, until this incident, no negative disciplinary actions on his record. He did, however, have,  a Bravery Commendation, 16 Merit Commendations, 6 Commendatory Citations and 6 Fraternal Order of Police awards to his credit.

90.     During January of 2019, Palma received a letter a copy of the Injustice Watch Letter at his home.  He did not speak with them.

91.     Several weeks after receiving the letter, Palma received a phone call at work from Captain Kinabrew who worked for Commissioner Rich Ross. He was asked if I he had spoken to

Injustice Watch, to which he said no. The captain then replied that the commissioner is going to initiate an internal investigation in reference to the letter.

92.     During March of 2019 Palma was ordered to appear at Internal Affairs to be interviewed by Sergeant Garvey. Also in attendance was FOP attorney Nick Pinto. Palma was asked several questions about his Facebook posts, and the FOP attorney looked over his answers and said everything is ok.

93.     Then, on June 5th, 2019, Palma received a call from his commanding officer, Captain Massaque of the crime scene unit, and told to surrender his service weapon and that he was being reassigned to the Police Department Auto Pound.  Palma was also prohibited from taking any police action and I was not allowed to carry even a personal firearm while off duty.

94.     On June 6th, 2019, Palma was ordered to go to the Police Department Employee Assistance Program.  This program helps you cope with stress and any other problems you may be having. That same month he was ordered to attended social media training at the police academy.

95.     Then, on July 12, 2019, Palma received a phone call from FOP Vice President McGrody, where he was told that he was being given a 30 day suspension with the intent to Dismiss because of the Facebook investigation.

96.     He was the instructed to appear at IAD on August 5th, 2019, to sign his termination paperwork (75-18) and to hand in all my departmental equipment.   Then, rather than risk losing his pension and other contractual benefits earned over his thirty-year police career, Sgt. Palma involuntarily "retired" on August 6th, 2019.

**Robert Bannan**

97.     Officer Robert Bannan began his law enforcement career with the City on April 8,

1985 as a Correctional Officer Recruit for the Philadelphia Prisons. While working in the prisons he took the police recruit test and in June 1989 and was notified to start the processing for the Philadelphia Police Academy.

98.    However, during the last week of June 1989, Bannan was hit in the face by an inmate and suffered facial injuries that required surgery. Surgery was on July 5,1989, but by the end of August 1989 he was able to continue processing for the police academy and was notified to officially start the academy on September 11, 1989, where he graduated on February 2,1990.

99.    After a series of successful duty assignments with the PPD, Bannan was shot in the abdomen while on duty on May 3,1991, when he and his partner responded to a robbery at a restaurant located at City Ave & Presidential Blvd. Despite being seriously wounded, Bannon was able to return fire striking the robber in his legs enabling him to be arrested.

100.    The bullet is still inside of Officer Bannan, for which he received both a Valor commendation related to the shooting and a Bravery commendation making an arrest of a gunman while under fire.

101.    During November of 1990 Bannan returned to duty and was transferred to the Anti-Crime Team (ACT), a plain clothes unit that worked city wide in high crime areas. During his time in the ACT, Bannan received several official Merit commendations, mostly for making "sight" arrests for robberies and burglaries.

102.    In 1996 Bannan transferred to Highway Patrol, where he performed many special assignment motorcycle escorts of dignitaries such as U.S. presidents, hero funerals and other similar events.

103.    Bannan's distinguished service continued until late 2018 when he first heard about the Plainview Project and that many police officers across the country were being labeled

as having possible racist online posts, including some in the PPD. Bannan did not believe he was was posting anything that was offensive and in strove to delete any post that someone left on his "wall" that he thought could be offensive.

104.    On June 1, 2019, Bannan learned that the Plain View Project released its list of what they claimed to be possible racist Facebook posts and I was shocked to find out he was listed in the Plain View Project's release. Then, on June 5, 2019 Sgt. Andy Skaziac form Traffic came to Bannan's home and issued him a notice that he was being placed on restricted duty, even though he was already in IOD status, and also relieved him of my duty weapon and taser.

105.    On June 10, 2019 Bannan attended an Employee Assistance Program meeting as ordered, and on June l8, 2019 he had an interview at IAD in regard to the Facebook postings that the Plain View Project had made public. Bannan was informed by the IAB investigator, unknown at this time, that he was not investigating Bannan's posts, but he was merely obtaining information as to whether or not the listed postings were made by Bannan.

