## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MICHAEL MELVIN, DANIEL FARRELLY, BRION MILLIGAN, MARK PALMA, ROBERT BANNAN, JESUS CRUZ, STEVEN HARTZELL, and JOSEPH FOX, ) | |
| Plaintiffs, ) | Civil Action No. 2:21-cv-3209 |
| v. ) | Judge Petrese B. Tucker |
| THE CITY OF PHILADELPHIA, ) | |
| and ) | |
| INJUSTICE WATCH NFP, d/b/a THE PLAIN VIEW PROJECT ) | |
| Defendants. ) | |

### ORDER DENYING DEFENDANT'S, CITY OF PHILADELPHIA
### MOTIONS TO DISMISS PLAINTIFFS' COMPLAINT

AND NOW, this _____ day of _____, 2021, upon consideration of

Defendant's, City of Philadelphia, Motion to Plaintiffs' Complaint for failure to state a claim

upon which relief can be granted and any Plaintiffs' response thereto, it is HEREBY ORDERED

that said Motion is DENIED.

BY THE COURT:

_____

Hon. Petrese B. Tucker
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Michael Melvin, *et al*

                     **Plaintiffs,**

     v.

City of Philadelphia, *et al*

                     **Defendants.**

Civil Action No.  21-03209

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S, CITY OF PHILADELPHIA, MOTION TO DISMISS


Dated: November 1, 2021

Respectfully submitted,

*/s/ Andrew Teitelman*
Andrew Teitelman, Esq.
380 Red Lion Rd Ste 103
Huntingdon Valley, PA, 19006
Bar No: 43545
Tel: 267-255-6864
Email: ateitelman@teitelaw.com

*Counsel for Plaintiffs*

Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton FL 33433
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
Email: leklayman@gmail.com

*Pro Hac Vice*

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................... 1

II.  STATEMENT OF FACTS ....................................................... 2

Examples of Equivalent Social Medial Conduct not Acted Upon by
Defendants ........................................................................... 3

III.  LEGAL STANDARD ............................................................ 17

IV.  LEGAL ARGUMENT ........................................................... 18

A.  PLAINTIFFS HAVE PROPERLY ALLEGED THEIR CAUSES
OF ACTION FOR DEPRIVATION OF CIVIL RIGHTS
PURSUANT TO THE UNITED STATES CONSTITUTION,
FIRST AND FOURTEENTH AMENDMENTS AND
UNDER 42 U.S.C. § 1983 ............................................ 18

1.  The Plaintiff's Posts Were Made as Private Citizens and
Address Issues of Public Concern ................................. 22

2.  None of the Individual Plaintiffs' Speech Activity
Resulted in Disruption ................................................. 23

a.  The absence of any temporal nexus between the Plaintiffs'
Facebook posts and the City's claimed disturbance
is a fact issue in the *Pickering* analysis ..................................... 24

B.  PLAINTIFFS MAY PROCEED ON CLAIMS SEEKING
DECLARATORY AND INJUNCTIVE RELIEVE UNDER
THE PENNSYLVANIA CONSTITUTION ......................................... 27

C.  THE PLAINTIFFS STATE A CLAIM FOR VIOLATION OF T
HEIR RIGHTS UNDER THE FOURTEENTH AMENDMENT ........ 28

V.  CONCLUSION ......................................................... 31

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Armstrong v. City of Dallas,*
 997 F.2d 62, 67 (5th Cir. 1993) ............................................................ 26

*Arnett v. Kennedy,*
 416 U.S. 134, 159, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) ................... 28

*Ashcroft v. Iqbal,*
 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) .......... 17

*Associated Builders & Contractors v. Cty. of Northampton*,
 376 F. Supp. 3d 476, 491-92 (E.D. Pa. 2019) .................................... 17

*Azzaro v. Cty. of Allegheny,*
 110 F.3d 968, 979 (3d Cir. 1997) ....................................................... 22

*Baloga v. Pittston Area Sch. Dist.*,
 927 F.3d 742, 756 (3d Cir. 2019) ....................................................... 24

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) .......... 17

*Bistrian v. Levi,*
 *696 F.3d 352, 365 (3d Cir. 2012)* ....................................................... 18

*Brown v. Leflore Cty., Mississippi*,
 150 F. Supp. 3d 753, 767–68 (N.D. Miss. 2015) ................................ 26

*Castorina ex rel. Rewt v. Madison County School Board*,
 246 F.3d 536 (6th Cir.2001) ............................................................... 21

*Connally v. Gen. Const. Co.,*
 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed.322 (1926) ........................ 28

*Connick v. Meyers,*
 461 U.S. 138, 147–48 (1983) ............................................................... 18, 19, 20,
                            21, 22, 23,
                            24, 25

*Cook v. New Castle Area Sch. Dist.,*
 No. CIV.A. 08-0089, 2008 WL 5263705, at *8 (W.D. Pa. Dec. 16, 2008) ........... 20

*Coover v. Saucon Valley Sch. Dist.,*
955 F. Supp. 392, 401 (E.D. Pa. 1997) ............................................................. 29

*Czurlanis v. Albanese,*
721 F.2d 98 (3d Cir. 1983) .................................................................. 18

*Derek Isaac v. Marsh,*
2020 WL 6504637, at *5 (M.D. Pa. Nov. 5, 2020) ............................... 27

*Evans–Marshall v. Bd. of Educ.,*
428 F.3d 223, 239 (6th Cir.2005) ........................................................ 26

*F.C.C. v. Fox Television Stations, Inc.,*
567 U.S. 239, 132 S.Ct. 2307, 2317, 183 L.Ed.2d 234 (2012) ............................ 28

*Feldman v. Philadelphia Housing Authority,*
43 F.3d 823, 830 (3rd Cir. 1994) ........................................................ 24

*Frazier v. City of Philadelphia,*
441 F.Supp.3d 76, 87 (E.D. 2020) ........................................................ 22

*Frederick v. Morse,*
439 F.3d 1114, 1121 (9th Cir. 2006) ..................................................... 21

*Gentile v. State Bar of Nevada,*
501 U.S. 1030, 1048, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) ......................... 29, 30

*Givhan v. Western Line Consolidated School Dist.,*
439 U.S. 410, 415 n. 4 (1979) ............................................................ 23

*Grayned v. City of Rockford,*
408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) .................................. 29

*Green v. Phila. Hous. Auth.,*
105 F.3d , 105 F.3d 882, 885 (3rd Cir. 1997) ........................................... 20

*Guiles ex rel. Guiles v. Marineau,*
461 F.3d 320, 329 (2nd Cir. 2006) ....................................................... 21

*Hedges v. United States,*
404 F.3d 744, 750 (3rd Cir. 2005) ....................................................... 17

*Holder v. City of Allentown,*
987 F.2d 188 (3d Cir. 1993) .............................................................. 18

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410, 1420 (3rd Cir. 1997) ..................................................... 17

*Jacobellis v. Ohio,*

378 U.S. 184 at 197 (1964) ................................................................................ 22

*Johnsen v. Indep. Sch. Dist. No. 3,*
    891 F.2d 1485, 1491 (10th Cir. 1989) ................................................ 26

*Johnson v. Lincoln Univ.,*
    776 F.2d 443, 454 (3d Cir. 1985) ......................................................... 21