106.    Bannan was informed that after the IAD interview that the entire file would be handed off to a law firm and that the law firm would be investigating the posts and making the decision if any violations of any PPD policy occurred.

107.    This was followed, on July 17, 2019, by Bannon being called by phone at home by Lt. Vida Lark from the Traffic District to inform him that he was being placed on 30 days suspension with intent to dismiss, and that he was to turn himself into IAD on July 19, 2019 to be served with suspension papers and to turn in my city owned equipment.

108.    On July 18 I attended a meeting with FOP Lodge 5 officials at FOP headquarters and, on August 19, 2019 Bannan went to police personnel office and retired under duress. He states that he felt I had no choice but to retire. If he did not retire, then he would lose his pension

and medical benefits. His wife is not well and suffers from several medical problems and he had to maintain medical coverage for her.

## Jose Cruz

109. Jesus Cruz was appointed to the police academy on 10/22/1989 and was forced to resign on 07/19/2019 due to the Plain View Project activities.

110. During his almost 30 years of service, Cruz received numerous accommodations from sight homicide, robbery and arson arrests and distance determination by the way of gunshot residue which his findings concluded with a guilty verdict for the defendant (murder charges) .

111. In almost 30 years Cruz has been an exemplary officer and has never been disciplined for any departmental violations, nor did he receive any civilian complaints against him. Cruz believes it was unfair to force him to retire for one "infraction," without any advance warning that this could be construed as an infraction, in 30 years.

## Steven Hartzell

112. Steven Hartzell has worked his entire adult career, spanning over 25 years for the PPD. As a result of the Plain View Project conduct described above, he too was forced to retire under duress on September 6,2019.

113. However, unlike the other Plaintiffs, Hartzell was reinstated to full duty after he was first placed on restricted duty because of the Plain View Project conduct, only to be taken out of service a second time after being led to believe he had been cleared.

## Joseph Fox

114. First appointed to the PPD Academy on March 26, 1990, Officer Fox served a distinguished career until the Plain View Project conduct described above forced him to retire under duress on or after July 19, 2019.

115.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth in each of the following counts.

**V.      CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
*Deprivation of Civil Rights – U.S. Constitution, First Amendment*
*(42 U.S.C. §1983)*
*Plaintiffs vs. Defendants*

116.    The Government Defendant's decision to fire, directly and/or constructively, each of the Plaintiffs, as aforesaid, and to take the other adversary actions described herein against the Plaintiffs was retaliatory in nature and based, in whole or in part, on their personal exercise of their protected free speech activity on matters of inherent public concern.

117.    The Government Defendant's actions, as set forth herein, served to deprive the Plaintiffs of, and to infringe upon, their protected rights of free speech and freedom of expression as guaranteed by the First Amendment of the United States Constitution.

118.    The acts and omissions all of the Government Defendant, as alleged above, under color of state law for political, illegal and other improper purposes, deprived the Plaintiffs of their constitutional rights to equal protection under the law and due process guaranteed by the U.S. Constitution, as granted to them by the Fourteenth Amendment.

119.    Plaintiffs have been injured in their person, property or business by reason of acts committed by the Government Defendant, working together in concert with the Plain View Defendants, for political, illegal and other improper purposes, that involve racial, religious and ethnic based discrimination against the Plaintiffs in their employment and otherwise.

120.     The Government Defendant, for political, illegal and other improper purposes, under color of state law as part of a conspiracy with the Plain View Defendants, fraudulently using U.S. mail and wires, have caused plaintiffs to be injured in their persons, property, or

businesses, as well as reputations and physical and emotional states as pled herein, and these

Defendants are jointly and severally liable pursuant to 42 U.S.C. § 1983 for any and all damages

that plaintiffs have sustained as a result of such injuries.

**SECOND CAUSE OF ACTION**
***Deprivation of Civil Rights - U.S. Constitution, Fourteenth Amendment***
***(42 U.S.C. §1983)***
***Plaintiffs vs. Defendants***

121.    Plaintiffs repeat and re-allege each and every allegation of the foregoing Causes

of Action as if fully set forth herein.