*Johnson v.Yurick,*
    39 F. App'x 742, 746 (3d Cir. 2002) .................................................... 23

*Jones v. City of Philadelphia,*
    890 A.2d 1188, 1216 (Pa. Commw. Ct. 2006) ..................................... 27

*Kost v. Kozakiewski,,*
    1 F.3d 176, 183 (3rd Cir. 1993) ........................................................... 16

*Loscombe v. City of Scranton,*
    902 F. Supp. 2d 532, 545 (M.D. Pa. 2012) ..................................... 28, 29

*Maio v. Aetna, Inc.,*
    221 F.3d 472-82 (3rd Cir.2000) ........................................................... 17

*Mihos v. Swift,*
    358 F.3d 91, 103 (1st Cir. 2004) .......................................................... 26

*Miles v. City of Philadelphia,*
    2001 WL 392878, 2001 U.S. Dist. LEXIS 4736, at *22 (E.D.Pa. 2001) ............ 22

*Miller v. Clinton County,*
544 F.3d 542, 550 (3rd Cir. 2008) ........................................................... 20

*Mooney v. Lafayette Cnty. Sch. Dist.,*
    538 Fed.Appx. 447, 454 (5th Cir.2013) ............................................... 25

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
    429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) ............ 19, 20, 21

*Munroe v. Central Bucks School Dist.,*
    805 F.3d 454, 472 (3rd Cir. 2015) ................................................. 20, 21, 22

*Nagle v. Marron,*
    663 F.3d 100, 111 (2d Cir. 2011) ......................................................... 25

*Newsom v. Albemarle County School Bd.,*
    354 F.3d 249, 252 (4th Cir. 2003) ....................................................... 21

*Pickering v. Board of Education,*

391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968) ...................................... 18, 19, 20, 22, 24

*Pocono Mtn. Charter Sch. v. Pocono Mtn. Sch. Dist.*,
442 F. App'x 681, 687 (3d Cir. 2011) ................................................... 27

*Pro v. Donatucci*,
81 F.3d 1283, 1288 (3rd Cir. 1996) ...................................................... 20, 24

*Rankin v. McPherson*,
483 U.S. 378 (1987) ........................................................................ 18, 19, 23, 24

*San Filippo v. Bongiovanni*,
961 F.2d 1125, 1136 (3rd Cir. 1992) ...................................................... 28, 29

*Smith v. Coll. of the Mainland*,
63 F. Supp. 3d 712, 719 (S.D. Tex. 2014) .............................................. 25

*Snyder v. v,Phelps*,
562 U.S. 443, 453, 131 S.Ct. 1207 (2011) .............................................. 22, 23

*Spruill v. Gillis*,
372 F.3d 218, 223 (3rd Cir. 2004) ...................................................... 17

*Sullivan v. Houstoun*,
928 F. Supp. 521, 524 (M.D.Pa. 1996) ................................................. 22, 24

*Suppan v. Dadonna*,
203 F.3d 228, 235 (3d Cir. 2000) ........................................................ 19

*Swanson v. Gen. Servs. Admin.*,
110 F.3d 1180, 1188 (5th Cir. 1997) ..................................................... 25

*Tinker v. Des Moines Independent Community School Dist.*,
393 U.S. 503 (1969) ...................................................................... 22

*United States v. Mazurie*,
419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975) ............................ 29

*United States v. National Treasury Employees' Union*,
513 U.S. 454, 115 S.Ct. 1003, 1021, 130 L.Ed.2d 964 (1995) ............................ 19

*Via v. Taylor*,
224 F. Supp. 2d 753, 766 (D. Del. 2002) ............................................. 29, 30

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ............................. 28

*Waters v. Churchill*, 511 U.S. 661 (1994) ......................................... 18

*Watters v. City of Philadelphia,*
    55 F.3d 886, 892 (3rd Cir. 1995) .......................................................... 18, 20, 22, 24

*Wishart v. McDonald,*
    500 F.2d 1110, 1111 (1st Cir.1974) ...................................................... 28

*Zamboni v. Stamler,*
    847 F.2d 73, 79 n. 6, 80 (3d Cir. 1988) ................................................ 21

## **Rules**

Fed. R. Civ. P. 8(a)(2) .......................................................................... 17

F.R.Civ P. Rule 12(b)(6) ...................................................................... 1, 16, 17, 20, 22, 23

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Michael Melvin,** *et al* | |
| **Plaintiffs,** | |
| **v.** | |
| **City of Philadelphia,** *et al* | **Civil Action No.  21-03209** |
| **Defendants.** | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S,**
**CITY OF PHILADELPHIA, MOTION TO DISMISS**

Plaintiffs Michael Melvin, Daniel Farrelly, Brion Milligan, Mark Palma, Robert Bannan, Jesus Cruz, Steven Hartzell and Joseph Fox (collectively "Plaintiffs") hereby submit the following in opposition to Defendant's, City of Philadelphia, Motion to Dismiss (ECF No. 14).

**I.     INTRODUCTION**

A motion to dismiss under F.R.Civ P. Rule 12(b)(6) is designed to test the sufficiency of the Plaintiffs' complaint and is not the time or place to prove that a defendant's defense to the allegations contained therein should prevail. Nonetheless, that is the substance of the City of Philadelphia's (the "City") motion to dismiss. They seek to "prove" their defense to Plaintiffs' complaint using the "facts" currently established or assumed, as they interpret (or ignore) them, applied against the law as they see it, making this is more of a summary judgment motion *without discovery or a complete record* than a motion to dismiss under Rule 12(b)(6). What the City ignores is that the Plaintiffs were all discharged by the City *without any due process* and, as of the date hereof, only one of the plaintiffs, Daniel Farrelly, has been given an arbitration

hearing.[1]

## II.   STATEMENT OF FACTS

The Plaintiffs, all once Philadelphia police officers who were sworn to and did, in fact, serve their community with fairness and integrity, were the target of discriminatory termination – whether actual or constructive – at the hands of the City. The City, by virtue of its officials who have been tasked with oversight of the Philadelphia police department,[2] have arbitrarily and capriciously acted outside the scope of their official duties, the collective bargaining agreement with the Fraternal Order of Police, the constitutions of the United States and Commonwealth of Pennsylvania and the statutory and common law to terminate Plaintiffs in furtherance of such officials own personal and political agendas, without the requisite due process that is required to be afforded to Philadelphia law enforcement officers. Comp. ¶¶ 27 – 30, 33.

The convenient excuses for Plaintiffs' terminations derive from the release of a group of hacked personal and private social media posts from their co-Defendants, The Plain View Project ("PVP") and Emily Baker-White ("Baker White" and collectively the "Plain View Defendants"). Comp. ¶¶ 21 - 26. The City, without providing *any* due process to Plaintiffs, discharged these otherwise distinguished officers, while giving lesser discipline to other officers who had been the subject of the Plain View Defendants' database ("PV Database"); but worse, completely ignoring similar conduct by other officers who did not fit the "profile" of Plaintiffs and were conveniently not examined by the Plain View Defendants or included in the PV Database. Comp. ¶¶ 27 – 30, 36 - 43.

On June 1, 2019, an entertainment web publisher called Buzzfeed News published a story

---

[1] See Comp. ¶ 42 and fn. 31.