122.    Plaintiffs allege that the following two specific provisions in the City of

Philadelphia Police Department Directive 6.01, are unconstitutionally vague and overbroad, as

applied to the Plaintiffs' exercise of their free speech activity in this case:[39]

I.    Employees are prohibited from using ethnic slurs, profanity, personal insults; material that is harassing, defamatory, fraudulent, or discriminatory, or other content or communications that would not be acceptable in a City workplace under City or agency policy or practice.

J.    Employees are prohibited from displaying sexually explicit images, cartoons, jokes, messages or other material that would be considered in violation of the City Policy Preventing Sexual Harassment in City Government.

123.    To the extent that any disciplinary measures were taken against the Plaintiffs

based on an alleged violation of Policy Directive 6.01(I) or 6.01(J), such action impermissibly

infringes on the Plaintiffs' freedom of speech and otherwise violates their constitutional right

under the Fourteenth Amendment due process clause.

124.    Policy Directive 6.01(I) and 6.01(J), as applied to the Plaintiffs' Facebook posts,

are unconstitutionally vague and overbroad and do not reasonably inform the Plaintiffs of the

type of speech activity that is proscribed.

---

[39] See Exhibit 1 hereto.

125.    In addition, the Defendant arbitrarily and capriciously applies a double standard in its enforcement of Policy Directive 6.01(I) and (J) based on the viewpoint being expressed, and oftentimes the race of the speaker.

126.    By way of example, each of the PPD officers whose Facebook/social media posts are exemplified in paragraphs 36 – 37 above, are racially black, some may be religiously Islamic and all have demonstrated hatred towards people who are racially white and people who are conservative politically. At least one, Sgt. Lyles, discriminated against people who are not religiously Islamic.

127.    Despite the foregoing, none of the PPD officers identified as the makers of the social media posts shown at paragraphs 36 – 37, are known to have been investigated by or to have received any discipline or other sanction from the PPD for this conduct, and, if they did, it was not made public.

### THIRD CAUSE OF ACTION
*Deprivation of Civil Rights – Second Amendment Right to Bear Arms*
*(42 U.S.C. §1983)*
*Plaintiffs vs. Government Defendant*

128.    Plaintiffs repeat and re-allege each and every allegation of the foregoing Causes

of Action as if fully set forth herein.

129.    By the acts and omissions all of the Government Defendant described above, for

political, illegal and other improper purposes as pled herein, deprived the Plaintiffs of their

constitutional rights to bear arms, guaranteed by the Second Amendment to the U.S.

Constitution, by ordering them not to possess and carry even their own personal firearms for

their personal protection, the protection of their property and/or the protection of the person or

property of others.

130.    This caused and continues to cause Plaintiffs to be exposed to violence and threats

of violence from ultra-leftist anarchists like ANTIFA and other radicals operating and

committing illegal acts under the false notion that Plaintiffs were racists, bigots, and/or

homophobes due to Defendants' gross misconduct.

131.    The Government Defendant, for political, illegal and other improper purposes

under color of state law, have caused Plaintiffs to be injured their persons, property, businesses,

employment rights, reputations, physical and emotional states as pled herein; and Defendants are

jointly and severally liable pursuant to 42  U.S.C. § 1983 for any and all damages that plaintiffs

have sustained as a result of such injuries

### FOURTH CAUSE OF ACTION
*Violation of Pennsylvania Constitution*
*Article I, Section 7*
*Plaintiffs vs. Defendants*

132.    Plaintiffs repeat and re-allege each and every allegation of the foregoing Causes

of Action as if fully set forth herein.

133.    Article I § 7 of the Constitution of the State of Pennsylvania provides as follows:

**Freedom of press and speech.**

c. The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. *The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject*, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

(Emphasis supplied).

134.    The Government Defendant's decision to fire the Plaintiffs and to take the other adversary and disciplinary actions described herein against each of the individual Plaintiffs was retaliatory in nature and based, in whole or in part, on their personal exercise of their protected free speech activity on a matter of inherent public concern.

135.    The Government Defendant's actions, as set forth herein, served to deprive the Plaintiffs of, and to infringe upon, their protected rights of freedom of expression as guaranteed by the Constitution of the State of Pennsylvania.

136.    The Government Defendant acted in concert and cooperation with the Plain View Defendants in the foregoing for political, illegal and other improper purposes,

**FIFTH CAUSE OF ACTION**
***Intentional Interference with Contractual Relation***
***Plaintiffs vs. The Plain View Defendants***

137.    Plaintiffs repeat and re-allege each and every allegation of the foregoing Causes

of Action as if fully set forth herein.