[2] Including, without limitation, Mayor James Kenney, District Attorney Larry Krasner, Police Commissioner Danielle Outlaw, and former Police Commissioner Richard Ross.

headlined: "Cops Across the U.S. Have Been Exposed Posting Racist and Violent Think On Facebook. Here's the Proof". The article was published in collaboration with Injustice Watch, a self-described "nonprofit newsroom focused on exposing institutional failures that obstruct justice and equality." Injustice Watch and Buzzfeed relied, as their primary source for the article, on the PV Database .

PVP was founded in 2016 by Defendant Baker-White, a Pennsylvania attorney at the time. In 2017, Baker-White and others at PVP obtained access to the social media postings of police officers in eight major cities, including Philadelphia, spanning several years. The Plain View Defendants' stated goal was to publicly expose any social media posts by law enforcement officers which it, PVP, subjectively determined to be offensive or hinted of any bias or racism. Notably, at least in the Philadelphia version of the PV Database, PVP ignores the offensive, biased and racist postings of black officers and focuses only on white officers (see, e.g. Comp. ¶¶ 34 – 38) - - which is itself biased and racist conduct by PVP. Nonetheless, PVP pooled these social media posts into an online database which they then made available on-line publicly exposing the officers, inviting ridicule and inspiring disciplinary action by their employers.

### Examples of Equivalent Social Media Conduct Not Acted Upon by PVP or the City[3]

36.     The below six Facebook posts from PPD Sergeant Derrick Lyles (a supervisory level officer), who explicitly identifies on Facebook as a PPD officer, are examples of racism against white people, combined with strong anti-conservative sentiments, with an anti-Christian bent as well for good measure. Sgt. Lyles was never punished by the PPD nor identified by the Plain View Project for these posts:

---

[3] Excerpted and reproduced from Comp. ¶¶ 34 – 38. These examples were available without discovery. It is anticipated that many others will come to light during discovery in this matter.





**Your Community Newspaper**

# Private Prisons Suing States For Millions If They Don't Stay Full

*Low crime rates bad for business for white-owned private prisons; they demand states keep them full*



@JulieZebrak

This week a white man sent bombs to democrats; another white man shot and killed black patrons at Kroger; and another white man just killed 8 at a synagogue and 3 officers. We don't have a caravan problem. We have a white male domestic terrorism problem.



314. Kathy Caswell is an officer in the 12th District. Unlike the Plaintiffs, Officer Caswell identifies herself on her personal Facebook Page as an employee of the City of Philadelphia Police Department. Officer Caswell posted a very controversial Facebook post utilizing extremely foul, racist and inflammatory language, yet Officer Caswell was never punished by the Police Department for her publication of this post; nor was she singled out by the Plain View Project for this or any other Facebook posting.







315. Michelle Dennard is a police officer with the City of Philadelphia Police Department. Unlike the Plaintiffs, Ms. Dennard identifies herself as a member of the City of Philadelphia Police Department on her Facebook page.

316. The following is a copy of a Facebook post by Officer Dennard in which she engages in blatantly racist commentary:



318. Glenn Holmes is an officer in the 9th District of the City of Philadelphia. Officer Holmes has posted in excess of 100 Facebook postings including the examples below, of

controversial, racially charged and inappropriate Facebook Posts. However, Glenn Holmes was

not disciplined or reprimanded for his posts; nor was he ever flagged by Plain View project.



319. Lt. Jonathan Josey is an officer with the Philadelphia Police Department. The following is an example of a Facebook post by Lt. Josey. Plaintiffs allege that Lt. Josey has not been subjected to any form of discipline for his post or cited with any violation of Police Directive 6.01.



All of the foregoing examples of equivalent social medial posts were made by black PPD officers. While Plaintiffs were among the PPD officers targeted by PVP and the City for expressing views that PVP and the City subjectively found offensive, none of the black officers who engaged in identical conduct were singled out or disciplined. We do not believe any of these officers should be fired for these posts, including Plaintiffs, but we do believe that all should have equal rights and be equally protected under the law in all instances, regardless of race, religion, gender or sexual preferences. Plaintiffs were not given such equality in this matter.

During the time period prior to and after the events described in Plaintiffs' complaint, the City's Police Department ("PPD") had a policy known as Directive 6.10, Social Media and

Networking, which disclaimed any sponsorship or endorsement by the City or the PPD of any

social media statements or posts taken by an employee:

> **Directive 6.10. Social Media and Networking**
> G. Employees who are off-duty, and using privately-owned property to engage in
> the personal use of social media, do not represent the City of Philadelphia, the
> Philadelphia Police Department, or any official position maintained by either entity.
> Under such conditions, employees represent only themselves and their personal
> interests.

This constituted the entirety of the pre-firing social media guidance given by the PPD to

Plaintiffs, and its personnel in general. The parties seem to agree that the comments posted by

the Plaintiffs, which allegedly formed the basis for their termination or forced retirement, were

statements made by them while off-duty and in their personal capacities as private citizens.

There is also no dispute that the postings addressed matters of political, social or other concern to

the community. Moreover, none of the Plaintiffs identified themselves in the Facebook postings

at issue as officers or employees of the City of Philadelphia. Nor is it disputed, for purposes of

this motion, that the City's negative employment actions against the Plaintiffs were motivated by

the Plaintiffs speech activity in their Facebook postings.

There is no evidence before the Court that the Plaintiffs' private speech in the form of

social media postings caused any disruption within the Department, even though the City

arbitrarily claims that the Plaintiffs' exercise of their free speech was *per se* disruptive. However,

they supply no evidence to support their legal conclusion that the Plaintiffs' Facebook posts,

many of which date several years prior to June 1, 2019, when this PV Database went public,

negatively impacted the ability of the Defendant to maintain discipline of for Plaintiffs to

appropriately carry out their duties with the public. Comp. ¶ 24. The lack of any controversy

prior to the publication of the PV Database lends support to this conclusion.

Further evidence of the arbitrariness of the *post hoc* enforcement policy devised by the

City, *after* release of the PV Database, can be found in the clandestine way they devised the

heretofore non-existent enforcement policy using the cover an outside law firm, Ballard Spahr,

and then attempting to conceal the contents of the report that firm generated from Plaintiffs and

the other disciplined officers, as well as the City's own Police Advisory Commission (the

"PAC"). Comp. ¶¶ 31 – 33, fn. 19.  More compelling than any argument the Plaintiffs, as

litigants, can make regarding the arbitrary, capricious, and unfair nature of the newly contrived

disciplinary process applied to them, as contrasted to that applied to others similarly situated or

none at all to officers whose conduct is similar but who were not mentioned in the PV Database

and who received no disciplinary attention at all, comes from the report of the PAC, which

found:[4]

> a.    "The PPD *developed a metric to decide whether an officer's unprotected
> content in the PVP database made them eligible for serious discipline.* Anyone holding
> the rank of *police officer was eligible for serious discipline if they had 10 or more posts.*
> Anyone holding a *supervisory rank was eligible for serious discipline if they had 5 or
> more posts.* In addition to this metric, the content of the posts and comments was also
> considered."[15]

This standard for discipline clearly did not exist prior to these enforcement proceedings against
Plaintiffs and the other involved officers, so they could not have known they would someday be
held to such an arbitrary metric for having their employment terminated. This, alone is a
deprivation of their rights to equal protection under the law, as compared to their fellow officers
identified in the PV Database, but who received lesser (or no) discipline because they had less
than the heretofore secret number of "offending" posts, and as to those who were "lucky" enough
not to have been included in the PV Database, despite equally offensive social media posts, as
will be shown hereafter.