138.    By hacking and illegally and/or otherwise improperly taking Plaintiffs' private social media posts and improperly making them public without any privilege or legal justification, the Plain Vue Defendants are the proximate cause of the firing and all other disciplinary related proceedings against Plaintiffs by the City.

139.    The Plain View Defendants, at all times pertinent to the matters complained of herein, knew that Plaintiffs employment by the City was pursuant to a contract between them, by way of the FOP as Plaintiff's collective bargaining agent (the "Collective Bargaining Agreement").

140.    The Plain View Defendants were aware of the Collective Bargaining Agreement prior to causing the Plaintiffs' illegally and improperly obtained private social media posts contained in the PV Database to be widely publicized, including said defendants' false characterizations thereof.

141.    It is believed and therefore averred that the Plain View Defendants intended to interfere with the Collective Bargaining Agreement and Plaintiffs' jobs pursuant thereto by causing the Plaintiffs' illegally and improperly obtained private social media posts contained in the PV Database to be widely publicized, including said defendants' false characterizations thereof.

142.    The Plain View Defendants intended to cause the Plaintiffs to be publicly humiliated and to be fired or otherwise disciplined, constituting said defendants' intentional interference with the Collective Bargaining Agreement, so as to harm Plaintiffs economically and as otherwise enumerated hereinabove, which harm said defendants did successfully bring about.

143.    Plaintiffs' private social media posts are not of any legitimate public concern.

## PRAYER FOR RELIEF

### General Relief

1.    Plaintiffs demand that judgment be entered against all Defendants, jointly and severally, for compensatory and actual damages because of their inflicted demonstrable financial, physical and emotional, reputational injury to Plaintiffs, punitive damages because of Defendants' callous and reckless indifference to and violation of the Plaintiffs' rights under the Constitution of the United States, Constitution of Pennsylvania, Philadelphia Home Rule Charter, all statutes and ordinances deriving therefrom and common law related thereto, or otherwise relevant hereto, including without limitation all such constitutional rights to free speech, religion, expression, association, the right to bear arms, equal protection, privacy and all other civil rights, giving rise to a jury verdict and judgment for damages in excess of $2,000,000 USD per Plaintiff, to be trebled where appropriate, and such other relief the Court may deem just and proper, including equitable relief, and an award of attorney's and costs.

### Declaratory Judgment

2.    As to the Governmental Defendant, an actual controversy exists between the parties as to whether the Governmental Defendant's policies, practices and customs with regard to the restrictions placed its employee's free speech activity as expressed on the employee's personal social media are enforced in an arbitrary manner and therefore violate the Plaintiffs' constitutional rights. Plaintiffs respectfully request a declaratory judgment that the actions of the City of Philadelphia, Pennsylvania violated the federal and state constitutional rights of the Plaintiffs to freely exercise their freedom of speech.

**Nominal Damages**

3.      Plaintiffs seek an order awarding nominal damages for the Defendants' concerted violation of their federal and state constitutional rights.

**Compensatory Damages**

4.      Plaintiffs each individually seek an order awarding compensatory damages to them for the Defendant's violation of their federal and state constitutional rights in the amount of their actual losses incurred through the loss of wages, fringe benefits and retirement and all other benefits under the Collective Bargaining Agreement, estimated to at least $2,000,000 each.

**Equitable Relief**

5.      As against the Government Defendant, each Plaintiff demands an injunctive order whereby their jobs will be reinstated with full repayment of all lost wages and the value of all fringe benefits, retirement contributions and such other benefits as are provided for by the Collective Bargaining Agreement.

## JURY DEMAND

Plaintiffs respectfully demand a jury trial on all issues so triable.


Dated: July 19, 2021                                  Respectfully submitted,

Larry Klayman, Esq.
General Counsel
AMERICA'S SHERIFF, INC.
7050 W. Palmetto Park Road
Boca Raton, Florida 33433-3426
Tel: (561) 558-5336
Email: leklayman@gmail.com

*Pro Hac Vice Motion to be Filed*

*/s/ Andrew Teitelman*
Andrew Teitelman, Esq.
PA ID No. 43545
380 Red Lion Rd Ste 103
Huntingdon Valley, PA, 19006
Tel: 267-255-6864
Fax: 215-434-7491
Email: ateitelman@teitelaw.com

*Counsel for Plaintiffs*