> b.    "**Re-writing Discipline Charges After PBI Losses**
> Only 7 PBI hearings occurred as of April 3, 2020. *All 7 of these hearings resulted in a not
> guilty finding.* After these initial PBI hearings, the PPD charging unit rewrote the charges
> for the remaining officers in order to make the charging language more specific to each
> case."[16]

This must be an example of "there, but for the grace of God" went the seven lucky officers who
had their cases heard before the City developed their secret-sauce charging formula. In this
instance, Plaintiffs' rights to equal protection under the law are violated where others, looked
upon as having committed the same level of violations, were charged differently and received
not only faster, but entirely different "justice". This is exacerbated by the ongoing fact that of the
Plaintiffs in this matter, only one has had a PBI hearing as of the date hereof, a collective due
process violation that even the COVID-19 event can no longer excuse.

---

[4] The referenced material consists of Comp. ¶33, but without footnotes included. See Comp. at Ex. 2,
which is a complete copy of the August 21, 2020, PAC Report, entitled <u>A Review of The Philadelphia</u>

c.    "Serious Discipline for the Most Egregious Officers

According to *information provided by high-ranking PPD officials, the most important factor in determining whether an officer was eligible for serious punishment (a 30-day suspension or dismissal) was the number of unprotected posts they made.* A senior PPD leader told the PAC that *the Chief Inspector called in to handle charging decisions related to the PVP database developed a numeric benchmark that was used to determine which officers were eligible for serious discipline.* A police officer became eligible for

serious punishment if they made 10 or more unprotected posts. A supervisor became eligible for serious punishment if they made 5 or more unprotected posts. *The same PPD leader noted that the number of unprotected posts was the most important factor in deciding discipline because the PPD disciplinary code section that refers to conduct unbecoming an officer requires that a course of conduct be demonstrated.*"[17]

This is more than a restatement of item (a), as it provides insight into just how arbitrary the 5/10-Post rule is. Besides being custom built for PV Database related discipline by the "Chief Inspector called in to handle charging decisions", we are given an insight into why an arbitrary standard was needed in the first place - - because the most serious charge of "*conduct unbecoming an officer requires that a course of conduct be demonstrated.*" We also learn about two other important distinctions, being (i) *that the number of unprotected posts was the most important factor in deciding discipline,* and (ii) how significant this arbitrary standard was to the PAC when the wrote this report.

This is an example of *ex post facto* creation of a legal standard that those subject to it could not have known of when they committed the acts for which they lost their jobs years later.

d.    "When the PPD does not cooperate with Executive Order 2-17, the PAC has no authority to hold them accountable for their failure to do so. While the PAC continues to demand  access to documents and personnel, the outstanding questions about this scandal remain. The PAC is not able to provide a full accounting of the PPD's response to the PVP database without access to documents and personnel. Below are some aspects of the response that the PAC was able discern with limited access."[18]

The irony of this statement may also explain the overt candor of the PAC Report in disclosing the circus of newly invented and arbitrary rules and fumbled procedures, that were inconsistently applied to the officers subject to the PV Database and never applied to other officers, not subject to the PV Database, but for whom there is evidence of equally "offensive" (if there should be any offense at all) social media postings. It seems the PAC was, itself, upset with how it was treated by the PPD, a theme the Plaintiffs certainly identify with.

---

Police Department's Response to The Plain View Project. Since the PAC is an agency of the City, its findings must be treated as admission against interest by the City.

   e. "***Investigation Oversight and Errors***

When the PPD eventually shared their discipline information with the PAC, reviews only raised more questions. For example, Officer Joseph Gillespie has 21 entries in the PVP database and received training and counseling, which is not discipline, while other officers had fewer posts, or similar posts, and received discipline. When asked about PO Gillespie's discipline, Deputy Commissioner Dennis Wilson replied that there were only 14 entries for PO Gillespie on the spreadsheet that was reviewed by Ballard Spahr, and only 1 of those posts was determined to be unprotected. Because PO Gillespie only had 1 unprotected post, he received training and counseling. Again, PO Gillespie has 21 posts in the PVP database, not only the 14 that were reviewed by Ballard Spahr."[19]

This is a clear example of three essential items. First, Officer Gillespie had 21 offensive entries that made it into the PV Database, but somehow only 14 made it onto the "spreadsheet" that was reviewed by Ballard Spahr, of which they only found 1 to be "unprotected" by the First Amendment. It cannot go unnoticed that the Gillespie family has a long and storied history in the PPD and FOP Lodge 5, and Plaintiffs join the PAC in its polite questioning of the overall fairness of the City's disciplinary process, as follows:

> This is just *one small example*, and the PAC does not intend to analyze the discipline received by each individual officer. *However, this raises additional questions about the information that Ballard Spahr reviewed. Were there any other officers who did not receive a complete review by Ballard Spahr?* The PPD based their disciplinary decisions on the guidance they received from Ballard Spahr's review.[20]

   f. "Further, in reviewing the PPD spreadsheets, the PAC found that the IAD spreadsheet had 343 names and the charging unit spreadsheet had 338 names. There were a few names listed in the PVP database that did not appear on either spreadsheet. There were 28 names that showed sustained findings at IAD, but no charges from the charging unit, and no indication on either spreadsheet as to why charges did not follow for these officers. An email exchange began in order to get answers regarding the PPD's process and the discrepancies present in the spreadsheets, but ultimately, the PPD referred the  PAC to the Law Department for any additional information. The PAC is awaiting answers to these questions as of the date of this report."[21]

If we were not dealing with the reputations and livelihoods of Plaintiffs and the other officers identified in the PV Database, it would not be unreasonable to consider this comedy of errors the script for a comedy movie. All of the necessary theatrical elements are present, but we will restrain our focus to the ugliest indicators. The foregoing numerical discrepancies are *unacceptable* under any circumstances. The indications are, as implied by the PAC, that some officers are more equal than others, and got forgotten or other forms of favorable treatment that Plaintiffs did not. Even though the FOP, supposedly the representative of the subject police

officers, including Plaintiffs, and the adversary of the PPD, somehow got the Ballard Memo (to the benefit of some, such as the lucky seven, but not all of the subject officers, such as Plaintiffs), the PAC, a sister agency of the PPD could not and was told it was subject to the "attorney client privilege". But, to make matters worse:

"*The PPD has declined to tell the PAC exactly how the Ballard Spahr document was shared with the FOP.* The PPD official who shared it may have done so without realizing it was inappropriate, or inadvertently, as the PPD maintains. *Or, they may have intended to make the Department's cases against the officers weaker by revealing PPD charging strategies.* The exact circumstances of this disclosure are beside the point, though, because *the appearance of impropriety remains. Context matters when mistakes occur, and fairly or not, people jump to conclusions and assume the worst.*[22] What is known is that the only officers who faced a PBI hearing for PVP content were found not guilty. If there is trust that the discipline process is legitimate from start to finish, these 7 not guilty verdicts are unfortunate[23] but acceptable. *However, the disclosure of the Ballard Spahr document to the FOP, paired with the questions that remain about how the Chief Inspector drafted charges, and the lack of oversight of the process in general, call the legitimacy of the process in question.*[24] The response to PVP database then begins to look like a continuation of the pattern that has led to recent public calls for increased accountability within the PPD."[25]

  g.    All of this is capped by the following PAC disclosure:

"Perhaps most tellingly, almost a year after the PVP database went public, *a senior PPD leader* positioned over some of the units most responsible for the PPD's response *expressed his belief that the database was a political witch hunt meant to criticize only those officers who hold conservative political beliefs.*[26] Additionally, *another senior PPD leader told the PAC that the individual assigned to draft the charges for the officers named in the PVP database did not agree with punishing officers for their social media posts, and in some cases, fought hard to prevent certain officers with whom he had personal relationships from being disciplined.* This information came from a credible PPD insider, but the PAC recognized that this was a single source and that there was no other immediate corroboration to this claim. *The PAC intended to interview the individual who made charging decisions to get their perspective on this claim. This individual declined to be interviewed by the PAC, and the PPD did not permit the PAC to compel an interview with him.*"[27]

Based on this series of admissions alone, Plaintiffs should be granted the relief requested in this suit. Although it is clear that the PAC is no friend to Plaintiffs' cause, *per se*, their constrained outrage at the conduct of the City and their fellow agency thereof, the PPD, is apparent from the foregoing excerpts from the PAC Report, which demonstrates the complete failure of due process and equal protection in this matter. It also substantiates Plaintiffs' claims of racial and religious bias *against them*, while permitting identical conduct from black and/or Islamic officers towards white and/or non-Islamic people, examples of which will be shown in the next section hereof.

(Highligthed emphasis supplied).

The foregoing is recited in its entirety because it is *completely ignored* by the City in its motion to dismiss even though the PAC is a City agency, but is the "800-pound gorilla" in the room that goes beyond merely establishing a firm predicate for Plaintiffs' Constitutional, Fourteenth Amendment, equal protection claims (Comp. ¶¶ 121 – 127), and the violation of their Constitutional, First Amendment, free speech claims, all brought pursuant to 42 U.S.C. §1983 (Comp. ¶¶ 116 – 120), and constitutes admissions against interest by the City. The conduct described by the PAC also establishes Plaintiffs' claims for the City's violation of their rights pursuant to Article I § 7 of the Constitution of the Commonwealth of Pennsylvania (Comp. ¶¶ 132 – 136).

Although the City attaches a variety of Facebook postings attributed to the Plaintiffs, they fail to authenticate them, do not state whether there are others and do not identify which of them resulted in the discipline imposed. They also do not identify who made the subjective determinations regarding offending nature of each of the posts and how/why they were deemed "*per se*" offensive and disruptive to the PPD. At a bare minimum, Plaintiffs are entitled to discovery about the details of why and how their individual firings were determined and, in contrast, why and how others named in the PV Database were given lesser discipline and, finally, why other officers not named in the PV Database, but who made similar social media postings received no intervention at all.

## III.    LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests "the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). As the moving party, "[t]he defendant bears the burden of showing that no claim has been presented." *Hedges v.* United States, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).".

"In general, a complaint is legally sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The touchstone of [this] pleading standard is plausibility." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Although Rule 8(a)(2) does "not require heightened fact pleading of specifics," it does require the recitation of "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citation omitted). In other words, "[t]he plausibility **standard** is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotation omitted)." *Associated Builders & Contractors v. Cty. of Northampton*, 376 F. Supp. 3d 476, 492 (E.D. Pa. 2019).

The evaluation of a motion to dismiss under Rule 12(b)(6) requires the court to accept as true all material allegations of the complaint. *Spruill v. Gillis*, 372 F.3d 218, 223 (3rd Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3rd Cir. 1997). A motion to dismiss may be granted only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472-82 (3rd Cir.2000).

## IV.    LEGAL ARGUMENT

### A.    Plaintiffs Have Properly Alleged Their Causes of Action for Deprivation of Civil Rights Pursuant to the United States Constitution, First and Fourteenth

**Amendments and Under 42 U.S.C. § 1983[5]**

The seminal case involving the free speech rights of public employees is *Pickering v. Board of Education* 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811, 1968 U.S. LEXIS 1471 (1968). In Pickering the U.S. Supreme Court decided that public-sector employees did not totally relinquish their First Amendment rights at the door. Rather, it adopted what is now called the "Pickering Test." *Id.* The Pickering Test has been adopted in the Third Circuit. See *Holder v. City of Allentown*, 987 F.2d 188 (3d Cir. 1993); *Czurlanis v. Albanese*, 721 F.2d 98 (3d Cir. 1983).

First, a plaintiff must show that the speech in question was protected. *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir. 1993); *Czurlanis v. Albanese*, 721 F.2d 98, 103 (3d Cir. 1983). This requires that the speech must be on a matter of public concern, and the employee's interest in expression on this matter must not be outweighed by any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees. *Waters v. Churchill,* 511 U.S. 661 (1994). See *Watters v. City of Philadelphia*, 55 F.3d 886, 892 (3rd Cir. 1995).

In *Rankin v. McPherson*, 483 U.S. 378 (1987) the court stated that:

Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690–91. Such an inquiry is a question of law, not fact. *Connick* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690–91 n. 7. And we have an obligation, imposed by the Supreme Court's First Amendment cases, to *examine independently the whole record* to be sure that "*the judgment does not constitute a forbidden intrusion on the field of free expression*." (Emphasis supplied).

---

[5] Plaintiffs' Constitutional arguments closely mirror those of the plaintiffs in the matter of *Fenico v. City of Philadelphia*, USDC, EDPa, No. 20-3336 (PBT), which is also before this court, and the arguments made herein directly incorporate those of the Fenico plaintiffs in their Memorandum of Law in Response to City of Philadelphia's Motion to Dismiss (Doc. No. 24) and will be copied directly or adapted therefrom.

*Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 2897 n. 9, 97 L.Ed.2d 315 (1987).

Second, a plaintiff must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), which is not in dispute in this matter since the Plaintiffs' speech activity was the sole reason the City summarily fired them. The key question here is whether the retaliatory act would "deter a person of ordinary firmness from exercising his or her First Amendment rights." *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir. 2000) (internal quotation omitted).

Once these factors are considered, the court is required to then conduct what has been traditionally referred to as a "*Pickering* balancing test", as enunciated in *Pickering v. Board of Ed. of Tp. High School Dist.,* 205, 88 S.Ct. 1731, 1734, 391 U.S. 563, 567 (1968). In *Watters*, the Court described this balancing test as follows:

> We must weigh the interests on behalf of the speech against the interest of the City as an employer "in promoting the efficiency of the public services it performs through its employees." *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899 (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734). The Government bears the burden to justify a discharge, and that burden "varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691; see also *United States v. National Treasury Employees' Union*, 513 U.S. 454, 115 S.Ct. 1003, 1021, 130 L.Ed.2d 964 (1995) (O'Connor, J., concurring in the judgment and dissenting in part) ("As the magnitude of intrusion on employees' interests rises, so does the Government's burden of justification."). "[T]he balancing test articulated in Pickering is truly a balancing test, with office disruption or breached confidences being only weights on the scales." *Zamboni*, 847 F.2d at 79 (citation and quotation omitted).

Whether speech is a matter of public concern depends on the "content, form, and context of a given statement." *Connick v. Meyers,* 461 U.S. 138, 147–48 (1983). A court must consider whether the statement relates to any matter of political, social, or other concern to the community, keeping in mind that having free and unhindered debate on matters of public

importance is at the core of values protected by the Free Speech Clause of the First Amendment. *Id.* If the disputed speech is not on a matter of public concern, but rather addresses a private matter only, it enjoys no constitutional protection. *Id.* at 146. *Cook v. New Castle Area Sch. Dist.,* No. CIV.A. 08-0089, 2008 WL 5263705, at *8 (W.D. Pa. Dec. 16, 2008), aff'd, 353 F. App'x 769 (3d Cir. 2009).

The second and third stages of this analysis present questions for the fact finder and *are not subject to dismissal on a motion under Rule 12*. *Green v. Phila. Hous. Auth*., 105 F.3d , 105 F.3d 882, 885 (3rd Cir. 1997); *Pro v. Donatucci*, 81 F.3d 1283, 1288 (3rd Cir. 1996) (recognizing second and third steps in *Pickering/Mt. Healthy* analysis are questions for fact finder); see also *Watters*, 55 F.3d at 892 n. 3; *Zamboni v. Stamler*, 847 F.2d 73, 79 n. 6, 80 (3d Cir. 1988) (noting whether protected activity acted as substantial or motivating factor in discharge and whether same action would have been taken regardless are questions for jury), *cert. denied*, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988); *Johnson v. Lincoln Univ*., 776 F.2d 443, 454 (3d Cir. 1985) (holding the "second and third questions ... should be submitted to the jury").

As the Third Circuit has cautioned: "The balancing we must undertake is a fact-intensive inquiry that requires consideration of the entire record and must yield different results depending on the relative strengths of the issue of public concern and the employer's interest." *Munroe v. Central Bucks School Dist*., 805 F.3d 454, 472 (3rd Cir. 2015). "We cannot 'cherry pick' something that may impact the public while ignoring the manner and context in which that statement was made or that public concern expressed. Our inquiry must also consider the form and circumstance of the speech in question." *Miller v. Clinton County* 544 F.3d 542, 550 (3rd Cir. 2008); *Munroe v. Cent. Bucks Sch. Dist.,* 805 F.3d 454, 467 (3rd Cir. 2015).

Contrary to Defendant's argument, there is no such thing in First Amendment jurisprudence as speech that is "*per se*" offensive and thus undeserving of First Amendment protection. Even in the context of obscenity cases, the Supreme Court has failed to recognize such an all-encompassing standard for denying free speech protection. The Defendant would have this Court hopscotch over the *Pickering* balancing test and adopt Justice Stewart's approach to obscenity and denounce as unprotected the Plaintiffs' speech on the basis of an "I know it when I see it" standard.[6] In the context of government employee speech, no court has ever held that speech on its face is *per se* undeserving of constitutional protection.[7]

In *Miles v. City of Philadelphia,* 2001 WL 392878, 2001 U.S. Dist. LEXIS 4736, at *22 (E.D.Pa. 2001), Judge Waldman held: "Discontent over the subject matter to which the protected speech relates, . . . does not render that speech itself disruptive." Clearly there is discontent over the Plaintiffs' Facebook postings, but that does not render their speech presumptively disruptive. This is particularly true where, as in the instant case, the Defendant failed to even identify which of the Plaintiffs' individual Facebook posts violated its policy and in what manner. *Munroe v. Cent. Bucks Sch. Dist.,* 805 F.3d 454, 467 (3d Cir. 2015).

Plaintiffs allege in their Complaint that, when considered in its full context, their posts as

---

[6] See *Jacobellis v. Ohio*, 378 U.S. 184 at 197 (1964) (Stewart, J., concurring).

[7] Several circuits have rejected similar "per se" offensive bans of free speech, many in the context of student expression. In *Newsom ex rel. Newsom v. Albemarle County School Bd.*, 354 F.3d 249, 252 (4th Cir. 2003), the Fourth Circuit addressed a school dress code that prohibited all images of weapons on clothing. *Id.* at 254. *Newsom* applied the test in *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503 (1969), and held essentially that while pictures of weapons that promote violence may arguably be regulated, *Id.* at 257, it cannot be said that all such depictions are *per se offensive*, see *Id.* at 259–60 (ruling that ban on all images of weapons overly broad); accord *Frederick v. Morse*, 439 F.3d 1114, 1121 (9th Cir. 2006). Similarly, in *Castorina ex rel. Rewt v. Madison County School Board*, 246 F.3d 536 (6th Cir. 2001), the Sixth Circuit was confronted with a school's order that reprimanded a student for wearing clothing bearing confederate flags. *Id.* at 538. The Sixth Circuit applied *Tinker* and remanded the case for further fact-finding regarding disruption. *Id.* at 543–44. See generally *Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 329 (2nd Cir. 2006).

private citizens relate to matters of political, social and community importance and therefore is

deserving of First Amendment protection. Each of the Plaintiffs also allege that their posts or

comments did not cause any disruption within the Department and did not negatively impact the

ability of the City to maintain discipline and relationships in the workplace. (Comp. ). At a

minimum, the Court should conduct the proper fact analysis

under *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811

(1968); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Watters v. City*

*of Philadelphia,* 55 F.3d 886 (3d Cir.1995)). *Sullivan v. Houstoun*, 928 F. Supp. 521, 524 (M.D.

Pa. 1996) before dismissing Plaintiffs' complaint on a Rule 12 motion.

### 1.   The Plaintiff's Posts Were Made as Private Citizens and Address Issues of Public Concern.

Plaintiffs displayed a wide range of political and social commentary, using humor and

satire on their Facebook Posts over the years. In fact many of the posts were re-posts from other

contributors and all of the posts address issues of public importance and concern. "[A]n

employee whose 'primary purpose is to bring about systemic reform' is more likely speaking as

a citizen." *Frazier v. City of Philadelphia*, 441 F.Supp.3d 76, 87 (E.D. 2020), citing *Azzaro v.*

*Cty. of Allegheny*, 110 F.3d 968, 979 (3d Cir. 1997).

In *Munroe v. Cent. Bucks Sch. Dist.,* 805 F.3d 454, 470–71 (3d Cir. 2015); the court

stated that the extensive media coverage of Plaintiff's blog generally indicated that Munroe's

speech met the "public concern" element of the Pickering test. *See also Snyder v. v,Phelps,* 562

U.S. 443, 453, 131 S.Ct. 1207 (2011) (stating that speech implicates matter of public concern

when it is subject of legitimate news interest). *Munroe v. Cent. Bucks Sch. Dist.,* 805 F.3d 454,

470–71 (3d Cir. 2015).

The inappropriate or controversial nature of a statement is irrelevant to the "public

concern" inquiry. *Snyder v. Phelps,* 562 U.S. 443, 453 (2011). Humor, satire, and even "personal invective" can be used to make or embellish a point about a matter of political, social or other concern to the community. *Munroe v. Cent. Bucks Sch. Dist.,* 805 F.3d 454, 470 (3d Cir. 2015. As the Court in *Rankin v. McPherson* explained, "[T]he manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson,* 483 U.S. 378 (1987) (citing *Connick*, 461 U.S. at 152–153, 103 S.Ct. 1684; *Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 415 n. 4 (1979)); accord *Johnson v. Yurick,* 39 F. App'x 742, 746 (3d Cir. 2002).

### 2.   None of the Individual Plaintiffs' Speech Activity Resulted in Disruption.

The Defendant raises an issue of fact in its motion by disputing Plaintiffs' allegations in the Complaint that their specific Facebook posts resulted in no disruption within the PPD. Instead, the Defendant counters with the bare assertion that **"[t]he widespread publication of the Facebook posts, starting with the Plain View Project database and Buzzfeed's subsequent expose, cause actual disruption."** (City's Memo in Support of Motion to Dismiss, Doc. 14, p. 28). To the extent this contention by the Defendant is extra-judicial and outside the four corners of the Amended Complaint, it is improper and cannot serve as grounds for dismissal under Rule 12.

Significantly, Plaintiffs' Facebook posts *predate the release of the PV Database by several years*, during which time there was not so much as a whisper of attention, let alone any "actual" disruption. (See dates of Plaintiffs' posts, infra at 28).

The City's motion is also premised on speculation that the Plaintiffs "***can*** damage trust and close working relationships between police officers who are members of the targeted community". (Doc. 14 at p. 25, emphasis added). At this early phase in this litigation, such

speculation is not a basis for granting a motion to dismiss. As the court stated in *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 756 (3d Cir. 2019):

> In balancing the competing interests, we must consider "whether the [First Amendment activity] impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the [employee's] duties or interferes with the regular operation of the enterprise." Baldassare, 250 F.3d at 198 (quoting *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). This is a "fact-intensive" exercise Miller, 544 F.3d at 548, and no single factor is dispositive, Baldassare, 250 F.3d at 198.

The Defendant must go further to articulate specific facts and present evidence that a sufficient threat of disruption of the workplace existed to outweighed each of the Plaintiffs' expressions. "The point is simply that the balancing test articulated in *Pickering* is truly a balancing test, with office disruption or breached confidences being only weights on the scales." *Feldman v. Philadelphia Housing Authority*, 43 F.3d 823, 830 (3rd Cir. 1994).

In the context of speech by government employees, both the Third Circuit and the Supreme Court have recognized that there must be a balancing of competing interests. The first is that it is essential that government employees be permitted to speak out on matters of public concern. This interest must be balanced against the interest of the state, as an employer, in the efficiency of the public services it provides through its employees. *Pro v. Donatucci,* 81 F.3d 1283, 1287 (3d Cir.1996) (citing, *inter alia, Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Watters v. City of Philadelphia,* 55 F.3d 886 (3d Cir.1995)). *Sullivan v. Houstoun*, 928 F. Supp. 521, 524 (M.D. Pa. 1996).

   a.   **The absence of any temporal nexus between the Plaintiffs' Facebook posts and the City's claimed disturbance is a fact issue in the *Pickering* analysis.**

Many of the Plaintiffs' individual Facebook posts occurred months and even years before

the disciplinary actions imposed in this case. In the Title VII retaliation context, "[c]lose timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Servs. Admin.,* 110 F.3d 1180, 1188 (5th Cir. 1997) (citing *Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir. 1993)). Closeness in time is also relevant in the First Amendment retaliation context. *See Mooney v. Lafayette Cnty. Sch. Dist.,* 538 Fed.Appx. 447, 454 (5th Cir.2013) ("Close timing between an employee's protected [speech] and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a *prima facie* case of retaliation."); *Nagle v. Marron,* 663 F.3d 100, 111 (2d Cir. 2011) (holding that a sufficient "showing of temporal proximity suffices to make out a *prima facie* claim of retaliation under the First Amendment"). *Smith v. Coll. of the Mainland*, 63 F. Supp. 3d 712, 719 (S.D. Tex. 2014).

"Close timing between an employee's protected [speech] and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a *prima facie* case of retaliation." *Mooney v. Lafayette Cty. Sch. Dist.*, 538 Fed.Appx. 447, 454 (5th Cir. 2013); *see Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011) (holding that six weeks between speech and adverse action was sufficient "showing of temporal proximity suffices to make out a prima facie claim of retaliation under the First Amendment"). *Brown v. Leflore Cty., Mississippi*, 150 F. Supp. 3d 753, 767–68 (N.D. Miss. 2015).

When evaluating the government's interest, a number of factors may be considered; among these are (1) the ***time***, place, and manner of the employee's speech, (emphasis added), *Connick,* 461 U.S. at 153, 103 S.Ct. 1684 (noting that speech will likely be more disruptive if it occurs during work hours, at the office, or requires the speaker or others to leave work stations),

and (2) the employer's motivation in making the adverse employment decision. See *Mihos v. Swift,* 358 F.3d 91, 103 (1st Cir. 2004) (noting if the employer retaliated entirely out of self-interest as opposed to a legitimate concern about the functioning of government services, the government's side of the balance is undermined). Ultimately, a *Pickering* balancing, like the public concern analysis, is highly fact specific. See *Evans–Marshall v. Bd. of Educ.,* 428 F.3d 223, 239 (6th Cir.2005); *see also Gustafson,* 290 F.3d at 909 (citation omitted). *Davignon v. Hodgson,* 524 F.3d 91, 104 (1st Cir. 2008).

In some cases, a pattern of speech may be considered as a unitary whole for determining whether it addresses matters of public concern. *Johnsen v. Indep. Sch. Dist. No. 3*, 891 F.2d 1485, 1491 (10th Cir. 1989). The determination of whether such a unitary analysis is appropriate is "fact sensitive and depends on how interrelated are the different aspects of the speech." Id. at 1492. Relevant factors include "the time frame in which the speech occurred, the different audiences to which the speech may have been directed, the continuity of the speech, and the degree to which the different aspects of speech built upon each other to create a cumulative impact on the state employer." *Id.*

The time frame of the Plaintiffs' Facebook posts and the Defendant's disciplinary action is a matter of relevant inquiry. The Buzzfeed News article and the resulting disciplinary actions began in July of 2019. However, the Plaintiffs' posts predate these events by several years. See City Motion to Dismiss at its Exhibit C, being a collection of Plaintiffs' Facebook posts. The *most recent* postings from the Plaintiffs are dated, as follows:

| | |
|---|---|
| Melvin - | September 10, 2017 |
| Farrelly - | March 30, 2016 |
| Milligan - | April 29, 2015 |
| Palma - | August 30, 2017 |
| Bannan  - | June 3, 2016 |
| Cruz - | May 23, 2017 |

Hartzell -          February 10, 2017
Fox -               March 23, 2016

Given that the Buzzfeed article announcing the PV Database was released during June of 2019, none of these postings is related temporally to the discipline actions against Plaintiffs and cannot reasonably be found to have disrupted the operations of the PPD. Moreover, when these Plaintiffs posted their speech there was increased national and local public attention on the issues they discussed. The Plaintiffs' comments cannot be divorced from their context at the time they engaged in their speech. The backdrop of events on the national stage must be factored into the evaluation and balancing of the *Pickering* analysis.

**B.     PLAINTIFFS MAY PROCEED ON CLAIMS SEEKING DECLARATORY AND INJUNCTIVE RELIEVE UNDER THE PENNSYLVANIA CONSTITUTION.**

The Third Circuit recognizes, "[n]o Pennsylvania statute establishes, and no Pennsylvania court has recognized, a private cause of action for damages under the Pennsylvania Constitution." *See Pocono Mtn. Charter Sch. v. Pocono Mtn. Sch. Dist.*, 442 F. App'x 681, 687 (3d Cir. 2011). Accordingly, any claims seeking damages pursuant to the Pennsylvania Constitution are subject to dismissal. However, Plaintiff's may proceed on any claims seeking declaratory and injunctive relief under the Pennsylvania Constitution. *Derek Isaac v. Marsh,* 2020 WL 6504637, at *5 (M.D. Pa. Nov. 5, 2020); *See Jones v. City of Philadelphia*, 890 A.2d 1188, 1216 (Pa. Commw. Ct. 2006).

The Plaintiffs seek only declaratory relief that the Defendant's actions violate their rights under Article I, Section 7 of the Pennsylvania Constitution. [Amended Complaint, Doc.11-1 at p. 46]. Therefore, the Plaintiffs' claims under the Pennsylvania Constitution do not fail as a matter of law.

27

**C.     THE PLAINTIFFS STATE A CLAIM FOR VIOLATION OF THEIR RIGHTS UNDER THE FOURTEENTH AMENDMENT.**

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.,* 567 U.S. 239, 132 S.Ct. 2307, 2317, 183 L.Ed.2d 234 (2012). Such vagueness is found where "men of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* (quoting *Connally v. Gen. Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed.322 (1926)).

Thus, the "doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id*.; *Loscombe v. City of Scranton*, 902 F. Supp. 2d 532, 545 (M.D. Pa. 2012), *aff'd,* 600 F. App'x 847 (3d Cir. 2015).

A facial challenge to vagueness will only be upheld where "the enactment is impermissibly vague in all of its applications." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). In the public employment context, "broad public employee dismissal standards" have passed muster since "standards are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *San Filippo v. Bongiovanni,* 961 F.2d 1125, 1136 (3rd Cir. 1992)(citing *Arnett v. Kennedy,* 416 U.S. 134, 159, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)). For example, discharge of a teacher was permissible under a regulation allowing such "only for 'conduct unbecoming a teacher ... or other good cause.'" *Id.* at 1137 (citing to *Wishart v. McDonald,* 500 F.2d 1110, 1111 (1st Cir.1974)). The district court found that a university regulation permitting dismissal for lacking "standards of sound

scholarship and competent teaching" was not unconstitutionally vague. *Id.* The Third Circuit rejected the district court's narrow construction of the provision and upheld it as a broad "standard which encompasses a wide range of conduct." *Id. Loscombe v. City of Scranton*, 902 F. Supp. 2d 532, 546 (M.D. Pa. 2012), aff'd, 600 F. App'x 847 (3d Cir. 2015).

While it is clear that the basis of their disciplinary action was the fact that their Facebook posts were the subject of the Plain View Project and Buzz Feed News articles, not a single Plaintiff was shown which specific posts serve as the basis for their termination or suspension.

The void for vagueness doctrine "finds repulsive laws that endow officials with undue discretion to determine whether a given activity contravenes the law's mandates." *Id. Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Vagueness concerns are particularly implicated where a law or regulation has no clarifying interpretation or settled usage and is so unclear that it requires a person to guess at its contours or misleads a person into believing he or she is compliant with it. *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1048, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). *Via v. Taylor*, 224 F. Supp. 2d 753, 766 (D. Del. 2002).

In the context of public employment, the vagueness doctrine is grounded in notions of fairness, and the concept that individuals must be given fair notice that certain conduct puts them at risk for sanctions. *San Filippo,* 961 F.2d at 1136. Each situation must be taken in a case by case manner, and the "void for vagueness" inquiry is always examined to see if it is vague as applied to the affected party. *San Filippo,* 961 F.2d at 1136 (*citing United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975)). *Coover v. Saucon Valley Sch. Dist.,* 955 F. Supp. 392, 401 (E.D. Pa. 1997).

The Plaintiffs have alleged that Department Policy Directives 6.01(I) and 6.01 (J) are both vague as applied to them, and that the Defendant has arbitrarily and capriciously applied a

double standard as to what speech is acceptable and what speech is not.

Policy Directive 6.01(I) and (J) provide as follows:

> Employees are prohibited from using ethnic slurs, profanity, personal insults; material that is harassing, defamatory, fraudulent, or discriminatory, or other content or communications that would not be acceptable in a City workplace under City or agency policy or practice.

Policy Directive 6.01(J) provides:

> J. Employees are prohibited from displaying sexually explicit images, cartoons, jokes, messages or other material that would be considered in violation of the City Policy Preventing Sexual Harassment in City Government.

As the examples shown above at pages 4 – 10 demonstrate, there is already ample evidence in this case that these policies are being enforced in an arbitrary and capricious manner. Many of these officers, spared from any disciplinary attention, posted speech that was as bad or worse than that attributed to Plaintiffs, with several identifying themselves by name and that they were employed by the PPD.

The fact that these and other such posts were made with impunity by officers within the Department who identify on their social media as employees of the Department while each of the Plaintiffs have been charged with violating Policy Directive 6.01(I) and 6.01(J) raises significant concerns regarding the validity of these directives as they are being applied. These regulations have no clarifying interpretation or settled usage and are so unclear that they require a person to guess at their contours or mislead a person into believing he or she is compliant with them. *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1048, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). *Via v. Taylor*, 224 F. Supp. 2d 753, 766 (D. Del. 2002).

Despite the fact that the City of Philadelphia Police Department's own internal policy Directive 8.6 states that "the entire disciplinary procedure and outcomes shall be consistent and fair," the severity of the penalties imposed on the Plaintiffs related to their conservative political

views, and the lack of any discipline of those expressing contrary views constitutes arbitrary

viewpoint discrimination. The Defendant's arbitrary practice, custom, usage and policy have the

effect of intentionally, and without a rational basis, treating the Plaintiffs differently from others

who are similarly situated and constitutes a violation of their rights as guaranteed under the

United States Constitution as well as the Constitution of the State of Pennsylvania.

## V.    CONCLUSION

Based on the foregoing, the City's motion to dismiss must be denied, and this case must

be permitted to proceed to discovery.

Dated: November 1, 2021                    Respectfully submitted,

*/s/ Andrew Teitelman*
Andrew Teitelman, Esq.
380 Red Lion Rd Ste 103
Huntingdon Valley, PA, 19006
Bar No: 43545
Tel: 267-255-6864
Email: ateitelman@teitelaw.com

Larry Klayman, Esq.
Klayman Law Group, P.A.
7050 W. Palmetto Park Rd.
Boca Raton, Florida 33433
(561)- 558-5336
Email: leklayman@gmail.com

Of Counsel

*Counsel for Plaintiffs*