IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTIAN FENICO, THOMAS YOUNG, THOMAS GACK, EDWARD MCCAMMITT, TANYA GRANDIZIO, ANTHONY ANZIDEO, ANTHONY ACQUAVIVA, KRISTINE AMATO, JOSEPH PRZEPIORKA, WILLIAM BOWDREN, RAPHAEL MCGOUGH, and FRANCIS T. SHERIDAN,<br><br>          Plaintiffs,<br><br>     v.<br><br>CITY OF PHILADELPHIA,<br>          Defendant. | CIVIL ACTION<br><br><br><br>NO.  20CV3336 |
| MICHAEL MELVIN, DANIEL FARRELLY, BRION MILLIGAN, MARK PALMA, BRIDGET BANNAN, JESUS CRUZ, STEVEN HARTZELL, and JOSEPH FOX,<br><br>          Plaintiffs,<br><br>     v.<br><br>CITY OF PHILADELPHIA,<br>          Defendant. | CIVIL ACTION<br><br><br><br>NO.  21CV3209 |

## OPINION

Plaintiffs are police officers currently or formerly employed by the Philadelphia Police Department (the "PPD"), which is a department of the Defendant City of Philadelphia (the "City"). Over the course of several years, Plaintiffs made a variety of Facebook posts on their personal accounts about hot-button topics such as race, religion, immigration, sexual orientation, gender, and crime. After some of Plaintiffs' Facebook posts came to light, the City

1

disciplined Plaintiffs, who then sued the City alleging civil rights violations.

The City now moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56, on Plaintiffs' sole remaining claim for First Amendment retaliation in violation of 42 U.S.C. § 1983.  Plaintiffs Christian Fenico, Thomas Young, Thomas Gack, Edward McCammitt, Tanya Grandizio, Anthony Anzideo, Anthony Acquaviva, Kristine Amato, Joseph Przepiorka, William Bowdren, Raphael McGough, and Francis T. Sheridan (collectively, the "Fenico Plaintiffs") and Plaintiffs Michael Melvin, Daniel Farrelly, Brion Milligan, Mark Palma, Bridget Bannan (as administrator of the estate of her late husband, Robert Bannan), Jesus Cruz, Steven Hartzell, and Joseph Fox (collectively, the "Melvin Plaintiffs") allege that the City violated their rights under the First Amendment by disciplining them, in some cases by terminating them, in retaliation for their protected speech.

For the reasons set forth below, the City's Motion will be granted with respect to all Plaintiffs.

## I.    BACKGROUND

Except where otherwise noted, the following facts are not in genuine dispute.

### A.  The Plain View Project and Plaintiffs' Posts

The Facebook posts at issue here were initially exposed by the Plain View Project ("Plain View").  According to its website, Plain View "is a database of public Facebook posts and comments made by current and former police officers from several jurisdictions across the United States."  Established in 2017 and last updated in 2019, the database contains "images of more than 5,000 posts and comments" which, due to their subject matter or mode of expression, Plain View deemed likely to "undermine public trust and confidence in police."  Plain View attributed over 3,000 posts to Philadelphia police officers.  Five hundred and ninety-three are tied

to officers who are Plaintiffs in these lawsuits.[1]

The Plaintiffs' posts resist uniform characterization.  They speak on a multitude of topics, including race, religion, immigration, sex, gender, policing, penology, vigilantism, just deserts, and others.  They take many forms, ranging from memes or news stories shared with or without substantial commentary, to text-block sound-offs on political *plats du jour*, to stray comments chiming in on others' discussions.  And each Plaintiff did not contribute an equal number of posts to the lot—of the twenty Plaintiffs, the three with the smallest footprints collectively totaled less than twenty posts, while the three most prolific Plaintiffs collectively contributed almost two-hundred.[2]

### B.  The Ramifications of the Plain View Report

In February 2019, Injustice Watch—a non-profit affiliated with Plain View—wrote to the PPD regarding an article it was working on with the *New York Times* which highlighted the social media posts found on the Plain View database.  Specifically, it said, it was investigating the posts of seven Philadelphia police officers.  Plaintiffs Fenico, Melvin, and Palma personally received similar letters.  The PPD reviewed the social media posts and interviewed, among others, those three Plaintiffs.  But, at that time, it took no disciplinary action against them.

Later that year, Plain View's database caught the attention of several journalists at local

---

[1] This figure represents the sum total of Facebook posts either posted, shared, or commented upon by the Plaintiffs as a group.  Since some Plaintiffs commented on other Plaintiffs' posts, the number of unique posts interacted with by Plaintiffs is smaller; however, due to the configuration of the Plain View database, that number is not easily ascertained.

[2] Although the number of posts associated with any given Plaintiff is not dispositive to the First Amendment analysis to follow, these figures—along with the other contrasts that can be drawn between posts—demonstrate that not all Plaintiffs engaged with social media in the same way, and underscore the importance of considering each Plaintiff's claim individually.  *See Fenico v. City of Philadelphia*, 70 F.4th 151, 166 (3d Cir. 2023) (reversing District Court's dismissal of Fenico Plaintiffs' First Amendment retaliation claims in part because the District Court took a "one-size-fits-all approach" to analyzing the officers and their posts, instead of proceeding "officer-by-officer").

and national news outlets like *CNN*, *The Philadelphia Inquirer*, and *Buzzfeed News*. The latter published a long-form article that looked not only at the posts, but also the posting officer's disciplinary history.

The news reports brought the PPD under close public scrutiny. Protestors picketed outside headquarters. Philadelphia City Council ordered investigatory "hearings . . . on objectionable social media posts of law enforcement officers." At those hearings, one citizen testified that she found the posts "sickening." Leaders from the Islamic, Hispanic, and Black communities met either with PPD leadership, the Mayor's office, or both, to express concerns about the effect the posts could have on community policing efforts.

The posts contained in the database (and the surrounding publicity) caused the PPD some degree of internal turbulence as well. Former Acting Commissioner Christine Coulter, for example, testified how some officers were offended by the posts made by their fellow officers, and described how such division puts officers' lives at risk and hampers recruiting efforts. To bring the force together, PPD leadership set up internal "healing forums" labeled "Courageous Conversations," where officers of the same rank—without the participation or involvement of PPD leadership—could speak freely with one another about the fallout from the posts' revelation.

### C.  PPD's Investigation

The PPD also launched an internal investigation into the officers whose posts populated the database, including Plaintiffs. Central to this investigation was the PPD's Directive 6.10 (the "Social Media Policy"), Section I of which expressly forbade "[e]mployees . . . from using ethnic slurs, profanity, personal insults; material that is harassing, defamatory, fraudulent, or discriminatory, or other content or communications that would not be acceptable in a City

workplace under City or agency policy or practice." Notably, by its plain terms, Section I applied to officers' social media use without regard to whether officers were on- or off-duty, or whether or not the post was accessible to all.

Investigators from the PPD's Internal Affairs team interviewed each officer whose posts were stored on the Plain View database, including each Plaintiff. Each officer interviewed was shown copies of the posts attributed to them and asked to initial the posts. Each Plaintiff initialed most, if not all, of the posts shown to them by investigators.

After the interviews, investigators prepared Investigation Reports, in which they shared their determinations about whether or not an interviewed officer had violated the Social Media Policy. Any violation was subsequently advanced through one of three channels: (1) the Police Board of Inquiry, a three-person panel of PPD members of varying ranks who, after an adversarial hearing, vote to determine guilt and recommend disciplinary action to the Police Commissioner, who makes the final decisions; (2) Command Level Discipline, whereby an accused's Commanding Officer reviews the Investigation Report and metes out an appropriate sanction; or, (3) a Commissioner's Direct Action, a procedure for bringing egregious cases directly to the attention of the Commissioner, who takes whatever disciplinary action he or she sees fit.

To aid these investigations, the City retained Ballard Spahr LLP to conduct an independent investigation, rooted in First Amendment law, to make recommendations about whether to discipline any of the officers in question. Lawyers from the firm reviewed each social media post identified by the PPD. Then they provided a report ("the Outside Counsel Report" or "the Report") and accompanying spreadsheet, stating with respect to each post whether, in their professional opinion, the posts were about matters of public concern, and

whether (and to what degree) the posts might cause interference with the PPD's policing goals—matters which are relevant to the legal analysis utilized in determining whether employee speech can form the basis of a disciplinary action. The Report also sorted the posts into categories, *e.g.*, "Racial," "Homophobic," or "Violence." Officers from the PPD's leadership team also reviewed each post and made their own determination about the posts' disruptiveness. Some members of the leadership team testified that they used the level of disruptiveness assigned by Ballard Spahr as a consideration in making their own determination, whereas other members of leadership independently made their determinations of disruptiveness.

Through these mechanisms, each of the Plaintiffs were found by investigators to have violated PPD policy, and disciplinary action was imposed on each. The District Attorney's Office also issued letters to some Plaintiffs—called *Giglio* letters, after the Supreme Court case *Giglio v. United States*, 405 U.S. 150 (1972)—which described the nature of the Plaintiff's conduct and alerted the Plaintiff that it "will be disclosed to the defense in all cases where you may be called to testify as a witness . . . ."

In sum, the City's review was extensive and individualized. The City's leadership conducted an interview with every Plaintiff, hired outside counsel to provide independent recommendations about the protected status of each post, and utilized three different review-and-sanction mechanisms to ensure a tailored approach to each officer and their posts.

Through these mechanisms, each of the Plaintiffs were found by PPD investigators to have violated PPD policy, and disciplinary action was prescribed for each. Most Plaintiffs were fired or resigned from the PPD. Some—but not all—were reinstated after appealing their dismissal through the police union.

## II.    SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion."  *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact."  *Id.* (citation omitted).  A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

"As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . .  More important . . . summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

### III.   FIRST AMENDMENT RETALIATION

Although "[s]peech by government employees receives less protection than speech by members of the public," *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 103 (3d Cir. 2022), "public employees do not surrender all of their First Amendment rights merely because of their employment status," *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 465 (3d Cir. 2015), *as amended* (Oct. 25, 2019).  Therefore, when a government employee has been fired due to their speech, the employee may have a viable First Amendment retaliation claim.  *See, e.g.*, *Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987).

To establish that claim, an employee-plaintiff must prove "that (1) [their] speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred." *Dougherty v. Sch. Dist.*, 772 F.3d 979, 986 (3d Cir. 2014).  The Parties agree that Plaintiffs' posts were a substantial factor in their discipline.  Therefore, the controlling question is whether the posts were protected by the First Amendment.

To show that their speech is protected by the First Amendment, an employee-plaintiff must prove three things: (1) that they spoke "as a private citizen;" (2) on "a matter of public concern," *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); and, (3) that the employee and the public's collective interest in the employee's speech outweighs the government's interest in avoiding disruption to its operations that could be or was caused by that speech.  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also Fenico*, 70 F.4th at 162-63 (labelling the third factor "*Pickering* balancing").  These three elements are all questions of law, albeit ones "that

nonetheless require[] a robust factual basis" to evaluate.  *Fenico*, 70 F.4th at 162.

Because the Parties agree that Plaintiffs spoke as private citizens at all relevant times, steps two and three of this test—the public concern analysis and the *Pickering* balancing—will inform the discussion that follows.

### A.  Matters of Public Concern

Speech relates to a public concern when it is "fairly considered as relating to any matter of political, social or other concern to the community," *Connick v. Myers*, 461 U.S. 138, 146 (1983), or when it is a "subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication," *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004).  Speech that pertains to a "purely private intraoffice grievance," on the other hand, does not relate to a matter of public concern.  *Fenico*, 70 F.4th at 163.  "Whether an employee's speech addressees a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Rankin*, 483 U.S. at 384-85.  "[T]hat the speech was uttered by a police officer does not affect the extent to which it might touch on matters of public concern; that factor is only relevant at the balancing phase of the inquiry."  *Fenico*, 70 F.4th at 163.

Crucially, the "'inappropriate or controversial nature' of the speech is not relevant to whether it touches on matters of public concern—it is only a factor in evaluating its disruptiveness during *Pickering* balancing."  *Id.* at 165 (quoting *Munroe*, 805 F.3d at 470).  "[E]ven the most deeply troubling speech may be of concern to the public"—for example, "speech touching on race relations" certainly "carries the potential to be inflammatory," but it "is 'inherently of public concern.'"  *Id.* (quoting *Connick*, 461 U.S. at 148 n.8; *Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006)).

### B. *Pickering* Balancing

The final step of the protected speech analysis—the "*Pickering* balancing"—asks whether "the employee's interest in speaking outweigh[s] the government's interest in promoting workplace efficiency and avoiding disruption;" if so, the employee's speech is protected.  *Id.* at 166 (citing *Pickering*, 391 U.S. at 568).  "While the test for disruption varies depending upon the nature of the speech, the factors a court typically considers include whether the speech 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Dougherty*, 772 F.3d at 991 (citing *Rankin*, 483 U.S. at 388).  Importantly, "an employer need not show that the speech in question caused actual disruption to its operations;" just "a reasonable likelihood of such disruption will suffice."  *Fenico*, 70 F.4th at 165; *see also Connick*, 461 U.S. at 152 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.").

While courts must grant "substantial weight to government employers' reasonable predictions of disruption," *Waters v. Churchill*, 511 U.S. 661, 673 (1994), "unadorned speculation as to the impact of speech," without more, will not justify a government employer's decision to discipline its employee.  *Fenico*, 70 F.4th at 166 (internal quotes omitted).  Still, "the Supreme Court has deferred heavily to employers' reasonable interpretations of employee speech and predictions of disruption—especially where, as here, the employer has performed an internal investigation into the matter."  *Id.* at 168 (citing *Waters*, 511 U.S. at 676).  And the Third Circuit has recognized its sister Circuits' view that this deference "is especially [appropriate] for police

departments, which face unique internal and external dynamics." *Id.* (citing *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1201 (9th Cir. 2000); *Locurto*, 447 F.3d at 179); *see also Kelley v. Johnson*, 425 U.S. 238, 246 (1976) (recognizing a police department's interest in "discipline, esprit de corps, and uniformity").

## IV.   DISCUSSION

The protected speech analysis discussed above must "at the very least" be performed "on an officer-by-officer basis, if not a post-by-post basis." *Fenico*, 70 F.4th at 166, 168 n.15.  This will be done; but for a few reasons—not least of which being that Plaintiffs did not launch, in their briefs, an "officer-by-officer" opposition to the City's arguments—some further discussion about the protected speech analysis is in order before each Plaintiff's claim is considered.

### A.  Plaintiffs' Global Arguments About the Protected Speech Analysis

It bears mentioning that these cases, in a few ways, are unlike many other First Amendment retaliation suits.  Much of their distinctiveness is owed to their unique facts.  The canonical First Amendment retaliation suit involves a single speaker making a single objectionable utterance.  *See, e.g., Pickering*, 391 U.S. at 566-67 (teacher dismissed after he wrote and published a letter critical of the school board's financial decision-making); *Rankin*, 483 U.S. at 379-80 (clerical employee fired after she stated, upon "hearing of an attempt on the life of [President Reagan], 'If they go for him again, I hope they get him.'").  Common variations on this theme include cases where multiple speakers share in a unified statement, *see, e.g., Gillis v. Miller*, 845 F.3d 677, 680-81 (6th Cir. 2017) (correctional officers terminated after they shared "a memorandum notifying their fellow correctional officers of their right to union representation"), and cases where one speaker makes several comments on the same topic which cause a unified uproar, *see, e.g., Munroe*, 805 F.3d at 472 (high school teacher fired after her

blog, which contained several offensive posts about her students, went public).

The instant cases, by contrast, involve twenty individual Plaintiffs, each of whom made multiple statements on a bevy of subjects and in a variety of tones. Though they were publicly shared, the posts went undiscovered for a considerable time—years, in some cases—until they were surfaced by Plain View, an advocacy group. What's more, when the posts were published by Plain View, they were situated alongside many hundreds of other statements by non-party officers from police forces both in and out of Philadelphia—unlike in the typical First Amendment retaliation case, where the speech of the complaining party is the sole or primary utterance at issue.

Plaintiffs make much of this distinction, especially as it relates to questions of causality. They first argue that, because the City has not demonstrated that any public outrage following the database's revelation was caused specifically by any of the Plaintiffs' posts, but rather by the contents of the Plain View database *in toto*, such outrage should not be weighted against them in the *Pickering* balance. In other words, Plaintiffs submit that, because the neat, 'but-for' causation between speech and disruption that characterizes the average First Amendment retaliation case is absent here, each Plaintiff's individual speech cannot be measured against the sum total of collective tumult that the City maintains was aroused by the posts.

Plaintiffs cite no authority to support this argument-by-distinction; that said, the argument is not without some intuitive appeal. The facts of these cases certainly do not resemble the typical First Amendment retaliation suit, where a clear causal connection between particular speech and disruption (likely or actual) is readily demonstrable. Nor do they resemble a suit where multiple tortfeasors can be said to have independently but sufficiently caused a shared harm; if they did, then there would be no issue with assigning each Plaintiff the full scope of the

actual disruption allegedly caused by the database's revelation.  *Cf. Fischer v. Governor of N.J.*, 842 F. App'x 741, 755 (3d Cir. 2021) (Phipps, J., concurring) ("If an injury has multiple sufficient causes, then any of those causes suffices to establish fairly traceable causation.").

If Plaintiffs were right—if the disruption caused by a group of employees could not be held against any individual employee unless that employee, considered alone, was a sufficient cause of the disruption—then a government employer's ability to root out disruptive speech would diminish as the number of disruptive speakers grows and their voices become more cacophonous, in that it would be more difficult to attribute sufficient responsibility to any given employee.  This outcome is inconsistent with the Supreme Court's emphasis on the importance of the government employer's interest in taking corrective measures to alleviate or prevent disruption caused by employee speech.  Consider the Court's characterization of this interest in *Waters v. Churchill*:

> Government agencies are charged by law with doing particular tasks.  Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.  The reason [a] governor may . . . fire [a] deputy is not that this dismissal would somehow be narrowly tailored to a compelling government interest.  It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively.

> The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.  The government cannot restrict the speech of the public at large just in the name of efficiency.  But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

511 U.S. at 674-75.  As the *Waters* Court made clear, the government's interest in operating its workplaces "as effectively and efficiently as possible" is no minor concern.  *Id.* at 675.  And as

the number of disruptive employees increases, so too does the potential for future disruption, and

so the necessity for the government to restore quietude.  After all, the *Pickering* analysis is a

balancing test.  *See Pickering*, 391 U.S. at 568 ("The problem in any case is to arrive at a balance

between the interests of the [employee], as a citizen, in commenting upon matters of public

concern and the interest of the State, as an employer, in promoting the efficiency of the public

services it performs through its employees.").

   Thankfully, the dilemma constructed by Plaintiffs—either hold the full weight of the

actual disruption alleged by the City against all Plaintiffs, or hold none of it against them—is a

false choice.  As stated previously, it is axiomatic that an employer need not "allow events to

unfold to the extent that the disruption of the office and destruction of working relationships is

manifest before taking action" against disruptive employee speech—a reasonable belief that the

speech could cause disruption is enough.  *Connick*, 461 U.S. at 152; *see also Fenico*, 70 F.4th at

166 ("[A]n employer need not show that the speech in question caused actual disruption to its

operations in order to satisfy *Pickering*—a reasonable likelihood of such disruption will

suffice.").  So, in the analysis that follows, if the undisputed facts show that the City reasonably

found that an individual Plaintiff's posts were likely to cause a disruption, then actual disruption

need not be considered.  *See Connick*, 461 U.S. at 151-52 ("When close working relationships

are essential to fulfilling public responsibilities, a wide degree of deference to the employer's

judgment is appropriate.  Furthermore, we do not see the necessity for an employer to allow

events to unfold to the extent that the disruption of the office and the destruction of working

relationships is manifest before taking action.").  That said, whether or not *actual* disruption was

in fact caused by the speech in question is a relevant concern when evaluating the reasonableness

of the government's assessment of *likely* disruption; accordingly, undisputed allegations of actual

14

disruption (or lack thereof) will be considered in the *Pickering* balance insofar as they can be reasonably connected to an individual Plaintiff.  *See, e.g., Amalgamated Transit*, 39 F.4th at 104-05 (finding that a lack of actual disruption caused by previous speech in the workplace similar to the speech at issue undermined the government's assessment of likely disruption); *Munroe*, 805 F.3d at 477-78 (citing public outrage over teacher's offensive comments as evidence validating school's "claim[] that the actual and potential disruption caused by [the teacher's] speech outweighed her free speech rights").

Plaintiffs' second causal argument is essentially an instantiation of this point—that evidence of actual disruption (or lack thereof) can inform the determination of whether an employer's prediction about likely disruption is a reasonable one.  Specifically, Plaintiffs point to the undisputed fact that their "posts had existed in 'plain view' for several years . . . without any evidence of discovery" to argue that the posts were not likely to be discovered by the public in the first place, and were thus unlikely to cause disruption.[3]

In this connection, Plaintiffs cite to *Moser v. Las Vegas Metropolitan Police Department* for the proposition that "a court may discount the government employer's fears of disruption if there is little evidence that the offending speech has been or will be discovered."  984 F.3d 900, 910 (9th Cir. 2021).  In that case, a SWAT officer was disciplined for making a Facebook post

---

[3] Though Plaintiffs acknowledge that the posts were eventually discovered by Plain View, they argue that "there is an enormous difference between the likelihood of disruption created by the happenstance discovery of one of the Plaintiffs' social media posts by a member of the public versus its discovery by a targeted, investigative reporting team which has as its agenda the public exposure of any social media post it subjectively finds offensive."  Plaintiffs do not spell out what they believe this "enormous difference" to be, but the implication is that Plain View's motivations should somehow inform the *Pickering* analysis in a manner beneficial to Plaintiffs.  Whatever this argument is meant to convey, Plaintiffs cite no authority in support, so it will not be considered.  *See Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion such as the one made here . . . will be deemed waived."); *see also* E.D. Pa. Local Civ. R. 7.1(c) ("Every motion not certified as uncontested . . . shall be accompanied by a brief containing a concise statement of the legal contentions *and authorities* relied upon in support of the motion.") (emphasis added).

that appeared to endorse the extrajudicial use of force against an individual suspected of shooting a police officer, and the District Court granted summary judgment in favor of the police department on the plaintiff's First Amendment retaliation claim.  *Id.* at 902.  The Ninth Circuit reversed, finding that the police department had failed to provide adequate evidence to support their prediction of disruption where the offensive post was reported to the department by anonymous tipster, was not the subject of news coverage or other public exposure, and was removed from Facebook after a few months' time.  *Id.* at 910-11.

Plaintiffs accurately distill one principle underpinning *Moser*'s holding—that evidence indicating that the speech in question went undiscovered by the public at large can undermine a claim that the speech was likely to cause disruption.  But *Moser* involved a single offensive Facebook comment which was never discovered by the public at large, whether through news coverage or word of mouth; instead, the post's existence was reported directly to the police by a single anonymous tipster within months of being posted and was taken down shortly thereafter without causing any stir in the wider community.  *Id.*  In the instant cases—as Plaintiffs do not dispute—the offensive Facebook posts *were* eventually discovered by the public at large, as they were covered by local and national news.  Therein lies the difference.  *Moser* does not stand for the proposition that offensive speech is unlikely to cause a disruption if it takes a long time to be discovered—indeed, as the Ninth Circuit noted, what matters is whether or not "the community . . . discovered the speech or would inevitably discover it."  *Id.* at 909; *see also Munroe*, 805 F.3d at 477 (observing that the eventual discovery of a teacher's offensive blog undermined her argument that it was unlikely to cause a disruption, even where the blog had only a "small readership" and offered "relative anonymity" before its discovery).

Notably, the Third Circuit's *Fenico* opinion touches on a similar issue.  *See Fenico*, 70

F.4th at 167-68 ("[The Fenico Plaintiffs] also allege that some of their posts were several years old, raising yet unrebutted causal questions as to whether a uniform likelihood of disruption could extend to all [the Fenico Plaintiffs'] posts.").  However, in raising this issue, the Third Circuit's concern was with the District Court's "one-size-fits-all approach" to the *Pickering* balancing, *id.* at 166, which reflexively assigned a "uniform likelihood of disruption" to all Plaintiffs and all posts, *id.* at 168, despite the fact that Plaintiffs' posts were not monolithic (and thus their likelihood of disruption was not uniform).  The Third Circuit's holding was not that, when analyzing the disruption likely to be caused by each Plaintiff's posts, the duration those posts sat undiscovered must be treated as a dispositive fact in Plaintiffs' favor (just as the fact that the posts were eventually discovered does not require a ruling in the City's favor).  Rather, in raising these "yet unrebutted causal questions as to whether a uniform likelihood of disruption could extend to all [the Fenico Plaintiffs'] posts," the Third Circuit sought to ensure that, however else the 'disruption' inquiry may shake out, it must be conducted with an eye toward each Plaintiff's individual speech, accounting for whatever facts may be relevant in that consideration (whether concerning timing, causation, or any other relevant concern).  *Id.* at 167-68.

This issue also percolated through *Fenico* in the context of a discussion of *Amalgamated Transit*, a case which turned on the question of whether or not a government employer's assessment of likely disruption was reasonable.  *Fenico*, 70 F.4th at 167 (discussing *Amalgamated Transit*, 39 F.4th at 101).  The case involved employee discipline meted out under the Port Authority of Allegheny County's policy, implemented during the Covid-19 pandemic, that forbade employees from wearing face masks with political messages like "Black Lives Matter" and "Trump 2020" while on duty.  *Amalgamated Transit*, 39 F.4th at 101.  The Port

Authority argued that these masks were likely to cause a disruption, but the Third Circuit found

otherwise, citing to an evidentiary record that demonstrated "only minimal risk" of disruption.

*Id.* at 105 ("The record shows a lone employee complaint, three race-related incidents among

Port Authority employees within the past fifteen years, wholly unrelated to and predating the

mask rules, and electronic messages among employees expressing differing opinions about the

Black Lives Matter movement.").

In *Fenico*, the Third Circuit used *Amalgamated Transit* to demonstrate "that it is not

impossible for an employee to show that their controversial speech is unlikely to cause

disruption."  70 F.4th at 167.  However, it also noted that *Amalgamated Transit* is "distinct in a

few key ways"—ways that limit its applicability here, particularly now that a fuller evidentiary

record has been built out through discovery.  *Id.*  Of critical importance here is that, in

*Amalgamated Transit*, the evidentiary record suggested that customers witnessed the allegedly

offensive masks—meaning that the speech had likely been discovered by the public and by

fellow employees—yet no great uproar had occurred.  *Amalgamated Transit*, 39 F.4th at 104-05.

In the present cases, by contrast, the City provides evidence of how the public and certain

employees reacted quite passionately to the revelation of the offensive posts—and putting aside

the previously disposed concern about attributing the sum total of that disturbance to any

individual Plaintiff, the Plaintiffs do not dispute that, for example, community groups loudly

expressed their displeasure about the posts made by Plaintiffs and other PPD officers.  This

factual difference alone suggests that, for purposes of this litigation, *Amalgamated Transit*

should not be leaned upon for much more than the proposition highlighted by the Third Circuit in

*Fenico*—namely, "that it is not impossible" in certain cases "for an employee to show that their

controversial speech is unlikely to cause disruption."  *Fenico*, 70 F.4th at 167.

Putting aside these concerns about causation and disruption, the instant cases are unlike typical First Amendment retaliation suits for another reason: The Plaintiffs' each had multiple posts and comments included in the Plain View database, but only certain of those posts and comments formed the basis of the City's disciplinary actions. This quirk is, however, easily dealt with. Because the City has identified precisely for which posts each Plaintiff was disciplined, only those identified posts will be considered in the *Pickering* analysis.

Plaintiffs also attack the propriety of the City's internal investigation. They point to statements from members of PPD leadership sharing their belief that the Plain View database (and the accompanying publicity, spearheaded by Injustice Watch) was politically one-sided— *i.e.*, only targeting and publishing Facebook posts that betrayed conservative viewpoints, not liberal ones. Then, Plaintiffs impute that perceived political slant to the City, presenting what they term "comparator" posts: posts which supposedly have a liberal slant, which were posted by self-identified PPD officers, and which could be seen to violate the Social Media Policy, but whose authors were never disciplined by the PPD. But the "comparator" posts were never published in the Plain View database, and Plaintiffs do not argue that the City knew about them. So any claim that the City discriminated based on viewpoint is not supported by the record.

In any event, Plaintiffs have pleaded First Amendment retaliation claims, not claims alleging the Social Media Policy is an *ex ante*, viewpoint-discriminatory prior restraint on speech.[4] Although "[c]oncern over viewpoint discrimination is the very reason *Pickering*

---

[4] Plaintiffs attack the PPD's internal investigation in a few other ways, none of which map onto the First Amendment retaliation analysis. First, they challenge that they had sufficient notice of the Social Media Policy, arguing that no officer was ever substantively trained on what it required and forbade. Plaintiffs' view is that sanctioning officers for violating the Policy, without them ever having received such training, is unfair.

Next, Plaintiffs argue that the actual reason the PPD sanctioning them was pretextual, and that the investigation itself was conducted in an arbitrary manner. In support of their pretext argument, the Plaintiffs cite then-Commissioner Ross's press conference in July 2019—conducted while the investigation was still ongoing—during

rejected the older rule that the First Amendment does not protect government-employee speech," *Amalgamated Transit*, 39 F.4th at 108, the proper test for analyzing Plaintiffs' retaliation claims is the one announced in *Pickering* itself, as described above—not one which considers "comparator" posts or similarly situated officers.  And even if these "comparator" posts were likely to cause disruption, as Plaintiffs suggest, nothing in *Pickering* or its progeny requires that an employer ferret out all employee speech that is unprotected by the First Amendment and discipline its speakers.  *Cf. Waters*, 511 U.S. at 675 ("The reason the [government] may . . . fire [an employee] is not that this dismissal would somehow be narrowly tailored to a compelling governmental interest.  It is that the [government has] a job to do . . . .").

### B.  The Officer-By-Officer Analysis

As a threshold matter—after having reviewed each post for which Plaintiffs were disciplined—every post speaks about a matter of public concern.  The posts touch on the topics of race and ethnicity;[5] religion and religiously motivated terrorism;[6] immigration, refugees, and

---

which he stated that thirteen officers would be fired.  In support of their arbitrariness argument, Plaintiffs cite to the metrics that the PPD used in measuring the amount of interference Plaintiffs' posts could have caused.

But arguments about notice, arbitrariness, pretext, and the fairness of the PPD's investigation and resulting sanctions all sound in due process, a claim not before the Court.

[5] The following posts touched on race and/or ethnicity (with citations to the City's Statement of Undisputed Material Facts, or "SUMF"): SUMF at ¶¶ 53(a), (b), (f), (h), (k); 76(l); 101(f); 113(a), (c); 120(j), (k), (l), (m); 129(l); 163(d); 174(b), (k), (m); 183(e), (f), (l); 194(e); 203(i), (t), (x), (bb), (ff), (gg), (hh), (ii), (kk), (oo).

[6] The following posts touched on religion and religiously motivated terrorism: SUMF at ¶¶ 53(c), (d), (e), (g), (j); 76(o); 83(b), (d); 92(a), (b), (c), (d), (e), (f), (g), (h), (j), (l), (m), (n), (p), (q), (r), (t), (u), (v), (x), (y), (z); 101(g), (k), (n); 113(d); 120(d), (e), (f), (g), (i); 129(a), (c), (m), (n); 137(a), (b), (c), (d), (e), (f); 146(c), (d); 154(a), (b), (e); 174(d), (g), (i), (n); 183(d), (e), (g), (j); 194(c), (d); 203(a), (b), (d), (e), (f), (g), (h), (l), (m), (n), (o), (p), (r), (s), (t), (u), (v), (y), (z), (aa), (dd), (ee), (ll); 220(b), (c), (d), (f), (i), (j), (k).

cultural assimilation;[7] sex, gender, and sexuality;[8] local and national news stories and political figures;[9] protests and protestors;[10] and policing, crime, and punishment, whether meted out by the justice system or by vigilantes.[11]  All of these are topics which can be "fairly considered as relating to any matter of political, social or other concern to the community," *Connick*, 461 U.S. at 146, or are otherwise of "legitimate news interest"—*e.g.*, they are "subject[s] of general interest and of value and concern to the public at the time of publication," *City of San Diego*, 543 U.S. at 84.[12]

Speech about race relations, "[w]hile it carries the potential to be inflammatory . . . is 'inherently of public concern.'"  *Fenico*, 70 F.4th at 165 (quoting *Connick*, 461 U.S. at 148 n.8); *see also Locurto*, 447 F.3d at 183 ("Whatever our own views of the quality and prudence of the

---

[7] The following posts touched on immigration, refugees, and/or cultural assimilation: SUMF at ¶¶ 61(a); 83(c); 92(c), (f), (j), (p), (q), (v); 101(g), (k), (m), (n); 113(d), 129(k); 154(a); 174(n); 203(b), (g), (l), (m), (q), (r), (y), (ee), (bb), (ii), (ll), (nn), (oo); 220(f), (h), (j), (k).

[8] The following posts touched on sex, gender, and sexuality: SUMF at ¶¶ 76(p), (r); 101(j); 129(s); 154(f), (j); 174(h), (i); 183(h), (i); 203(k), (o); 220(e), (j).

[9] The following posts touched on local and national news stories and political figures: SUMF at ¶¶ 92(l), (u), (v); 101(a), (c), (d); 120(b), (h), (l), (m); 129(e), (i), (o), (p); 146(a), (c), (f); 163(b); 174(k); 183(b).

[10] The following posts touched on protests and protestors: SUMF at ¶¶ 61(c), (d); 76(g), (j), (k); 83(f); 92(w); 101(e), (l); 120(h); 129(j), (r); 154(f), (g), (h), (i), (j); 163(c); 174(l); 194(f), (i); 220(m), (cc).

[11] The following posts touched on policing, crime, and punishment: SUMF at ¶¶ 53(i); 61(b); 68(a), (b), (c), (d), (e); 76(a), (b), (c), (d), (e), (f), (h), (i), (m), (n), (q), (s); 83(a), (e), (g); 92(i), (k), (o), (s), (w), (aa); 101(b), (c), (d), (h), (i), (o), (p); 113(b), (c); 120(a), (c), (j); 129(b), (d), (f), (g), (h), (q), (t); 146(b), (e), (g) ; 154(c), (d) ;163(a), (c), (d); 174(a), (b), (c), (e), (f), (j), (o); 183(a), (b), (c), (i), (k); 194(a), (b), (g), (h), (i); 203(c), (d), (j), (w), (jj), (mm); 210(a); 220(a), (l), (m).

[12] It is worth noting that a few of Plaintiffs' posts tread close to the line separating public concerns from private matters—for example, Plaintiff Przepiorka's "Mexican Word of the Day" post about the National Football League rivalry between Green Bay and Dallas, or Plaintiff Palma's comment about "smok[ing] a cigar" with one of his Facebook friends who suggested that Philadelphia's Rocky Balboa statue might be defaced by racial justice activists.  But even these posts do not constitute the kinds of "purely private intraoffice grievances" that courts have found to fall entirely outside the First Amendment's ambit.  *Fenico*, 70 F.4th at 163.  Instead, because they invoke concepts that are of public concern, like race relations and social justice activism, they are not "private grievances in which the public might have little interest," and they "clear th[e] first hurdle" on the path toward protection under the First Amendment.  *Id.* at 163-64.

plaintiffs' chosen means of expression, commentary on race is, beyond peradventure, within the core protections of the First Amendment.").

Religion, and the relationship between religious teachings and "the fate of our Nation," are likewise matters of public concern. *Snyder v. Phelps*, 562 U.S. 443, 454 (2011) (finding that picket signs with the messages "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," among others, spoke on matters of public concern).

The same goes for speech about immigration. *See, e.g., Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 777 (9th Cir. 2022) (finding that a teacher's hat bearing the phrase "Make America Great Again" constituted speech on "issues such as immigration, racism, and bigotry, which are all matters of public concern").

So too for sex, gender, and sexuality. *See, e.g., Snyder*, 562 U.S. at 454 (finding that picket signs with the messages "Fag Troops," "Semper Fi Fags," "God Hates Fags," and "Fags Doom Nations" spoke on matters of public concern); *Warren v. DeSantis*, 90 F.4th 1115, 1130 (11th Cir. 2024) (finding that "[t]ransgender rights and abortion" were subjects of public concern).

As for the posts that shared local and national news stories, it is axiomatic that stories of "legitimate news interest" are matters of public concern. *City of San Diego*, 543 U.S. at 84; *see also Munroe*, 805 F.3d at 470-71 (reasoning that "the extensive media coverage" of a teacher's blog posts about her students suggested that her speech involved a matter of public concern). The same is true of speech about political figures. *See, e.g., Rankin*, 483 U.S. at 386 (speech concerning President Reagan and "the policies of [his] administration" touched on matters of public concern).

Protests and protestors, too, are "subject[s] of general interest and of value and concern to the public." *Lane v. Franks,* 573 U.S. 228, 241 (2014) (internal quotations omitted).  As is speech involving policing, crime, and punishment.  *See Bowley v. City of Uniontown Police Dep't*, 404 F.3d 783, 787-88 (3d Cir. 2005) ("[T]he commission and investigation of violent crimes . . . are matters of 'paramount public import.'") (quoting *Fla. Star v. B. J. F.*, 491 U.S. 524, 536-37 (1989)); s*ee also Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999) (finding that "speech on crime rates" and "police staffing . . . quite plainly involve matters of public concern"); *Moser*, 984 F.3d at 907 (reasoning that "a comment advocating unlawful violence by law enforcement" would involve a matter of public concern).

With that said, what follows is an "officer-by-officer" *Pickering* balancing for each Plaintiff and their posts.  *Fenico*, 70 F.4th at 166, 168 n.15.

### a. Anthony Acquaviva

Detective Acquaviva began working for the PPD in 2007.  At his Internal Affairs interview, Acquaviva was shown a packet containing seventeen posts that were included in the Plain View database, each page of which he initialed.  He contends that he initialed each page to confirm that it had been shown to him during the interview, and not to acknowledge that he had made the posts; he does not, however, explicitly deny making any of the posts attributed to him.[13]

---

[13] All Plaintiffs make similar contentions.  The City asserts that this review-and-initial mechanism served the purpose of authenticating that each post was the officer's own, but Plaintiffs contend that the initials indicated only that the officer acknowledged having been shown the posts.  Whether or not the Plaintiffs knew the purpose of the initializing mechanism is immaterial, because the Plaintiffs do not uniformly *deny* having made the posts in question—they merely dispute the significance of their initials.  Furthermore, at oral argument, counsel for the Melvin Plaintiffs conceded that, by initialing, the Melvin Plaintiffs confirmed that they made each post.

Acquaviva also stresses that he does not remember making these posts, suggesting that this fact should somehow affect the analysis.  But Acquaviva's memory is not at issue—what matters is whether he made the posts, and he never asserts that he did not.  In any event, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version

The PPD sanctioned Acquaviva for eleven of his posts.  As determined in Section IV.B

*supra*, each of his posts dealt with a matter of public concern.

Two posts are memes about the Confederate battle flag:



---

of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).
Acquaviva's name and likeness appears atop every Facebook post that his sanction was grounded upon; it is not
reasonably believable, without some evidence otherwise, that the posts were not his.



One post depicts a Black man with his pants below his waist, and what appears to be a diaper visible, with the caption "Thuggies™":



Five posts speak about Muslim or Arab people and their place in American society:

 



**Anthony Acquaviva** shared A Revolutionary Act's photo.
November 19, 2015 · 🌐

# This has no place
## A Revolutionary Act
# on American soil



Anthony Acquaviva shared Joseph Przepiorka's post.
November 17, 2015 · 🌐

 **Anthony Acquaviva** shared Politically Incorrect And Proud Of It Too.'s photo.
November 19, 2015 · ⊘





Two posts share Acquaviva's thoughts on respect for the armed forces and law enforcement:





**Anthony Acquaviva** shared Patriot Guy's photo.
February 1, 2016 · 🌐

This is Kyle Tyrrell, an Australian Veteran of Iraq.

STAND UP FOR AUSTRALIA

In January this year Kyle beat the living shit out of 8 Muslims single handedly- after the Muslims attacked his wife calling her a "wife slut" and a "white whore". Like and share if Kyle should not be charged for defending his family.

**Patriot Guy**                                  👍 Like Page
January 28, 2016 · 🌐

Absolutely not !!
****UPDATED****
Some are Doubtful of this story so here is the link to the story
http://www.heraldsun.com.au/.../5dc4297357afc9280d7a6292487c2...

⮞ Share

👍 5

And one image makes implications about President Obama's race or religion:



After the Internal Affairs interview, the District Attorney's Office issued a *Giglio* letter to Acquaviva which characterized his posts as "exhibiting anti-Muslim bias."  The Outside Counsel Report found that his posts "likely would have a significant impact on policing because of the repeated use of racial stereotyping against African Americans, encouraging racial profiling, repeated anti-Muslim comments, and encouraging violence against people in these groups."  The Commissioner issued a Direct Action charging Acquaviva with Conduct Unbecoming and Neglect of Duty.  Acquaviva resigned before he could be suspended or terminated.

As stated, all of Acquaviva's posts touch on matters of public concern.  The question is whether "the interests of both [Acquaviva] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005)).

Here, the City's interest in preventing the disruption actually or likely caused by Acquaviva's posts is substantial, and it outweighs his and the public's interest in the posts. Acquaviva's posts invoke racial stereotypes about black men being "thugs;" suggest that Muslim women "ha[ve] no place on American soil;" and advocate for violence against those who assault police officers and military members, among other things.  These comments, when made by a police officer like Acquaviva, are likely to jeopardize the "relationship of trust between the police . . . and the communities they serve" because they suggest that members of those communities will not receive fair treatment or adequate protection from police officers who speak in this manner.  *Locurto*, 447 F.3d at 183.  The PPD is sworn to protect and serve a diverse community that includes African Americans, Muslims, and other Philadelphians, whether or not they are critical of the police and military; accordingly, Acquaviva's speech, which suggests a

bias against members of those groups, has a high potential for disrupting effective policing.  *See Munroe*, 805 F.3d at 474 ("[I]nvective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations.").

Indeed, the events that followed the Plain View database's revelation confirm the sensibility of this prediction—leaders from the Black and Muslim communities met with PPD leadership and the Mayor's office to express their concerns about the Plain View posts which included those made by Acquaviva.  Furthermore, Acquaviva's speech could also reasonably be predicted to vitiate his credibility at trial if he were to testify against a member of the aforementioned groups; the District Attorney's Office recognized as much when it issued him a *Giglio* letter.  To be clear, what is relevant here is not so much the issuance of the *Giglio* letter itself, but rather the PPD's and the District Attorney's Office's knowledge that a defense attorney would be likely to try to use the content of Acquaviva's posts to impeach him at any trial at which he is called to testify (now that those posts have been made accessible through the Plain View database) and the concomitant concern that prosecutors may, accordingly, choose not to put him on the stand.

The City has demonstrated that Acquaviva's posts were likely to cause significant interference with the PPD's operations.  Because the City's interest in preventing this disruption outweighs Acquaviva's and the public's interest in his Facebook posts, his posts are not protected as a matter of First Amendment law.  Accordingly, for the reasons set forth above, the City is entitled to summary judgment on his First Amendment retaliation claim.

### b.  Kristine Amato

Officer Amato began working for the PPD in 1990.  At her Internal Affairs interview, investigators showed her a packet containing nineteen posts and comments contained in the Plain

View database under the name "Yo Stuff,"[14] each page of which she initialed.

Amato was sanctioned for four of her posts.  As determined in Section IV.B *supra*, each of her posts dealt with a matter of public concern.

Two posts were comments about immigration and refugees that Amato left on other people's posts:



---

[14] Amato posted on Facebook under a *nom de plume*, other Plaintiffs used their middle names in lieu of their surnames when posting, and no Plaintiff affirmatively identified themselves as a PPD officer on their Facebook page.  Plaintiffs argue that these facts suggest that the likelihood their posts would be discovered, and that disruption would ensue, is small.  But they ignore the fact that Plain View was able to deduce each Plaintiff's identity (and their employment as a PPD officer) based on their publicly available Facebook data.  Here, as in *Munroe*, "[t]he discovery" of Plaintiffs' posts "undermines Plaintiff[s'] early assumptions that [their] . . . relative anonymity would protect [their posts] from reaching" the public's attention.  *Munroe*, 805 F.3d at 476-77.



One post was a comment regarding the use of force and its role in handling suspects:



And the last was a post about protestors who apparently had gathered outside the home of a PPD officer:



After the interview, the District Attorney's Office issued a *Giglio* letter to Amato.  The
Outside Counsel Report found that Amato's posts "likely would have some impact on policing
because they advocate police violence, express anti-Muslim violence and racial bias."  The
Commissioner issued a Direct Action charging Amato with Conduct Unbecoming and Neglect of
Duty and imposed a thirty-day suspension.

As stated, all of Amato's posts touch on matters of public concern.  The question is
whether "the interests of both [Amato] and the public in the speech at issue" are outweighed by
"the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace
efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting
*McGreevy*, 413 F.3d at 364).

Here, the City's interest in preventing the disruption that Amato's posts were likely to
cause outweighs her and the public's interest in the posts.[15]  With regards to her comment about

---

[15] Amato, like most of the Plaintiffs, provides context for the posts in question (*e.g.*, that the "Temple Turbans" comment was left on a video depicting a violent protest) and shares that she "never intend[ed] to be mean-spirited" in making the posts.  This context is offered in support of a triptych of arguments.

Plaintiffs first argue that the City and Ballard Spahr should have—but did not—evaluate the "content, form, and context" of their posts.  *Rankin*, 483 U.S. at 385.  Regardless, the inquiry as to whether the posts are protected speech is for the Court—so, while what the City and Ballard Spahr did or did not do is in the mix, it is not dispositive one way or the other here.  *Fenico*, 70 F.4th at 162 ("The inquiry into the protected status of speech is a question of law . . . .").

Next, Plaintiffs argue that there are factual disputes about the meaning of some posts that preclude summary judgment.  For a dispute about a post's meaning to preclude summary judgment, the Plaintiff's proffered meaning must "affect the outcome of the suit"—*i.e.*, it must tip the *Pickering* balance in the Plaintiff's favor.  *Anderson*, 477 U.S. at 248.  Wherever Plaintiffs have suggested a colorable reading of a post's meaning that differs from the City's, the Court has used the Plaintiff's.  However, in no case has doing so "affect[ed] the outcome of the suit"—as described throughout, even Plaintiffs' proffered readings of their posts have a potential for disruption that outweighs their and the public's interest in the posts.  *Id.*

Finally, Plaintiffs rely on *Munroe* to emphasize that satirical, humorous, and even purposefully offensive posts can still be protected.  805 F.3d at 470.  True enough.  But by the same token, "the inappropriate tone of the speech . . . could play a critical role in ascertaining the existence and likelihood of disruption."  *Id.* at 474.  Indeed, in *Munroe*, the Third Circuit noted that "Plaintiff's [purposefully offensive] speech, in both effect and tone, was sufficiently disruptive as to diminish any legitimate interest in its expression."  *Id.* at 473 (internal quotations omitted).  As explained throughout, the same holds true in these cases.

Muslim immigrants allegedly refusing food, Amato commented "Send these ungrateful fucks

back . . . Fuck them!"  This comment directs "invective" toward Muslim immigrants, who are

some of "the very persons that the governmental agency is meant to serve," *Munroe*, 805 F.3d at

474; it is therefore likely to erode trust between the PPD and the Muslim community in

Philadelphia, and to render Amato an unreliable witness in any trial involving a defendant who is

a Muslim or a refugee.  This kind of disruption was not just likely—it occurred; as Deputy

Commissioner Wimberley testified, the Muslim community expressed its discomfort both to

PPD leadership and the Mayor regarding the Islamophobic posts revealed by Plain View.

Two other comments, one referring to "Temple Turbans" (a phrase that Amato explained

in her deposition refers to head bandages given to protestors at Temple University Hospital) and

the other commending an officer for running over a suspect, are just as likely to cause significant

disruption because they advocate for extrajudicial violence against protestors and criminal

suspects—groups that police officers are sworn to protect, not to attack.[16]  *See, e.g., Grutzmacher*

*v. Howard Cnty.*, 851 F.3d 332, 347 (4th Cir. 2017) (speech that "advocat[ed] violence to certain

classes of people" was likely to disrupt a fire department's operations because it had the

"potential . . . to diminish the [d]epartment's standing with the public").

The City has demonstrated that Amato's posts were likely to cause significant

interference with the PPD's operations.  Because the City's interest in preventing this disruption

outweighs Amato's and the public's interest in the posts, her posts are not protected.

Accordingly, for the reasons set forth above, the City's Motion for Summary Judgment will be

---

[16] Amato, like several other Plaintiffs, was reinstated after her termination and has since received no complaints
from citizens accusing her of any kind of maltreatment.  According to Plaintiffs, this fact undermines the City's
predictions about disruption, because it demonstrates that Plaintiffs' posts are not mirrors of their behavior as police
officers.  But as the Third Circuit has recognized, the fact that Plaintiffs have been reinstated without incident does
not "somehow estop[] or bar[]" the City "from claiming that the actual and potential disruption caused by [Plaintiffs'
posts] outweighed [their] free speech rights" at the time Plaintiffs were disciplined.  *Munroe*, 805 F.3d at 478.

granted as to Amato's First Amendment retaliation claim.

c.   Anthony Anzideo

Detective Anzideo began working for the PPD in 2007.  During his Internal Affairs interview, he was shown sixty-three posts and comments contained in the Plain View database. He initialed sixty-one of these sixty-three posts.  He declined to initial the remaining two posts because the name on the screenshots of the posts were redacted.  Later, in his deposition, Anzideo testified that he never would have initialed the posts had he known that the posts had not been "authenticated," and that he had heard rumors that the posts might have been "edited," but he does not offer evidence to dispute the authenticity of the posts.

In any event, out of the sixty-one posts that Anzideo initialed, the PPD sanctioned him for five.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

All five of the posts consisted of commentary on recent criminal activity:



43



**Anthony Anzideo**
June 18, 2015 · 🌐

This is horrible..Hope they track this POS down and take him out



USATODAY.COM
9 dead in shooting at black church in Charleston, S.C.
Police say the shooting took place at about 9 p.m. local time, according to re…

↪ Share

 12

2 Shares





**Anthony Anzideo** shared Luimarco Daily's video.
February 17, 2014 · 🌐

No respect for anyone...this is why this country is going down the toilet..this is not the only place where people act like this...wait, I'm sorry, not people but animals...People don't act like that

**Luimarco Daily** added a new video: Wild Wild West In Oakland Nightly ! from February 13, 2014 to their timeline.
February 13, 2014 · ⏱ · 🌐                    👍 Like Page

Oakland Nightly !

↪ **Share**

👍 2

View 2 more comments 🔿

disgraceful.
4y

Disgusting. I have no words...
4y

Cops in gray ferry don't play that shit lol
4y



The Outside Counsel Report described Anzideo's posts as having "some, although somewhat lesser, impact on policing because they advocate violence against those who have been accused of crimes." Anzideo was sanctioned for Neglect of Duty, and after an internal review process, served a one-day suspension.

As stated, all of Anzideo's posts touch on matters of public concern. The question is whether "the interests of both [Anzideo] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace

efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting

*McGreevy*, 413 F.3d at 364).

Here, the disruption that Anzideo's posts are likely to cause outweighs his and the

public's interest in the posts.[17]  He uses phrases like "animal" and "POS" (understood here to

mean "piece of shit") to refer to criminal suspects and defendants, groups of people whose safety

is entrusted to police as part of the core duty of their calling.  This kind of "invective," when

"directed" by a police officer "against the very persons that the [police are] meant to serve[,]

could be expected to have serious consequences for the performance of the speaker's duties and

the agency's regular operations."  *Munroe*, 805 F.3d at 474; s*ee also Grutzmacher*, 851 F.3d at

347 (speech that "advocat[ed] violence to certain classes of people" was likely to disrupt a fire

department's operations because it had the "potential . . . to diminish the [d]epartment's standing

with the public").

And because Anzideo's posts expressed such disdain for people whose safety he is

entrusted with as a police officer, it is highly likely that those posts could be used to impeach his

credibility if his testimony was offered at a criminal trial.  Indeed, Anzideo recognized as much

in his deposition testimony and answers to the City's interrogatories; he gave an example of a

"federal jury trial for a shooting incident that occurred in Philadelphia, PA, in which he was the

assigned investigator," and described how federal prosecutors decided not to call him to the

stand so "that the news article and website published by Injustice Watch on the Plain View

Project could not come into question . . . ."

---

[17] Two of the posts' meanings are in dispute: the posts that use the phrase "take him out."  The City argues that the posts "suggest" that Anzideo "condoned the use of lethal force by police for vengeance."  Anzideo asserts that he meant to express only his hope that the police apprehend the suspects.  But resolving that question in Anzideo's favor does not change the outcome of the *Pickering* balancing, for the reasons set forth above.  *Anderson*, 477 U.S. at 248.

The City has demonstrated that Anzideo's posts were likely—and in fact did—cause significant interference with the PPD's operations.  Because the City's interest in preventing this disruption outweighs Anzideo's and the public's interest in his posts, his posts are not protected.  Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on Anzideo's retaliation claim.

### d.   Robert Bannan

Officer Bannan began working for the PPD in 1990.  During his Internal Affairs interview, Bannan was shown sixty-two social media posts and comments from the Plain View database.  He initialed each and admitted that he operated a Facebook account under the name "Bob Bannan," the same name used to share each social media post.

Out of the sixty-two posts shown to him, Bannan was sanctioned for twenty-one.  However, the Parties have presented only nineteen posts.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Eight posts propose violence against individuals who were suspected of engaging in criminal activity:



 **Bob Bannan** shared a photo.
April 11, 2015 ·

I won't use the word mother, but this monster should be shot.



**6abc Action News**
April 11, 2015 ·

👍 Like Page

UPDATE: A young quadriplegic man, who also has cerebral palsy, was found alive in the woods of Cobbs Creek - with only a blanket and a Bible. Police say the victim's mother laid him on the ground and abandoned him to go visit her boyfriend in Maryland.

Police say the victim had been there for days: http://6abc.cm/1yfSCES





**Bob Bannan**
November 6, 2014 · 🌐

I hereby volunteer to beat these worthless animals, just as they beat this child to death, upon their conviction of murder.



6ABC.COM
**3-year-old hung up by feet, beaten, killed in Chester County**
Police say a man and his girlfriend are charged with murdering the girlfriend'...

👍 29                                    20 Comments  8 Shares





**Bob Bannan**

May 18, 2014 · 🌐

What an A-Hole. Someone should rob his restaurant and then the police shouldn't respond.

···

| | KATU.COM |
|---|---|
| 🖼 | **Co-owner of restaurant tells 911 not to send police** |
| | A business co-owner called 911 about a potentially deadly situation at a restaurant, and told the dispatcher not to send police. It happened at the… |

👍 3

5 Comments  1 Share

**Bob Bannan** shared a photo.
October 30, 2014 · 🌐

•••

Fantastic job in capturing him. It's a shame he is still alive.



**NBC10 Philadelphia**
October 30, 2014 · 🌐

👍 Like Page

BREAKING: CAUGHT! Accused trooper shooter in police custody

STORY HERE: http://on.nbc10.com/1HqEfl9

👍 25

3 Comments



**Bob Bannan**
October 8, 2013 · Philadelphia, PA · 🌐

First we had a POS who raped a 96 year old woman. Now we have this FPOS who attacks and severely beats a blind man. What is even worse are the people standing by, watching it and don't do a thing. These people should not get a trial, they should be shot on sight.

ABCLOCAL.GO.COM
**On Video: Blind man beaten in Germantown, suspect sought**
Philadelphia police are looking for the suspect who beat a blind man in an...

👍 10                                              9 Comments

↪ Share

Officer! Really! You mustn't say something like that! You're supposed to ask civilians like me to say things like, "FIRST THEY SHOULD BE RAPED BY A GORILLA, THEN WHATS LEFT OF THEM SHOULD BE SHOT JUST TO WASTE A BULLET! PEDOPHILES SHOULD FIRST BE PLACED IN A TANNING BOOTH FOR FOUR HOURS ON HIGH. THEN GORILLA FUCKED. THEN THE WASTED BULLET THING...phew! Did I cover everything? I need to sit down...
4y                                                👍 1

**Bob Bannan** I like your way of thinking. 👍 1
4y

Three posts involve the "hands up, don't shoot" mantra that groups like Black Lives Matter adopted after the police shooting of Michael Brown in Ferguson, Missouri:



**Bob Bannan** shared a photo.

October 28, 2014 · 🌐

...



**Eric Odom**

October 28, 2014 · 🌐

👍 Like Page

👍 10

1 Comment

↪ Share



Two posts are about women and girls:





One comments on the weather, invoking a stereotype of a Mexican accent in doing so:



Three poke fun at criminal suspects or defendants:



 **Bob Bannan**
February 4, 2014 · 🌐

Scream like the little girl you are. They may think they are tough but are cowards in the end.



HUNTO.COM
**Hard gangsta cries like a little girl during sentencing**

Hard Gangster Cries During Sentencing. After you hear what he did during th...

 12                                5 Comments  3 Shares

 **Bob Bannan** shared a video.
November 29, 2013 · 🌐

I posted this before and here it goes again. Where is the little girl?



**It's not illegal, it's frowned upon**
November 29, 2013 · ⚙

👍 Like Page

LOL JERKS

One is a joke about Islamic terrorism:



And one is a comment about political violence:



After the interview, the District Attorney's Office issued a *Giglio* letter to Bannan, characterizing his posts as evidencing "disrespect of the law."  The Outside Counsel Report described Bannan's posts as "likely" to "have a significant impact on policing because they advocate violence against people accused of crimes, including suggesting that police take violence [sic] against suspects, they contain racial stereotyping of several different ethnic groups, including African Americans and others, and use sexist imagery and language suggesting that women belong in the kitchen and should keep quiet."  The Commissioner issued a Direct Action charging Bannan with Conduct Unbecoming and Neglect of Duty.  Bannan resigned thereafter.

As stated, all of Bannan's posts touch on matters of public concern.  The question is whether "the interests of both [Bannan] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

67

Here, the City's interest is weightier.  The bulk of Bannan's posts—eight total—advocate

for extrajudicial violence perpetrated against suspects and defendants in one-off instances of

crime.  In one, Bannan shares a news story of two parents who abused and killed a child, and

then "volunteer[s] to beat" two defendants—in Bannan's words, "worthless animals"—"upon

their conviction of murder."  In another post, Bannan argues that a defendant is a "monster" that

"should be shot."  It is not genuinely disputed that this group of Bannan's posts advocate for

vigilante violence against defendants and suspects.  Indeed, Bannan reinforced that viewpoint in

one meme which said, "statistics show that criminals commit less crime after they've been shot."

Bannan's opinion about defendants and suspects is evidenced by three more posts, which mock

suspects and defendants being chased, or who have been apprehended, by law enforcement.  One

proclaims, "scream like the little girl you are."  Because these posts "advocat[e] violence to

certain classes of people"—in this case, criminal suspects and defendants—Bannan's speech has

a high "potential . . . to diminish the [PPD's] standing with the public . . . ."  *Grutzmacher*, 851

F.3d at 347.

His posts making fun of women and Black Lives Matter protestors are likewise disruptive

because they demonstrate bias against those groups, thereby eroding the "relationship of trust"

between the police and the public that the PPD relies on.  *Locurto*, 447 F.3d at 183.  What's

more, these posts could jeopardize Bannan's credibility in just about any criminal proceeding

because they demonstrate, as the District Attorney's Office recognized in the *Giglio* letter it

issued him, a general "disrespect for the law."

The City has shown that Bannan's posts were likely to cause significant interference with

the PPD's operations.  Because the City's interest in avoiding this disruption outweighs

Bannan's and the public's interest in his posts, his posts are not protected.  Accordingly, for the

reasons set forth above, the City is entitled to summary judgment on Bannan's First Amendment retaliation claim.

### e.   William Bowdren

Detective Bowdren began working for the PPD in 1996.  At the Internal Affairs interview, he was shown a twenty-page packet containing fourteen social media posts from the Plain View database, of which he initialed each page.  He acknowledged that he maintained a Facebook account under the name "William Bowdren," and that the packet contained social media posts made by his Facebook account.

Bowdren was sanctioned for seven of his posts.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Two involved Islam:



**William Bowdren** shared ████████'s photo.

February 23, 2016 · 🌐

████████

February 20, 2016 · 🌐

Those are not his daughters - those are his wives - welcome to Islam.

↪ Share

████████ So wrong

2y



One involved immigration:



And four discussed protestors, suspects, and criminal defendants:



**William Bowdren**
February 13, 2017 · 🌐

Vroom Vroom



CSCMEDIAGROUPUS.COM

Tennessee Passes Bill Allowing People To Hit Protesters Blocking Roads - C.S.C. Media Group U.S.

👍 Like          ↪ Share

👍 17

 **William Bowdren**
January 8, 2017 · 6abc · 🌐

These animals need to be tortured and mutilated in a public square.



 6ABC.COM

**Mother and boyfriend both charged in teen's murder**

The adoptive mother of a 14-year-old Montgomery County girl whose disme…

👍 Like                          ↱ Share

 20

75



After the Internal Affairs interview, the District Attorney's Office issued Bowdren a *Giglio* letter, which characterized his posts as exhibiting "anti-Muslim bias" and advocating "torture for murder suspects." The Outside Counsel Report characterized the posts as "likely" to "have a somewhat significant impact on policing because they promote vigilante violence and police brutality, and contain anti-Muslim and anti-immigrant comments." After the investigation was finished, Bowdren was charged with Neglect of Duty, but his sanction is still pending.

As stated, all of Bowdren's posts touch on matters of public concern.  The question is whether "the interests of both [Bowdren] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, the City's interest is weightier.  Two of Bowdren's posts advocate for defendants charged with murder "to be tortured and mutilated in a public square" or "to be exterminated immediately."  These posts advocate for extrajudicial violence against criminal defendants, and thus could undermine the public trust in law enforcement.  *See, e.g., Grutzmacher*, 851 F.3d at 347 (speech that "advocat[ed] violence to certain classes of people" was likely to disrupt a fire department's operations because it had the "potential . . . to diminish the [d]epartment's standing with the public").  The same posts could be used to impeach Bowdren at trial in just about any criminal proceeding, rendering him less useful to the prosecution as a witness—a core function of his duties as a member of law enforcement.  And Bowdren's posts about Islam and Muslims direct "invective . . . against the very persons that the governmental agency is meant to serve," and therefore "could be expected to have serious consequences for the performance of [Bowdren's] duties and the [PPD's] regular operations."  *Munroe*, 805 F.3d at 474.  The fact that leaders from Philadelphia's Muslim community met with PPD leadership and the Mayor's Office to share their concerns about posts like his is an example of such a consequence.

The City has demonstrated that Bowdren's posts were likely to cause significant interference with the PPD's operations.  Because the City's interest in preventing this disruption outweighs Bowdren's and the public's interest in the posts, his speech is not protected.  Accordingly, for the reasons set forth above, the City's Motion for Summary Judgment will be

granted as to Bowdren's retaliation claim.

      f.   <u>Jesus Cruz</u>

Officer Cruz began working for the PPD in 1989.  The Plain View database contains

thirty-six posts attributed to Cruz, all of which he initialed when shown them at his Internal

Affairs interview.  Cruz did not deny making any of the posts in question.

Cruz was sanctioned for twenty-seven posts.  As determined in Section IV.B *supra*, each

of his posts dealt with a matter of public concern.

Twelve posts shared his thoughts on Islam and its followers:



**Jesus Cruz** shared ▮▮▮▮▮▮'s post.
November 14, 2015 · 🌐



▮▮▮▮▮▮
November 13, 2015 · 🌐

🔊 Follow

↗ Share

👍 2



**Jesus Cruz**
November 24, 2015 · 🌐

···

Yes Islam a religion of peace..... I get it....



I-SUPPORTISRAEL.BLOGSPOT.COM
Breaking News! Watch: Palestinian girls trying to stab an elderly man
14 and 16 years old Palestinian girls stabbed 70-year-old Palestinian man be…

**Jesus Cruz**
May 13, 2016 · 🌐

Fucking yeah



SUPREMEPATRIOT.COM
GERMAN POLITICIAN SAYS: 'Muslims Should Be SHOT At The
Border If They Try To Enter Illegally -...

↪ Share

**Jesus Cruz**

June 12, 2016 · 🌐

No..... it's that fucked up religion of Islam. Wake the fuck up people



WWW.FOXNEWS.COM

Police say 'around 20' killed in shooting at Orlando nightclub, more than 40 taken to local...

↪ **Share**

👍 4





**Jesus Cruz**
June 14, 2016 · 🌐

Not an act of terrorism but another piece of shit Muslim



DENNISMICHAELLYNCH.COM

SWAT Team Kills Armed Muslim Who Took Hostages At TX Walmart

An armed man who took hostages at an Amarillo, Texas Walmart store Tues…

 Share

👍 1

**Jesus Cruz**
July 13, 2016 · 🌐

Keep letting those peaceful Muslims in.....



BREITBART.COM
Fashion Legend Karl Lagerfeld: Paris 'Is a Nightmare Now'

↪ Share



**Jesus Cruz**
July 26, 2016 · 🌐

Islam the religion of peace?



DENNISMICHAELLYNCH.COM
86-YEAR-OLD PRIEST BEHEADED BY MUSLIMS
details....

↪ Share

**Jesus Cruz**
September 19, 2016 · 🌐

Wait for it......... they were Muslims



BREITBART.COM | BY FRANCES MARTEL

Police Raid Suspect's Apartment in Elizabeth, NJ Following Train, Manhattan Bombings

↪ **Share**

👍😮 2



**Jesus Cruz** shared New York Post's video.
February 2, 2017 · 🌐

No matter how much you try to cuddle them this is the end result

23,101,703 Views

**New York Post** added a new video: Video shows parents sending a 7 and 9 year old daughters on su...
December 22, 2016 · 🌐

👍 **Like Page**

Video captures a Syrian mother and father preparing their two daughters, ages 7 and 9, for jihad suicide missions.

👍 Like          💬 Comment          ➤ Share

Ten more commented on Islam too, albeit through a distinctly political lens—either blaming President Obama for Islamic terrorism or Muslim migrants, or agreeing with President Trump about the need to prevent Muslim migrants from entering the country.  This group of posts also mentioned then-recent terror attacks:



**Jesus Cruz**
December 10, 2015 · 🌐

Look liberals this us what they want....



WWW.ISRAELVIDEONETWORK.COM
Woman Beheaded In Broad Daylight in 'Moderate' Muslim Nation
While Police Watch

 Share



**Jesus Cruz**

July 15, 2016 · 🌐

Wake up America these animals will not stop until you convert to Islam........
and if Clinton gets in there will be more terrorist let into our country.........



BREITBART.COM
Two Americans Killed in Nice, France Terror Attack: State Dept

 Share

👍 5

 **Jesus Cruz**
March 22, 2016 · 🌐

Yes let these animals in and America is in trouble, I don't care for Trump but he has a point about these Muslims





ALLENBWEST.COM
After Brussels terror, ISIS issues chilling six-word WARNING... - Allen B. West - AllenBWest.com

↪ Share

 2



**Jesus Cruz** shared NBC10 Philadelphia's photo.
September 19, 2016 · 🌐

Look another Muslim...... way to go Barack

NBC10 Philadelphia
September 19, 2016 · 🌐

👍 Like Page

FBI releases wanted poster that shows suspect in NY, NJ bombings:
http://on.nbc10.com/Hk8ZEYQ

↪ Share

👍😠 2



**Jesus Cruz**

January 29, 2017 · Shared via AddThis · 🌐

For you who forget what these Muslims are doing

DAILYWIRE.COM

A Complete List of Radical Islamic Terror Attacks on U.S. Soil Under Obama

👍 Like          💬 Comment          ↗ Share

👍😡 2



All I want from the government is to defend this country against Islam..........I will protect my family with my AR15.............







Three posts involved news stories about violent interactions between members of the public and police officers:





**Jesus Cruz**
August 7, 2016 · 🌐

Now tell me why the officer did not shoot this animal?

FREEDOMDAILY.COM
NASTY Woman With AIDS-> BITES Police Officer On Traffic Stop!
Exposing Him To DISEASE! ★ Freedom Daily

↗ Share

👍😡 2



One post shared an opinion about the treatment of those who kill police officers:



And finally, one post celebrated the death of an attempted rapist at the hands of the alleged

victim's husband:



After Cruz's Internal Affairs interview, the District Attorney's Office issued him a *Giglio*

letter. The Outside Counsel Report described Cruz's posts as likely having "a significant impact

on policing because there are a large number of posts that are anti-Muslim and promote violence

against Muslims, as well as promoting violence by police against suspects." The Commissioner

issued a Direct Action charging Cruz with Conduct Unbecoming and Neglect of Duty.  He was sanctioned with dismissal, but retired before the termination became effective.

As stated, all of Cruz's posts touch on matters of public concern.  The question is whether "the interests of both [Cruz] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, the City's interest in preventing the disruption that Cruz's posts were likely to cause outweighs his and the public's interest in the posts.  In some of his posts, Cruz calls criminal suspects "animal[s]" and "piece[s] of dog shit."  In other posts, Cruz simply attacks Muslim people for being Muslim—*e.g.*, referring to "piece of shit Muslim[s]" and "that fucked up religion of Islam."  This kind of invective against people whose safety the police are duty-bound to ensure is likely to erode trust between the police and the public.  *See Munroe*, 805 F.3d at 474.  He also calls Islam an "evil cult," and suggests America should "make peace" with it via nuclear weaponry.  This type of language would not merely be "of passing interest to members of the [Muslim] community; rather, [because] they were the very objects of [Cruz's] derision," it would likely jeopardize the working relationship between that community and the PPD. *Locurto*, 447 F.3d at 183.  Indeed, leaders from the Muslim community expressed these concerns when posts like these were brought to light.  The same can be said about Cruz's post cosigning the viewpoint that a person who kills a police officer should be killed in return, without any due process whatsoever—his blasé attitude toward the Constitution and legal process could undermine his credibility in any criminal proceeding.

The City has demonstrated that Cruz's posts were likely to cause significant interference

with the PPD's operations.  Because the City's interest in preventing this disruption outweighs Cruz's and the public's interest in his posts, his posts are not protected.  Accordingly, for the reasons set forth above, summary judgment will be entered in favor of the City on Cruz's First Amendment retaliation claim.

g.  <u>Daniel Farrelly</u>

Officer Farrelly began working for the PPD in 2002.  The Plain View database contains twenty-five posts attributed to Farrelly, none of which he denied having posted when shown them at his Internal Affairs interview.  The Facebook posts were all posted under the name "Daniel Mike."

Farrelly was sanctioned for the following seventeen posts and comments.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Three were about dealing with protestors using violence:



 **Daniel Mike** shared Survive the Streets: A Page for Cops's video. •••
December 26, 2015 · 🌐

Beautiful !!



# No one cares about your stupid protest

677,756 Views

**Survive the Streets: A Page for Cops** added a new video.
December 25, 2015 · ✹

👍 Like Page

Well, that traffic disruption protest didn't pan out.

 **Daniel Mike** shared azcentral's video.
March 19, 2016 · 🌐

···

Trump , trump , trump !!! I can't wait until someone has had enough , and just plows through these idiots !



6,880,208 Views

**azcentral** added a new video: Car driven through group of Trump protesters.
March 19, 2016 · 🌐

 Like Page

Watch a vehicle get driven through a group of people protesting Donald Trump's Fountain Hills rally. You can clearly see a Maricopa County Sheriff's Deputy shrug.
http://azc.cc/1RaKmdf

⤷ **Share**

👍 19

Four dealt with law enforcement tactics used to quell lawlessness:

 **Daniel Mike** shared WLBT 3 On Your Side's video.
April 8, 2016 · 🌐

To all the Bernie and Hillary supporters who agree with those two morons that the Police are the enemy ! These are the type of animals preying on your loved ones ! Careful what you wish for !



1,294,181 Views

**WLBT 3 On Your Side** added a new video.
April 7, 2015 · 🌐

👍 Like Page

EXCLUSIVE VIDEO: This video of some Jackson kids playing with guns was posted on Instagram and has community members on edge - they say it's a "disgrace to the ...
See More

 Share



**Daniel Mike** shared Mediatakeout's video.
February 17, 2016 · 🌐
· · ·

And people think American cops are tough ????

🚫  This video may show violent or graphic content.

👁 Uncover Video

2,793,185 Views

**Mediatakeout** added a new video: THIS Is What They Do To DRUG Dealers In UKRAINE!!
February 17, 2016 · ✳

👍 Like Page

Ukranian Rebels Capture A DRUG DEALER . . . And Instead Of Taking Him To PRISON . . . They WHIPPED HIM LIKE A SLAVE!!! (Wow . . . They Don't PLAY Over There)

↪ Share

👍 4

**Vince Cione** Think he'll deal drugs again ?
2y

**Daniel Mike** I think they killed him after , so no ! 👍 1
2y



**Daniel Mike** shared a video.
February 17, 2014 · 🌐

Here is what you created , bleeding heart liberals !!! Police should be sweeping in here and administering swift punishment ! But it's a criminals world now , and most don't fear the law anymore ! God help this country !

**Luimarco Daily**
February 13, 2014 · ◔ · 🌐

👍 Like Page

Oakland Nightly !

👍 11                                                    10 Comments

↪ Share

Bunch of idiots that need to be destroyed
4y                                                          👍 2

**Daniel Mike** In philly , 20 cars would be called to that corner and most of those idiots would have been sent to the hospital for an extended stay !
4y                                                          👍 5

They have no respect at all
4y                                                          👍 1

Cops are out numbered ....you send in the fucking military... Some places in Oakland or a fucking war zone
4y                                                          👍 1

I would sit on a roof top and just pop them off one by one lol
4y                                                          👍 1

Fight fire with fire!! Eventually the police will be back in charge of the streets. If the cops keep bumping the animals off, they may get suspended or fired, but they can only fire so many officers or suspend them.
4y

**Daniel Mike** You need to teach these assholes a lesson on who runs the streets like the not so old days ! Liberal judges don't punish anyone enough , and people who don't live in neighborhoods like this cry foul when cops are a little rough with these thugs ,But scream for justice when they are the victim ! Rizzo would never let this happen to his cops , or city !
4y                                                          👍 5



Three dealt with Islam and Muslim refugees:



 **Daniel Mike** shared Exposed's video.

March 16, 2016 · 🌐

···

Welcome these wonderful people to our country to go to school with your children !



944,333 Views

**Exposed** added a new video.
August 22, 2015 · 🌐

 **Like Page**

Lost for words

↗ **Share**

 **Daniel Mike** shared Brigitte Gabriel's video.

March 26, 2016 · 🌐

Let them in !!!! They are peaceful people !



901,331 Views

**Brigitte Gabriel** added a new video: The Islamic State's Promise To The West.

December 22, 2015 · 🌐                                                   👍 Like Page

Why aren't we hearing these words from our enemies in the mainstream media?

As I learned while living in a bomb shelter for my teenage years: Take serious those...
See More

 Share

One commented about those who participate in social welfare programs:



One despaired the state of a neighborhood in Philadelphia:



**Daniel Mike**
March 2, 2014 · 🌐

Overbrook ! Remember when you were able to say you lived there proudly ? To the assholes who took over that neighborhood , your an absolute disgrace to the human race !!!! There was practically zero crime there when I was growing up there !



👍 85                                           23 Comments  1 Share

↪ **Share**

Two are attempts at humor at the expense of Black people or gay men.





And one post displays apathy at the shooting death of a teenager.



After the interview, the District Attorney's Office issued a *Giglio* letter to Farrelly, which described his posts as inciting "violence and advocating excessive force against protestors and exhibiting racial, religious, and sexuality-based bias."  The Outside Counsel Report described Farrelly's posts as likely to "have a significant impact on policing because they express animus towards Muslims, advocate violence, express animus towards African Americans and contain slurs against members of the LGBTQ community."  At the end of the investigation, Farrelly was charged with Conduct Unbecoming and Neglect of Duty.  As a sanction, he was dismissed from the PPD.

As stated, all of Farrelly's posts touch on matters of public concern.  The question is whether "the interests of both [Farrelly] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, that balance weighs in favor of the City.  Several of Farrelly's posts either expressly advocate for, or at least condone, violence against protestors—including one post that describes a fantasy wherein a frustrated driver has "had enough, and just plows through" protestors on the street.  These posts have the "potential . . . to diminish the [PPD's] standing with the public" because PPD officers are tasked with ensuring protestors safety.  *Grutzmacher*, 851 F.3d at 347.  His post calling a gay man a "fudge-packer" and his posts suggesting Muslims are violent people who should be banned from American soil "could be expected to have serious consequences for the performance of [Farrelly's] duties," *Munroe*, 805 F.3d at 474, including his duty to testify in support of his arrests; the District Attorney's Office recognized as much when it issued him a *Giglio* letter.  And the post suggesting that police "teach these [criminal] assholes a

lesson on who runs the streets" flouts the community's expectation that they all, including those who live in a high-crime area like the one depicted in that post, will be treated appropriately.

The City has demonstrated that Farrelly's posts were likely to cause significant interference with the PPD's operations. Because the City's interest in preventing this disruption outweighs Farrelly's and the public's interest in his posts, Farrelly's posts are not protected. Accordingly, for the reasons set forth above, summary judgment will be entered in favor of the City on Farrelly's First Amendment retaliation claim.

### h. Christian Fenico

Fenico began working for the PPD in 2003. Before the Plain View database was published, and after receiving a letter from Injustice Watch regarding his posts, Fenico was interviewed by PPD leadership.[18] During this first interview, Fenico admitted that he maintained a Facebook Account under the name "Chris Joseph," but denied making any posts that might have shown bias, used any dehumanizing language or implicated law enforcement, violence, or any suspect or defendant's rights. Fenico was then interviewed a second time. This time, seven of his posts from the Plain View database were shown to him. He initialed each post, and this time did not deny making any of them.

---

[18] In Plaintiffs' view, the fact that Fenico and certain other Plaintiffs were initially interviewed after the Injustice Watch letters were sent, but were not disciplined at that time, undermines the City's determination that the posts were likely to disrupt. At oral argument on the instant Motion, the City responded that, during these initial investigations, the officers were not disciplined because the PPD was unable to locate the specific posts that are at issue here. Plaintiffs respond that the fact that the posts were not easy to find means that the posts were unlikely to disrupt.

As discussed earlier, the posts' likelihood of disruption is not necessarily tied to the difficulty of finding them, such that posts which are hard to find are automatically unlikely to disrupt. *See Munroe*, 805 F.3d at 476-77 ("The discovery of the blog undermines Plaintiff's early assumptions that her small readership and relative anonymity would protect her personal comments from reaching their subjects, especially as the blog was not password protected.").

Fenico was sanctioned for four posts.[19]  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

One was a comment about Jamie Foxx's public statements on race:



---

19 Fenico disputes the authenticity of some of the posts shown to him.  For example, he denies commenting "let them starve to death" regarding Muslim immigrants who had supposedly turned away free food.  Rather, he asserts that the "post was absolutely 100 [percent] edited."  But even accepting that point as true, it is not dispositive here in that "if . . . [an] employer makes a factual mistake about [an] employee's" speech when disciplining the employee, the employer may still defend against a First Amendment retaliation claim if the employer's interest in preventing potential disruption outweighs the employee's interest in making the perceived speech.  *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 273 (2016); see also *DiMarco v. Borough of Saint Clair*, No. 22-2865, 2023 WL 6442603 at *2 n.1 (3d Cir. Oct. 3, 2023) (citing *Heffernan* for same).

One concerned Muslim refugees:



And two involve acts of police use of force:





After the investigation, the District Attorney's Office issued Fenico a *Giglio* letter which noted that that one of his posts exhibited "anti-Muslim bias."  The Outside Counsel Report described Fenico's posts as likely to "have a somewhat significant impact on policing based on the cavalier attitude towards police brutality and inciting racial violence, as well as anti-Muslim comments and suggesting that minorities commit crimes and deserve to be shot by police while whites do not."  The Commissioner issued a Direct Action charging Fenico with Conduct Unbecoming and Neglect of Duty.  Fenico was dismissed from the PPD.

As stated, all of Fenico's posts touch on matters of public concern.  The question is whether "the interests of both [Fenico] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, the City's interest is weightier.  Fenico commented on a post about Muslim immigrants allegedly refusing food offered to them: "Good, let them starve to death.  I hate every last one of them."  This post directs the kind of "invective" against Muslims and/or refugees that "could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations."  *Munroe*, 805 F.3d at 474.  Other of Fenico's comments reflect, as the Outside Counsel Report put it, a "cavalier attitude towards policy brutality."  In one post, he commends police officers for "smash[ing]" a "teen boy's face" while the officers "tased him," commenting, "[w]ho cares, kid and mom are scumbags.  Good job police."  In another post, he comments on police brutality as it pertains to race, writing "I like the 'why is there no epidemic of white cops shooting white kids'. Ummm."  Fenico's celebration of police brutality "advocates violence" and has the "potential . . . to diminish" the PPD's "standing with the public . . . ."

*Grutzmacher*, 851 F.3d at 347.  Because of comments like these, Fenico's credibility as a witness would be suspect in criminal proceedings where he testified as a witness (as evidenced by the District Attorney's issuing Fenico a *Giglio* letter).

The City has demonstrated that Fenico's posts were likely to cause significant interference with the PPD's operations.  Because the City's interest in preventing this disruption outweighs Fenico's and the public's interest in his posts, his posts are not protected.  Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on Fenico's retaliation claim.

i.   <u>Joseph Fox</u>

Officer Fox began working for the PPD in 1990.  At the Internal Affairs interview, Fox was shown twenty-seven social media posts and comments from the Plain View Database, each of which he initialed.  He admits that he "authored many of" the posts, but does not identify any that he did not.

Fox was sanctioned for thirteen posts.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Five posts are about Muslims:





**Joseph Fox**
November 19, 2014 · 🌐

So one of the daily announcements at my job is to check all Synagogues and Mosques for terrorist activity. I'm sorry I was under the impression that the people who attend these facilities are the ones committing these activities . Just one of the many thoughts going thru my confused mind.

↪ Share

👍 6

Don't think to hard your brain will explode!
3y







**Joseph Fox**
December 10, 2014 · 🌐

Heard a great joke today. Who is the Best Muslim ? A Dead One..

👍 Share

👍 3

Underwater one
3y

Four were comments about race, history, and racial justice:









One expressed his frustration about working overtime as a perceived result of the protests that occurred in Ferguson, Missouri, after Michael Brown's death at the hands of police:



One post dealt with his frustration about anti-police sentiment:



One expressed his dissatisfaction with the mayor, while calling certain undisclosed individuals

"animals."



Another contained a story about his day at work:



The Outside Counsel Report described Fox's posts as likely to "have a significant impact on policing because they advocate bigotry and violence against Muslims and African Americans." Once the report was finalized, the Commissioner issued a Direct Action charging Fox with Conduct Unbecoming and Neglect of Duty. Fox was sanctioned with dismissal, but resigned before he could be terminated.

As stated, all of Fox's posts touch on matters of public concern. The question is whether "the interests of both [Fox] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'" *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, the City's interest outweighs Fox's and the public's. Many of Fox's posts endorse violence against Muslims. For example, he twice shared the same image of a woman in a burqa. In the first post, he asks, "When is open season on these fuckers?" Two weeks later, Fox shared a cropped version of the image, so viewers could only see the woman in the burqa, with the caption "Got some new targets for range day!" Just before sharing those posts, Fox shared that he was "teaching [his] dogs to start Pissing [sic] on Muslims. That's a start." About a month after all that, Fox posted a "great joke" he had "heard," that the "Best Muslim" is "A Dead One." Violent language like Fox's, when directed against those whom the police are meant to protect—even if delivered in jest—is likely to disrupt the efficient operation of the PPD. *See Locurto*, 447 F.3d at 179 (finding likely disruption where police officers' speech expressed bias against groups in the community); *Fenico*, 70 F.4th at 167 (citing *Locurto* for same). Indeed, the likelihood of this kind of disruption was validated when Muslim and Black leaders expressed their concerns about members of the PPD speaking in such a way. Fox also admitted in his deposition that, if

he were called to testify in a case with a Muslim defendant, "the[] [jury] would believe that [he] was some sort of racist" based on his posts, and thus his credibility would be brought into question.

The City has demonstrated that Fox's posts were likely to cause significant interference with the PPD's operations.  Because the City's interest in preventing this disruption outweighs Fox's and the public's interest in his posts, Fox's posts are not protected.  Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on Fox's retaliation claim.

j.   Thomas Gack

Officer Gack began working for the PPD in 1993.  At the Internal Affairs interview, Gack was shown thirty-two posts and comments from the Plain View database, of which he initialed each.  He admitted that he maintained a Facebook account under the name "Tom Gack."

Gack was sanctioned for twenty posts.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Six concerned Islam and Muslims:

**Tom Gack**

December 7, 2013 · 🌐

· · ·

Remember this is the religion if peace according to Obama!!!



AMERICANOVERLOOK.COM

Muslims Throw Girl Out 3-Story Window for Dating Christian Man

CLICK the image above to read the full story on AmericanOverlook.com.

↪ **Share**

**Tom Gack** shared a link.

December 14, 2013 · 🌐

···



YOUTUBE.COM

Muslims Say They Will Make Rape Legal On White Women When They Take Over Europe!!

↪ Share





**Tom Gack**
November 17, 2015 · Philadelphia, PA · 🌐

So let me get this straight......Gov Wolf will be allowing Islamic refugees into Pa!?!?!?!? The 3 locations in Philadelphia will be 5401 Rising Sun av, 21 and Arch, 12 and Arch! 12 and Arch......Convention Center and Criminal Justice Center only a block away!!!! A lot of people in court everyday!!! A lot of conventions in the center each month!!!! 21 and Arch middle of Center City.......main Septa and CSX hub at 30th St a few blocks away!!!!! 5401 Rising Sun Northeast Philly.....access to Rising a Sun Plaza, blocks away from Roosevelt Mall and short drive access to Cheltenham Mall!!!! Anyone else see a problem with where Obama and Wolf want to put these terrorists????

↪ Share

👍 13

5 Shares

⬤  Move out of the City Tommy!!! Stay safe
2y                                               👍 1

   🔴 **Tom Gack** He will be putting them in Scranton too!!! Stay safe up there!!
   2y · Edited

   ⬤  I'm locked and loaded up here... A lot of
      rednecks are waiting up here!
      2y                                          👍 1

⬤  It's an absolute disgrace!! This country is in trouble and
   we are all screwed.
   2y

   🔴 **Tom Gack** Lock and load Jason, lock and load!!!
   2y

   ⬤  Always brother! Like the American Express card,
      don't leave home without it
      2y                                          👍 1

⬤  No in Texas, but if they get into one state they can move
   anywhere they want
   2y                                               👍 1

   🔴 **Tom Gack** That's the problem Mark!!! They already lost track
   of 5 in New Orleans already!!!
   2y

   ⬤  Yep bring on another 100k
      2y

145

 **Tom Gack**
June 21, 2016 · 🌐

First President Oblunder bows to muslim princes.....now the Pope washes and kisses muslim feet!!!! This is what socialists do......pander to the evil that wants to kill you!!!!



OVERPASSESFORAMERICA.COM
POPE FRANCIS WASHING MUSLIM'S FEET TO 'BRING PEACE' #o4a #religion #RT

↪ Share

👍 2

Not my pope...bring back John Paul II  👍 1
1y



One dealt with transgender individuals using gender-conforming restrooms:



One dealt with armed self-defense:



Four concerned child molesters:





 **Tom Gack** via **Political Correctness Gone Wild**    •••
June 1, 2015 · 🌐

Arrested for 29th time!!!! This POS needs to be beaten to death by the families of his victims!!!



RIGHTWINGNEWS.COM
Serial Child Molester Arrested for the 29th Time, But His Mother Claims He's Just Wife-Hunting

 Share

👍 3

 **Tom Gack** via **God, Guns, Freedom and the American Way**
June 3, 2015 · 🌐

And that POS Professor from Rutgers says this normal?!?!?!? Give this guy over to the parents of these two boys!!!!



THREEPERCENTERNATION.COM | BY EMMANUEL GOL...
Man with history of child sex offenses, found in ca
Police catch pedophile in car with 2 terrified young ...

⤷ **Share**

👍 2



⬤     ▮▮▮▮▮▮▮▮ I'll second that
2y

Three posts dealt with race and the Black Lives Matter movement:





**Tom Gack** shared a link.

August 12, 2015 · 🌐

MADPATRIOTS.COM

It's Time To Call The Black Lives Matter People What They Are:
Terrorists! | Mad Patriots

Share

👍 2

3 Shares



One was a meme comparing Obama voters to chimpanzees holding their hand out in expectation:



One was a joke about Hillary Clinton, told at the expense of Mexicans:



Three dealt with the use of force against protestors, Antifa, and criminal suspects and defendants:







After the Internal Affairs interview, the District Attorney's Office issued Gack a *Giglio* letter which described his posts as exhibiting "multiple forms of racial, religious, and" anti-LGBTQ bias.  The Outside Counsel Report described Gack's posts as likely to "have a significant impact on policing based on several posts that advocate vigilante-style violence against people accused of crimes, referring to African Americans as thugs, as well as a number of anti-Muslim comments and anti-LGBTQ comments."  After the investigation terminated, Gack was charged with Conduct Unbecoming and Neglect of Duty and sanctioned with dismissal.

As stated, all of Gack's posts touch on matters of public concern.  The question is whether "the interests of both [Gack] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, Gack's and the public's interests are outweighed by the City's.  Several of Gack's posts express his approval of vigilante violence and suggest a bias against Muslims, which mean that he could be effectively discredited at almost any trial in which the District Attorney's Office needed to call him as a witness.  Second, Gack's posts about race (*e.g.*, the "Thuggies™" meme), religion (*e.g.*, the "Happy Ramadan" meme), and sexuality (*e.g.*, the transgender bathroom meme) could undermine the PPD's relationship with members of the communities those posts address.  *Munroe*, 805 F.3d at 474 ("[I]nvective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations.").  Finally, Gack's comments advocating for extrajudicial violence against criminals, such as "this POS needs to be

beaten to death by the families of his victims," also "advocate violence to certain classes of people" and therefore have a high "potential . . . to diminish the [PPD's]" reputation with the public. *Grutzmacher*, 851 F.3d at 347.

The City has demonstrated that Gack's posts were likely to cause significant interference with the PPD's operations. Because the City's interest in preventing this disruption outweighs Gack's and the public's interest in his posts, Gack's posts are not protected. Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on Gack's retaliation claim.

### k.   Tanya Grandizio

Corporal Grandizio began working for the PPD in 1995. At the Internal Affairs Interview, she was shown fourteen posts from the Plain View database, all of which she initialed. She does not deny having made the posts in question.

Grandizio was sanctioned for six posts; two posts consisted of the same graphic which Grandizio posted twice. As determined in Section IV.B *supra*, each of her posts dealt with a matter of public concern.

All of the posts expressed sentiments about Islam and Muslims:



**Tanya Grandizio** shared a link.
September 22, 2015 · 🌐

···

Christie New Craig shared The Conservative Hammer's photo.
Yesterday at 2:52pm · 🌐

# Muslims hate pork, beer, dogs, bikinis, Jesus, and freedom of speech. My question is,

CONSERVATIVEPOST.COM
Member of School Board Asks Muslims 1 Simple Question… She Risks Her Career

👍 Share

👍 3

5 Shares



**Tanya Grandizio**

September 21, 2016 · Liftable Media Network · 🌐

···

And this is going on right now!

CONSERVATIVETRIBUNE.COM

Here's The Disgusting Thing Muslims Did To Male Slaves... Be Warned, This Is Graphic

⤳ Share

👍😠 5

I can't imagine this happening today. I will be researching this...

👍 1

1y

**Tanya Grandizio** Please do. 👍 1

1y





**Tanya Grandizio**
November 27, 2015 · 🌐

I copied this from someone else and every word is true....Can a Muslim be a good American? This question was forwarded to a friend who worked in Saudi Arabia for 20 years. The following is his reply:

Theologically - no, because his allegiance is to Allah.

Religiously - no, because no other religion is accepted by His Allah except Islam (Qur'an 2:256).

Scripturally - no, because his allegiance is to the five Pillars of Islam and the Qur'an.

Geographically - no, because his allegiance is to Mecca, to which he turns in prayer five times a day.

Socially - no, because his allegiance to Islam forbids him to make friends with Christians or Jews.

Politically - no, because he must submit to the mullahs (spiritual leaders) who teach the annihilation of Israel and the destruction of America, the great Satan.
Domestically - no, because he is instructed to marry four Women and beat his wife when she disobeys him (Qur'an 4:34).

Intellectually - no, because he cannot accept the Americann Constitution since it is based on Biblical principles and he believes the Bible to be corrupt.

Philosophically - no, because Islam, Muhammad, and the Qur'an does not allow freedom of religion and expression. Democracy and Islam cannot co-exist! Every Muslim government is either dictatorial or autocratic.

Spiritually - no, because when we declare 'one nation under God,' we are referring to the Christian's God and not Allah.

Therefore, after much study and deliberation, perhaps we should be very suspicious of ALL MUSLIMS in this country. They obviously cannot be both 'good' Muslims and good Americans/Canadians; they cannot and will not integrate into the great melting pot of America.

The religious war is bigger than we know or understand. Muslims everywhere have said they will destroy us from within.

And it appears to be starting.

👍 4                                    2 Comments  3 Shares

↪ Share



This is sad. As a Christian, a follower of Jesus Christ & not a fan, we can not condemn those who do not believe in our faith. We must continue to pray for their deliverence. Our focus continues to be on doing what Jesus teaches us to do.

2y · Edited                                              👍 1

Well said! 👍 1

2y



**Tanya Grandizio** shared ████████'s post.
November 30, 2015 · 🌐

# CAN YOU CONNECT THE DOTS?

| LOCATION | TERRORIST'S RELIGION | GUN FREE ZONE ? | CASUALTIES |
|----------|----------------------|-----------------|------------|
| FT. HOOD | MUSLIM | ✓ | 13 DEAD 33 INJURED |
| BOSTON | MUSLIM | ✓ | 5 DEAD 280 INJURED |
| PARIS | MUSLIM | ✓ | 136 DEAD 352 INJURED |
| MADRID | MUSLIM | ✓ | 191 DEAD 2050 INJURED |
| SYDNEY | MUSLIM | ✓ | 3 DEAD 4 INJURED |
| CHATTO-NOOGA | MUSLIM | ✓ | 6 DEAD 2 INJURED |

(c) India Golf

████████
November 29, 2015 · 🌐

🔖 **Follow**

It's not rocket science. It's common sense.

↗ **Share**

👍 3



After the interview, the District Attorney's Office issued Grandizio a *Giglio* letter stating that her posts exhibited "anti-Muslim bias."  The Outside Counsel Report described Grandizio's posts as likely to "have a somewhat significant impact on policing because they contain a number of anti-Muslim comments."  After the investigation concluded, the Commissioner issued a Direct Action charging Grandizio with Conduct Unbecoming and Neglect of Duty.  She was sanctioned with a thirty-day suspension.

As stated, all of Grandizio's posts touch on matters of public concern.  The question is whether "the interests of both [Grandizio] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, the City's interest is weightier.  All of Grandizio's posts concern her views on Islam and Muslims—for example, her belief that "a Muslim" person can never "be a good American."  A reasonable citizen reading Grandizio's comments could conclude that she harbors bias against Muslims; for that reason, her posts could impair the "relationship of trust" between the Muslim community and the PPD that the agency relies on to do its job efficiently and effectively.  *Locurto*, 447 F.3d at 183.  Indeed, under one of Grandizio's posts, another Facebook user expressed this very concern, writing "stuff like this . . . pushes us further apart."  And it was posts like Grandizio's that, according to Deputy Commissioner Wimberly, led a group representing the "Islamic community here in Philadelphia" to meet specifically with PPD and/or City leadership to "share[] their concerns of how . . . police will treat them as people" based on the posts' expressed viewpoints about Muslims.  On top of that, because of these posts, Grandizio's credibility is in jeopardy in any trial where she is called to testify against a Muslim

person, as the District Attorney's Office recognized in issuing her a *Giglio* letter.

The City has demonstrated that Grandizio's posts were likely to cause significant interference with the PPD's operations.  Because the City's interest in preventing this disruption outweighs Grandizio's and the public's interest in her posts, Grandizio's posts are not protected. Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on Grandizio's retaliation claim.

### l.   Steven Hartzell

Officer Hartzell began working for the PPD in 1993.  At the Internal Affairs Interview, Hartzell was shown 37 posts and comments from the Plain View database, all of which he initialed.  He does not deny having made the posts.

Hartzell was disciplined for seven posts.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Three involve news reports of people being shot, either by police or by other members of the public:



**Steven Hartzell**
February 10, 2017 · 🌐

He died of led Poisoning led poison lol



CONTENT.JWPLATFORM.COM

**Curtis Deal Shooting**

Baltimore PD shooting of Curtis Deal

👍 Like          💬 Comment          ➔ Share



Three involved news and events in Philadelphia:





**Wayne Preston** is with Tommy O'Schaf and Brion Michael.
January 21, 2016 ·

WHAT THE HELL IS THIS?

PHILLY.COM
**City Council backs recognizing two Muslim holidays**
Philadelphia City Council on Thursday called on the city and the school district to officially recognize two Muslim holidays, which would give students and…

1                                            8 Comments  11 Shares

Share

Another slap in the face to police and a slap in the face to every other religion, race etc. It never ends.
2y                                            4

**Wayne Preston** Wow no other word
2y

**Lee Indiana** It's a gigantic pile of shit , wait were you asking what city council is , regardless my description is the same for both
2y                                            2

**Tommy O'Schaf** What the fuck is this horseshit?? Jones needs to go drown himself!! What a fuckin slap in the face to police as well as Christians !!! They have been taking God out of our schools now they want to celebrate pure fucking Evil??? The City of Philadelphia is a fucking toilet!! FUCK. This enrages me.
2y · Edited                                    3

**Wayne Preston** I agree living in Burbs is great Fuck the city
2y                                            1

Shocker
2y

**Joseph Iacuzio** Tommy. If the city makes it a holiday thats two more holidays they have to pay us for.
2y                                            1

**Steven Hartzell** Asa Lakim. No way
2y



**Steven Hartzell**
January 2, 2017 · 🌐

···

JUST REALIZED HOW AWESOME PHILLY SUGAR TAX IS. IT FUNDS UNIVERSAL PRE K, ENCOURAGING HOOD RATS TO PRODUCE MORE OFFSPRINGS SO THEY CAN SPEND EVEN LESS TIME WITH THEM.

👍😆 19                                                          31 Comments

👍 Like                🗨 Comment                ↱ Share

⬛ ██████ All bullshit. That's what they sold us on education. Not the case pal. They are creating a FUND ..,
Like · Reply · 1y

⬛ ██████████ Let the loser mom's sleep in
👍 1
Like · Reply · 1y

👤 **Steven Hartzell** ██████████ UDUGH READ MY SARCASM SLOWEEEEEEEERRR SO IT SINKS IN LOL
👍 1
Like · Reply · 1y

⬛ ██████████ Lol ... Happy new year 👍 2
Like · Reply · 1y · Edited

177

And the last involved immigration by Muslims:



The Outside Counsel Report found that these seven posts had the potential to cause a "significant impact on policing due to several posts that advocate vigilante-style violence, as well as posts that are anti-Muslim, a post that refers to citizens of Philadelphia as 'hood rats' and one which . . . is pejorative to people with disabilities and, potentially, African Americans."  After the Internal Affairs interview, the Commissioner issued a Direct Action charging Hartzell with Conduct Unbecoming and Neglect of Duty.  Hartzell was dismissed from the PPD, but resigned before his dismissal became effective.

As stated, all of Hartzell's posts touch on matters of public concern.  The question is whether "the interests of both [Hartzell] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, Hartzell's posts are likely to cause significant disruption to the PPD's effective operation, such that the City's interest is weightier.  The posts—which included a call to "nuke" Muslim neighborhoods," and generally celebrated the death of suspects at the hands of police— are likely to erode trust between the PPD and Philadelphia's citizens, especially its Muslim community.  *See Munroe*, 805 F.3d at 474 ("[I]nvective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations."); s*ee also Grutzmacher*, 851 F.3d at 347 (speech that "advocat[ed] violence to certain classes of people" was likely to disrupt a fire department's operations because it had the "potential . . . to diminish the [d]epartment's standing with the public").  And because of posts like these, Hartzell's credibility is likely to be challenged in any case where he testifies as a witness against a Muslim person, regardless of whether or not the District Attorney's Office issued him a *Giglio* letter.

The City has demonstrated that Hartzell's posts were likely to cause significant interference with the PPD's operations.  Because the City's interest in preventing this disruption outweighs Hartzell's and the public's interest in his posts, Hartzell's posts are not protected.  Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on Hartzell's retaliation claim.

> m.  Edward McCammitt

Officer McCammitt began working for the PPD in 1986.  At the Internal Affairs

Interview, he was shown twenty-six posts and comments which were attributed to him in the Plain View database, and he initialed each.  He does not deny making any of them.

McCammitt was sanctioned for ten posts.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Three are memes about Muslims and/or Muslim immigration:







Two are memes about use of force by police:





Two are memes about gender identity:





And three are memes involving violence against protestors:





**Ed McCammitt**
July 28, 2017 · 🌐

THIS BUMPER WILL TAKE AN ANIMAL HIT AT 65 MPH

OR A PROTESTER, WHATEVER

👍 Like          💬 Comment          ↗ Share

👍😆 9

▇▇▇▇▇▇ Hahaha my truck fits in this category, it's been proven it works too. That deer knew exactly what hit him. Lol

Like · Reply · 34w

▇▇▇▇▇▇▇▇ so did that person loll

Like · Reply · 34w



The Outside Counsel Report concluded that these posts "likely would have a significant impact on policing because they advocate vigilante violence and excessive force by police against protestors, as well as containing anti-Muslim and anti-LGBTQ statements." After the Internal Affairs interview, the investigator charged McCammitt with Conduct Unbecoming and Neglect of Duty. McCammitt retired a few days later.

As stated, all of McCammitt's posts touch on matters of public concern. The question is

190

whether "the interests of both [McCammitt] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'" *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, the City's interest is weightier. Speech like McCammitt's—which glorifies violence against protestors (including, specifically, transgender protestors), advocates for the use of lethal force in situations where it may not be necessary (as expressed in the shooting range target meme), and suggests a bias against Muslim immigrants—is likely to inflame the public, infringing on the PPD's ability to maintain an effective and efficient working relationship with those whom it is meant to serve. *Munroe*, 805 F.3d at 474 ("[I]nvective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations."); *see also Grutzmacher*, 851 F.3d at 347 (speech that "advocat[ed] violence to certain classes of people" was likely to disrupt a fire department's operations because it had the "potential . . . to diminish the [d]epartment's standing with the public"). To take just one example, officers are frequently tasked with ensuring the safety of protestors; when one posts a meme expressing that he sees protestors as no more than speed bumps in the roadway, there is an appreciable likelihood that members of the public may doubt that they will be protected if they attend a protest. Police rely on the "relationship of trust between the police . . . and the communities they serve," *Locurto*, 447 F.3d at 183, and posts like McCammitt's are likely to disrupt that relationship.

The City has demonstrated that McCammitt's posts were likely to cause significant interference with the PPD's operations. Because the City's interest in preventing this disruption

outweighs McCammitt's and the public's interest in his posts, McCammitt's posts are not protected.  Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on McCammitt's retaliation claim.

n.  <u>Raphael McGough</u>

Detective McGough raises a genuine dispute about the meaning of one of his posts.  But because the City has demonstrated that its interest in preventing disruption outweighs McGough's interest in speaking even when that dispute is resolved in McGough's favor, the City is entitled to summary judgment on McGough's First Amendment retaliation claim.

Detective McGough began working for the PPD in 2003.  At the Internal Affairs interview, McGough was shown thirty-six social media posts and comments from the Plain View database, of which he initialed each.  McGough did not deny making any of them.

McGough was disciplined for four posts.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern:



**Ray McGough**
September 16, 2017 · 🌐

Street Justice. One for the good guy I mean girl.

FOX29.COM
**Police: Woman finds boyfriend on top of daughter, 12, stabs him**

👍😡 19                                                            3 Comments

👍 Like          💬 Comment          ➤ Share

Exactly! She should of stabbed him 50 more times.
Like · Reply · 41w

**James Snell** well done Mom, should have kepy you swinging.
Like · Reply · 41w

You should have aimed for the heart!!!
Like · Reply · 41w







Ray McGough shared a post.
September 27, 2017 · 🌐

Before you rip people's intellect, please check your grammar.



# LeBron James: "If You Voted for Trump You Made a Mistake, At the End of the Day I Don't Think a Lot of People Was Educated"



Women For Trump Movement II: #maga2018
September 27, 2017 · 🌐

👀 Was Educated? 😂

How Did LeBron graduate High School w/ a 2.8 GPA ?

This Level of Winning Should Not Even Be Possible, Folks! ❤️

👍😆 17                                          14 Comments

👍 Like          💬 Comment          ↗ Share

Can say the same thing about the orangutan's grammar! 🙂
Like · Reply · 40w

Ray McGough Yes but put something up there. I still chuckle at orangutan.
Like · Reply · 40w

The Outside Counsel Report concluded that these posts "would likely have some impact on policing because they advocate vigilante violence and violence against protestors and suggest racial animus."  After the Internal Affairs interview, McGough's commanding officer charged him with Neglect of Duty, for which he was given a reprimand.  The District Attorney's Office also issued McGough a *Giglio* letter for making Facebook posts "exhibiting disrespect for the law."

As stated, all of McGough's posts touch on matters of public concern.  The question is whether "the interests of both [McGough] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, the balance tips in favor of the City.  In his post about Antifa members in Germany sharing photos of German police officers on the Internet, McGough wrote "If they show up at any cops [sic] house they should be eliminated."  McGough does not argue that the "eliminat[ion]" he calls for in this post should be understood to refer to anything less than the extrajudicial killing of Antifa members.  A police officer's call for a group of people—even political actors that he considers extremists—to be "eliminated" is likely to significantly erode the public's trust in the police force.  *Grutzmacher*, 851 F.3d at 347 (speech that "advocat[ed] violence to certain classes of people" was likely to disrupt a fire department's operations because it had the "potential . . . to diminish the [d]epartment's standing with the public").

Or consider McGough's comment "Street Justice.  One for the good guy I mean girl" atop a post about a woman who purportedly stabbed her boyfriend in order to thwart his attempted assault of her daughter.  This celebration of extrajudicial violence, coming from a

police officer, has a high likelihood to erode the "relationship of trust" between the public and the PPD that the agency relies on to do its job efficiently and effectively. *Locurto*, 447 F.3d at 183. And McGough's *Giglio* letter—which was issued on the grounds that his posts evidenced a "disrespect for the law"—carries the potential to vitiate his credibility in a criminal proceeding during which he may testify, which significantly "impedes the performance of [his] duties" as a police officer. *Rankin*, 483 U.S. at 388.[20]

The City has demonstrated that McGough's posts were likely to cause significant interference with the PPD's operations. Because the City's interest in preventing this disruption outweighs McGough's and the public's interest in his posts, his posts are not protected. Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on McGough's retaliation claim.

o. Michael Melvin

Sergeant Melvin began working for the PPD in 1995. He was interviewed twice. In the first interview with Internal Affairs, He denied making any posts or comments of an offensive or inflammatory nature. At his second interview, he was shown forty posts contained in the Plain View database and did not deny making any of them.

Melvin was sanctioned for fifteen posts. As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Four concern respect for law enforcement, the military, and the American flag:

---

[20] The Parties disagree about the meaning of McGough's exchange with a Facebook friend on a post concerning basketball star LeBron James' political commentary. The City argues that this exchange "evoked a racially insensitive trope by comparing [James] to an orangutan." McGough counters that the "racially insensitive trope" in question—the word "orangutan"—was meant to refer to President Donald Trump's tan, not James' race. This is a genuine dispute, considering that the post is as much about President Trump as it is about James, and considering the ubiquity in 2017 of jokes about the President's tan. However, the meaning of this post is not material to McGough's retaliation claim because, whether it is understood to refer to Donald Trump or to highlight the irony of a grammatical error in a critique of the educational level of others, the City's interest in preventing the actual or likely disruption attributable to McGough's other posts outweighs his and the public's interest in the post.



**Michael Vincent** shared Trevose Fire Company Station 4/84's photo.

November 22, 2015 · 🌐

How does someone not only vandalize a grave site but a firemens grave. Would be just terrible if the Police caught the person in that nice dark cemetery.

If anyone is driving by or around resurrection cemetery. The family of deceased fire fighter George redner could you please drive threw and just check on his gravesite it has been vandalized several times.the directions his mother gave me to his resting place were go threw the gates first right he's right there on the right hand side he has a station 10 shield their. If your not busy swing by just check make sure everything's ok please pass the word on share share share I know I'll swing by on my way to shoprite. You don't even have to get out of the car.

👍 Like        💬 Comment        ➤ Share

**Trevose Fire Company Station 4/84**                    👍 Like Page
November 22, 2015 · 🌐

We have confirmed this and would ask that if you know who is vandalizing the grave, please contact Bensalem Police. We are protecting the identity of the person who posted this information. Thank you.

➤ Share

👍 1

**Troy Matthew** Bring him back to the firehouse I know if that happened at my firehouse we'd love to have a talk with him after

2y

**Michael Vincent** shared Respecting our Military past and present's photo.

January 24, 2016 · 🌐



**Respecting our Military past and present**
January 20, 2016 · ☀

👍 **Like Page**

Never Disrespect Our Military
~Patton

↪ **Share**

👍 4

**Michael Vincent** shared Police Officers's photo.

September 16, 2016 · 🌐

···



**Police Officers**

July 12, 2016 · ☀

👍 Like Page

👋 Share

👍 4

 **Michael Vincent** via **Joe Walsh**
February 15, 2016 · 🌐                                       •••

Those little shits need to be smacked in the mouth.



WALSHFREEDOM.COM
Students Post Photo Of Themselves Standing On American Flag,
Flipping The Middle Finger

 Share

 3

Five are posts sharing news stories about crimes, often with commentary from Melvin:





**Michael Vincent**
February 12, 2016 · 🌐

Every other story is about the wonderful violent muslims.

JEWSNEWS.CO.IL
Italy: Muslims Destroy and Urinate on Virgin Mary Statue
by Raymond Ibrahim Friday, January 9. A man was kneeling in prayer before…

↪ Share

👍 2

NEVER EVER Trust a muslim. NEVER 👍 1
2y

**Nick Cione** Nice, but no one will say anything
2y

**Michael Vincent** Nope, still haven't seen this on the news. 👍 1
2y

**Michael Vincent**
February 15, 2016 · 🌐

Beautiful beautiful



JEWSNEWS.CO.IL
ITALY: African Muslim paedophile who attacked a 13-year-old girl
gets the crap beat out of him...

↪ Share

👍 3

**Michael Vincent**
September 10, 2017 · 🌐

· · ·

These two pieces of garbage should be thrown intro a wood chipper.



FOX29.COM
Police to charge brothers in Fairmount murder

👍 Like          💬 Comment          ↪ Share

👍 3



**Michael Vincent** shared FOX 12 Oregon's video.
November 11, 2016 · 🌐

That's how you move a group of violent cowards.

2,507,472 Views

**FOX 12 Oregon** added a new video.
November 11, 2016 · 🌐

👍 Like Page

Crowds at the riots in downtown Portland scattered after Portland Police Bureau officers deployed "less lethal munitions." kptv.tv/2fGMj6Y

👍 Like          💬 Comment          ↪ Share

👍 8

The era of whining is over!
Like · Reply · 1y

And the last six are memes making jokes or warning their reader about a variety of groups and individuals:













**Michael Vincent** shared American Warrior Revolution's photo.
March 22, 2017 · 🌐

WHITE IRISH SLAVES WERE TREATED WORSE THAN ANY OTHER RACE IN THE US.

WHEN WAS THE LAST TIME YOU HEARD AN IRISHMAN BITCHING HOW THE WORLD OWES THEM A LIVING?

You Won't...
The Irish are not pussies looking for free shit...

**American Warrior Revolution**
March 21, 2017 · 🌐

👍 Like Page

Full of the TRUTH!

👍 Like          💬 Comment          ➤ Share

👍 4

The Outside Counsel Report considered these fifteen posts to pose a "significant impact on policing based on several posts that advocate police brutality or vigilante-style violence against protestors, as well as posts that are anti-Muslim, racist, and anti-LGBTQ."  After the Internal Affairs interviews, the Commissioner issued a Direct Action charging Melvin with Conduct Unbecoming and Neglect of Duty.  The District Attorney's Office also issued Melvin a *Giglio* letter which described his posts as "threatening violence against transgender individuals and exhibiting anti-Muslim bias."  Melvin was dismissed from the PPD, but resigned before his dismissal became effective.

As stated, all of Melvin's posts touch on matters of public concern.  The question is whether "the interests of both [Melvin] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, Melvin's posts are likely to disrupt the PPD's effective operation, and the City's interest in preventing that disruption outweighs Melvin's and the public's interest in his posts. Several of Melvin's posts advocate for extrajudicial violence—*e.g.*, the post commenting that two individuals charged with murder are "pieces of garbage" who "should be thrown intro [sic] a wood chipper," or the post imagines greeting a transgender person who uses a gender conforming bathroom with a pistol.  Posts like these are significantly likely to undermine the public's trust in the PPD.  *Grutzmacher*, 851 F.3d at 347.  Another post makes fun of Muslim women who wear burkas—this post is highly disruptive because it expresses disrespect for Muslim women, who are among "the very persons that the [PPD] is meant to serve . . . ." *Munroe*, 805 F.3d at 474.  Comments like these are also likely to compromise Melvin's

credibility at trial, as evidenced by the *Giglio* letter he received from the District Attorney's Office.  Melvin also testified that fellow officers distanced themselves from him after his posts came to light, which demonstrates that his posts had a "detrimental impact on close working relationships for which personal loyalty and confidence are necessary . . . ."  *Rankin*, 483 U.S. at 388.

The City has demonstrated that Melvin's posts were likely to cause significant interference with the PPD's operations.  Because the City's interest in preventing this disruption outweighs Melvin's and the public's interest in the posts, Melvin's posts are not protected. Accordingly, for the reasons set forth above, the City's Motion for Summary Judgment will be granted as to Melvin's First Amendment retaliation claim.

### p.  Brion Milligan

Officer Milligan began working for the PPD in 1996.  At the Internal Affairs interview, Milligan was shown one hundred social media comments and posts, none of which denied making.

He was sanctioned for twelve of his posts.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Three of them are about Muslims:



**Brion Michael** shared Brigitte Gabriel's video.
December 10, 2015 · 🌐

Getting sick n tired of liberals on other friend's pages defending islam. The ones I had unfriended me. What is so fucking difficult about this? They are here, have been here. Watch your asses everybody

YOUNES ABDULLAH MOHAMMED
'Revolution Muslim'
Go to our site to tell us what you think

1,311,326 Views

**Brigitte Gabriel** added a new video: Homegrown Hate.
December 10, 2015 · 🌐

👍 Like Page

This is what it looks like when our freedoms are being used against us. Notice how Mohammed says, "Terrorize them (the disbelievers)," is a commandment from Allah.

"Liking" isn't taking action. SIGN UP for our Action Alerts and TAKE ACTION >>>
http://www.actforamerica.org/get-involved

↪ Share

👍 13

I'm ready to take care of business. 👍 1

2y

If you let them in our country, this is the way they thank you. Pig head fuckers. 👍 1

2y

↪ 🧑 Brion Michael replied · 1 Reply

216



**Brian Cain**

January 9, 2016 · Philadelphia, PA · 🌐

•••

So when are they going to take a look at the black muslims that are out every Friday downtown spewing their radical islam agenda on the street corners in Center City? This puke piece of shit that shot Jesse is one of them. Go listen to them for 30 seconds one day and tell me their message isn't more then freedom of speech. It's pure terroristic threats. They must be shut down and dealt with.

⇗ **Share**

👍 66

1 Share

    Frank Rizzo woulda known how to handle it...dogs,tear gas..firehoses..  👍 5

2y

    Where is the Muslim oversight committee???  👍 4

2y

**Brion Michael** Look at Dearborn MI. Hate rallies held all the time. Biggest muslim population in the US. Media silent. WWIII is about to kick into 2nd gear  👍 3

2y

**Michael G Bottum** That's why we have a 2nd amendment.... You can't depend on government to protect you!!!  👍 1

2y

**Brion Michael** But we can depend on this govt to fuck up the 2nd amendment

2y

217



Two are about "liberals:"





**Brion Michael**

March 23, 2016 · 🌐

How do you liberals feel knowing your political correctness is allowing innocent people to get butchered? Those "no go zones" in Europe the cops will not enter used to be called Muslim slums, now they're referred to as Islamic colonies. It's not so bad here yet, but you fucking liberals better get out of the way.

👍 41                                    6 Comments

↗ **Share**

Liberalism is a mental disorder. 👍 6

2y

**Brion Michael** With no treatment. Put them to sleep
👍 2

2y

I swear to God, I hope there is a civil war so we can separate ourselves from them. My dad and I talk about it all the time. The conservative regions would thrive and flourish, the liberal regions? Well just look at Chicago...
👍 2

2y

Four are about police and policing:







**Billy Killian Jr.**
February 17, 2015 · 🌐

Who remembers when south st was crazy on Fat Tuesday?

👍 49                                                                13 Comments

⤳ Share

███████████████ I was just talking about that with some of the girls at work! It was crazy down there.
3y                                                                👍 1

**Shaw Bjerring** I wish it still was. Im trying to go rage
3y                                                                👍 1

████████ I used to live on 8th and south back in 1997. It was ridiculous
3y                                                                👍 1

████████ Remember the dude who drove through the crowd running people down on south street on Fat Tuesday all because they were surrounding his car an wouldn't let him out?
3y                                                                👍 1

████████ We used to have a lot of fun, at Fat Tuesdays, bands all day, WMMR, frozen drinks... but it's just not the same down there anymore
3y                                                                👍 1

**Ernest Green** I use to love it
3y                                                                👍 1

████████ i remember the riot on sth street good old days lol
3y                                                                👍 1

**Brion Michael** I remember that Irish, potato head, toothless, pompus prick Timoney buckled that 1 year when that car drove thru the crowd & the media made a big deal about the cops not having control. Another worthless commissioner
3y                                                                👍 2

223



**Brion Michael**
April 29, 2015 · 🌐

I was once told by a jitbag inspector I needed to do some "soul searching", some here know the story I'm referring to & he didn't even know the full story or my side of the story. Now Barry obama says the same thing. These political hacks never put in an honest day's work in their lives, tell me to " soul search ", I say to all of you......when you're done fucking yourself, go get a job & see what its like. Police dept. brass included.

👍 16                                              24 Comments

↻ Share

          I love your candidness   👍 1
3y

          Brion...he did to stop posting like this...you going to get in trouble ...its not worth it. Think of your family. I was stupid years ago and did same thing on domelights and cause myself and family grief. If you need to vent do it in private messages.
3y

          I mean you to stop.
3y

          Brion you need to look at supreme court decision ...the right to free speech is not an absolute. You may not be criminal charge but employers can discipline you admistratively. Also read government labor laws.
3y                                                          👍 2

**Brion Michael** John, did I mention any names? Is this outside an opinion?
3y

**Brion Michael** Sure do John, I'm one of the poster boys for it   👍 1
3y

          You really don't have to mention name.. Just being critical of command can put you in DPR for months...then eventually lose days ...and arbitration takes years!
3y

**Brion Michael** No names, and this story was 18 yrs ago, this is an opinion of our president who hates cops, equated with the same terminology.
3y

          If they were a white shirt and u think they give a shit about u in blue......ur kidding urself! .....unless ur new...bc then u don't no any better.....
3y

          And it really doesn't change things. You don't have to be an alcoholic or an addict to say and understand the serenity prayer. Just trying to look out for you. I'm speaking from experience.
3y                                                          👍 1

**Brion Michael** I have experience, I've been questioned, I cooperated, did nothing wrong, just like now
3y

**Brion Michael** I have experience, I've been questioned, I cooperated, did nothing wrong, just like now
3y

          You can be critical of the president and his policy. You don't work for him...that protected. Just stop talking about work issue on open forum do it privately please.
3y

**Brion Michael** What's the work issue? A past incident I haven't even described that happened 18 yrs ago?
3y

          Brion...you a smart guy...you really don't get determine if your right or wrong. Even if you take a chance and defend yourself it takes years. I been waiting 4 yrs for a 3 day hit.
3y

          What you posted today... In my opinion could get u jammed up. Good luck.
3y

And the last three involve a grab-bag of topics—Facebook censorship of a previous post wishing ill on a celebrity; a news story about a botched execution; and the historical plight of Irish-Americans.



**Joe Gillespie**
April 30, 2014 · 🌐

···

This dude killed a year old girl and buried her. Why the f**k are people upset
that his execution didn't go well. F**K him. . Shame he didn't suffer for days.



WWW.USATODAY.COM
**Botched execution could slam brakes on death penalty**
An Oklahoma death-row inmate died of a heart attack Tuesday night after his...

👍 31                                                    12 Comments   4 Shares

↪ Share

████████████ Probably blaming the cops..it's a joke...he should have
no rights

4y

████████████ It's sad joe this man should have no rights but it is our
government stepping in again I hope he burns in hell

4y

**Steve Bas** It's a shame make him die and bring him back and make
him die - Groundhog Day
👍 2
4y

**Brion Michael** It wasn't botched enough. I wish he suffered more.
👍 3
4y



The Outside Counsel Report determined that these twelve posts could have a "significant impact on policing based on advocacy of violence, racial/ethnic stereotyping, anti-Muslim comments and anti-LGBTQ comments," as well as "derogatory comments about police department officials that include ethnic stereotyping."  After the Internal Affairs interview, the Commissioner issued a Direct Action charging Milligan with Conduct Unbecoming and Neglect of Duty.  The District Attorney's Office also issued Milligan a *Giglio* letter which described his posts as "exhibiting anti-Muslim and anti-transgender bias" as well as "advocating violence." Milligan was dismissed from the PPD.

As stated, all of Milligan's posts touch on matters of public concern.  The question is whether "the interests of both [Milligan] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, Milligan's posts are likely to cause significant disruption to the PPD's operations, and the City's interest in preventing that disruption outweighs Milligan's and the public's interest in the posts.  In two separate posts, Milligan called for liberals to be "put . . . to sleep" and "round[ed] up . . . & place[d] . . . in internment camps."  On a post discussing the civil unrest in Ferguson, Missouri and the subsequent police response, Milligan wrote "enough of the questions & criticisms anymore, let's just crack heads."  Elsewhere, he wished that Bruce Springsteen would be sexually assaulted in retaliation for expressing support for transgender people, and warned that, because of "[h]ate rallies" held in Dearborn, Michigan—which he claims has the "[b]iggest [M]uslim population in the U.S."—"[World War III] is about to kick into 2nd gear."  These comments all "advocate violence to certain classes of people," such as

liberals, those who support Muslim and transgender people, and others, and are therefore highly likely "to diminish the [PPD's] standing with the public . . . ."  *Grutzmacher*, 851 F.3d at 347. Posts of this sort have a high potential to compromise Milligan's credibility as a witness in just about any criminal proceeding, as recognized by the District Attorney's Office when it issued him a *Giglio* letter.

The City has demonstrated that Milligan's posts were highly likely to cause significant interference with the PPD's operations.  Because the City's interest in preventing this disruption outweighs Milligan's and the public's interest in the posts, Milligan's posts are not protected. Accordingly, for the reasons set forth above, the City's Motion for Summary Judgment will be granted as to Milligan's First Amendment retaliation claim.

### q.  Mark Palma

Sergeant Palma began working for the PPD in 1989.  The Plain View database contains 43 posts attributed to him.  He was shown each of these posts during his Internal Affairs interview; although he initially denied having made some or all of them, he admits now having made the posts shown to him at that time.

Palma was sanctioned for eleven of his posts.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Four of them involved crimes or current events in Philadelphia:







**Mark Palma**
August 25, 2017 · 🌐

Good job Central Detectives. The loud mouth school teacher took a pinch

👍 Like        💬 Comment        ↗ Share

👍❤️😆 223

5 Shares

**Ian Hans Lichterman**

👍😆❤️ 19

Like · Reply · 30w

**Mark Palma** Go home and get your shine box        👍❤️😆 12
Like · Reply · 30w

**Juan Ramirez** Bubba is waiting for his ass. Lol        👍 1
Like · Reply · 30w

**John Connors** Nice.... Tastes better than hot dogs Palma!!
Like · Reply · 30w

**Mark Palma** Lol
Like · Reply · 30w

**Juan Ramirez** Now, the same thing to Kalif. One by one. Bring these POS to justice. And definitely Soros and Pinnochio.        👍 3
Like · Reply · 30w

**Mark Palma** Juan you can drive the wagon
Like · Reply · 30w

**Brian Mac** If only Juan was the turn key when they brought him in. That I would pay to watch.        👍 1
Like · Reply · 30w

**Juan Ramirez** He would be crying but because of pain. His jaw would be the first thing that would hurt. I for one would teach him respect for the Police.        👍 1
Like · Reply · 30w





Two dealt with clashes between police and protestors:





Two were stories or videos about crimes outside of Philadephia:



**Mark Palma** shared a video.
February 19, 2017 · 🌐

···



🚫 **Cover This Video**

1,712,174 Views

**FOX 29** ✓
February 17, 2017 · 🌐

👍 **Like Page**

"HEARTBREAKING...BRUTAL...AND JUST WRONG." A mom's friend is accused of striking her 7-year-old son on the head, shoulders, legs, and buttocks at least 62 times in 5 minutes. Police say the beating knocked the child to the pavement.

STORY HERE: http://www.fox29.com/news/236518031-story

😣😢😡 7                                                          6 Comments

👍 Like             💬 Comment            ➤ Share

**Mark Palma** The adult needs to get hit with a 2x4
Like · Reply · 1y                                              👍 3

And one is either an Islamophobic or a racist meme:



The Outside Counsel Report considered these eleven posts to pose a "significant" level of disruption.  After the Internal Affairs interview, the Commissioner issued a Direct Action charging Palma with Conduct Unbecoming and Neglect of Duty.  The District Attorney's Office also issued him a *Giglio* letter which described his posts as "exhibiting racial and anti-Muslim bias and advocating excessive force against protesters."  Palma was dismissed from the PPD, but retired before the dismissal became effective.

As stated, all of Palma's posts touch on matters of public concern.  The question is whether "the interests of both [Palma] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, the City's interest is weightier.  Several of Palma's posts are calls for violence against individuals or groups—for example, the comment "he needs to be shot in the throat" (on an article about the perpetrator of a shooting and robbery); the comment "the adult needs to get hit with a 2x4" (on a video showing an adult beating a child); and the meme encouraging riot squads to hospitalize 'black bloc' protestors.  These posts have the potential to erode a community member's trust that the PPD will treat them fairly should they engage in a protest or be arrested for a crime.  *See Grutzmacher*, 851 F.3d at 347 (speech that "advocat[ed] violence to certain classes of people" was likely to disrupt a fire department's operations because it had the "potential . . . to diminish the [d]epartment's standing with the public").  His posts making fun of Muslims direct "invective . . . against the very persons that the governmental agency is meant to serve," and therefore "could be expected to have serious consequences for the performance of [Palma's] duties and the [PPD's] regular operations."  *Munroe*, 805 F.3d at 474.  And all of these

posts could be used to diminish Palma's credibility in a case where he is called to testify against a defendant, as recognized by the District Attorney's Office when it issued him a *Giglio* letter characterizing his posts as "exhibiting racial and anti-Muslim bias and advocating excessive force against protesters . . . ."

The City has demonstrated that Palma's posts were likely to cause significant interference with the PPD's operations.  Because the City's interest in preventing this disruption outweighs Palma's and the public's interest in his posts, his posts are not protected.  Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on Palma's retaliation claim.

### r.   Joseph Przepiorka

Sergeant Przepiorka began working for the PPD in 1989.  The Plain View database contains ninety-four posts attributed to him.  When he was shown each of these posts by Internal Affairs investigators, he did not deny making any of them.

Przepiorka was sanctioned for forty-one posts.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Twenty-two of them involved Islam and its followers:



**Joseph Przepiorka**
November 19, 2015 · 🌐

# ISLAM IS NOT A RELIGION OR A RACE!

Islam is an authoritarian, political doctrine which imposes itself by force. Any political doctrine that calls to kill those who do not believe in it is NOT a religion.

## ISLAM IS NOT A RELIGION IT IS A CULT THAT GLORIFIES DEATH





(Przepiorka posted the above image twice—first in 2015, and again in 2016.)

**Joseph Przepiorka** shared a link.
January 11, 2016 · 🌐



REDSTATEWATCHER.COM
**Sheriff Clarke: Muslim shooter in Philly should be tried for treason and put to death**

👍 29                                                    3 Comments  26 Shares

🖒 Like                                    ↪ Share

**Joseph Przepiorka** Commander and Chief of Homeland Security.
Let's gets more troops, better equipment and let us do are job and stop
all bull shit already. The police are the only thing savages from running
wild.

Like · 2y







**Joseph Przepiorka**
January 21, 2016 · 🌐

All of Europe and America need to unite and send these people back to their country or hell.



TELLMENOW.COM
**Muslim 'Refugees' DEMAND Government Change The Flag**
This nonsense has gone WAY too far!

👍 4                                                    3 Comments

👍 Like                                    ➤ Share





**Joseph Przepiorka** shared a link.
August 1, 2016 · 🌐

JEWSNEWS.CO.IL

**TRUMPED: What German police find at raid near radical mosque will absolutely shock you…still want them in your country?**

👍😡 9                                          3 Comments  27 Shares

👍 Like                              ↪ Share

**Tom Blackburn** And people don't think that is coming here
Like · 1y                                          👍 1

▇▇▇▇▇ As long as they get a free cell phone. They don't care
Like · 1y                                          👍 1

**Joseph Przepiorka** Imagine what 1000 of them with them weapons could do to any city
Like · 1y









**Joseph Przepiorka** shared a link.
September 21, 2016 · 🌐

ANGRYPATRIOTMOVEMENT.COM
**WATCH – BLM Thug Praises 'Allah,' Calls For Violence Against Whites in THIS State**

😡👍 7                                   5 Comments  17 Shares



**Joseph Przepiorka**
January 29, 2017 · 🌐

# THE PATH OF
# ISLAM
# IS ALWAYS THE SAME

1. ESTABLISH A MOSQUE     2. CREATE AN ENCLAVE
3. GROW THE POPULATION     4. CLAIM VICTIMHOOD
5. RESIST HOST AUTHORITIES & CUSTOMS
6. EXPLOIT LAWFARE     7. INSTITUTE SHARIAH
8. SECEDE     9. TAKE CONTROL

AFGHANISTAN WAS ONCE A BUDDHIST NATION, PAKISTAN
WAS ONCE HINDU AND LEBANON WAS CHRISTIAN.  DO
YOU SEE A PATTERN FORMING?  TODAY THEY'RE ALL
ISLMAIC NATIONS.  IF WE CONTINUE ON THIS PATH
EUROPE WILL BE NEXT TO FALL... THEN AMERICA?





Joseph Przepiorka shared a post.
February 21, 2017 · 🌐

February 21, 2017

 **Joseph Przepiorka** shared a post.
July 29, 2017 · 🌐

···

 ▉▉▉▉▉ shared a link to the group: The Deplorables.
July 29, 2017

The Poles are in...



CREEPINGSHARIA.WORDPRESS.COM
**Poland: "We will not open our doors to Islamic migrants"**
Refusing Islamic migrants is only way of ensuring security: Polish MEP





**Joseph Przepiorka** shared a photo.

January 30, 2017 · 🌐                                        •••

The Shoe Bomber was a Muslim
The Beltway Snipers were Muslims
The Fort Hood Shooter was a Muslim
The Underwear Bomber was a Muslim
The U.S.S. Cole Bombers were Muslims
The Madrid Train Bombers were Muslims
The Bali Nightclub Bombers were Muslims
The London Subway Bombers were Muslims
The Moscow Theatre Attackers were Muslims
The Boston Marathon Bombers were Muslims
The Pan-Am flight #93 Bombers were Muslims
The Air France Entebbe Hijackers were Muslims
The Iranian Embassy Takeover, was by Muslims
The Beirut U.S. Embassy bombers were Muslims
The Libyan U.S. Embassy Attack was by Muslims
The Buenos Aires Suicide Bombers were Muslims
The Israeli Olympic Team Attackers were Muslims
The Kenyan U.S. Embassy Bombers were Muslims
The Saudi, Khobar Towers Bombers were Muslims
The Beirut Marine Barracks bombers were Muslims
The Beslan Russian School Attackers were Muslims
The first World Trade Center Bombers were Muslims
The Bombay & Mumbai India Attackers were Muslims
The Achille Lauro Cruise Ship Hijackers were Muslims
The September 11th 2001 Airline Hijackers were Muslims

 ▶ The Deplorables

January 29, 2017

Try this on for size 👊





Seven are variations on a meme that pokes fun at Mexican people and their accents:















The remainder touch on a smattering of topics including, *inter alia*, immigration, crime, policing, bathroom policies with respect to transgender individuals, and protestors:







**Joseph Przepiorka** shared a link.

May 3, 2016 · 6abc · 🌐

6ABC.COM

### Officers attacked breaking up fight in Philadelphia

A chaotic scene at a SEPTA bus stop in Northeast Philadelphia saw two sch…

😡👍 7                                    2 Comments  2 Shares

👍 Like                          ↪ Share

**Joseph Przepiorka** That's a damn disgrace to bad the officers didn't kick their damn ass's.

Like · 2y                                              👍 1

That's y my kids in father judge how do u send ur kids to school with animals

Like · 2y                                              👍 1









**Joseph Przepiorka** shared a post.
December 17, 2016 · 🌐

December 14, 2016 · Key West, FL

Participant in a home invasion robbery. Prize birdshot











**Joseph Przepiorka** shared a link.
June 24 at 9:15 PM · 🌐

• • •

METRO.CO.UK | BY RICHARD HARTLEY-PARKINSON
**White paedophile ring held girl hostage and forced her into prostitution**

😡👍 16                                          9 Comments  5 Shares

👍 Like                              ↪ Share

**Joe Guglielmucci** Hopefully some big criminals hold them hostage.
Like · 1w                                              👍 2

**Joseph Przepiorka** These boys will learn Karma very shortly. Bubba is waiting
Like · 1w                                              👍 6



The Outside Counsel Report considered these forty-one posts to pose a "significant" level of disruption.  After the Internal Affairs interview, the Commissioner issued a Direct Action charging Przepiorka with Conduct Unbecoming and Neglect of Duty.  The District Attorney's Office also issued him a *Giglio* letter for making Facebook posts "threatening violence against transgender individuals, inciting violence against protestors, and exhibiting anti-Muslim bias." Przepiorka was dismissed from the PPD, but retired before the dismissal became effective.

As stated, all of Przepiorka's posts touch on matters of public concern.  The question is whether "the interests of both [Przepiorka] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, that balance tips in favor of the City.  The majority of Przepiorka's posts consist of nothing more than "invective directed against [some of] the very persons that the governmental agency is meant to serve"—in this case, Muslim, LGBTQ, and Mexican people—which "could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations."  *Munroe*, 805 F.3d at 474.  Additionally, many of Przepiorka's posts advocate violence against the aforementioned groups, plus protestors, suspects, and defendants, which has the "potential . . . to diminish" the PPD's "standing with the public . . . ." *Grutzmacher*, 851 F.3d at 347.  Because of these posts, Przepiorka's credibility with a jury is highly likely to be compromised at trial, as the District Attorney's Office recognized in its *Giglio* letter.

The City has demonstrated that Przepiorka's posts were likely to cause significant disruption of the PPD's operations.  Because the City's interest in preventing this disruption

outweighs Przepiorka's and the public's interest in his posts, Przepiorka's posts are not protected.  Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on Przepiorka's retaliation claim.

> s.   Francis Sheridan

Detective Sheridan began working for the PPD in 1990.  Only two Facebook comments are attributed to him, who posted under the name "Frank Sheridan," in the Plain View Database. These comments were shown to him during his Internal Affairs interview, both of which he initialed.  He also shared that, on one prior occasion, he had been notified that a foreign device had gained access to his Facebook account—though he does not allege specifically that someone else posted the comments he was shown.

The parties agree that the PPD sanctioned Sheridan for only one of his comments.  As determined in Section IV.B *supra*, this comment dealt with a matter of public concern:



After the Internal Affairs interview, Sheridan was charged with Neglect of Duty and was reprimanded by his commanding officer.

As stated, Sheridan's comment touches on a matter of public concern.  The question is whether "the interests of both [Sheridan] and the public in the speech at issue" are outweighed by

"the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'" *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, the City's interest is weightier, because the potential for disruption attributable to Sheridan's comment is significant. Sheridan commented "Thank God for Prison Justice!"[21] on a news story about a child rapist who had been raped in prison. Police officers are tasked with ensuring the safety of accused and convicted criminals in their custody—even child rapists. Sheridan's comment, insofar as it expresses his approval of an act of extrajudicial violence committed against an inmate, could erode the public's confidence in the police as bastions of law and order. *See Munroe*, 805 F.3d at 474 ("[I]nvective directed against the very persons that the governmental agency is meant to serve could be expected to have serious consequences for the performance of the speaker's duties and the agency's regular operations."); *see also Grutzmacher*, 851 F.3d at 347 (speech that "advocat[ed] violence to certain classes of people" was likely to disrupt a fire department's operations because it had the "potential . . . to diminish the [d]epartment's standing with the public").

Because the City's interest in preventing this disruption outweighs Sheridan's and the public's interest in his comment, Sheridan's post is not protected. Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on Sheridan's retaliation claim.

---

[21] In its Statement of Material Facts submitted in support of the instant Motion, the City alleges that Sheridan "linked [the above] article" and "commented 'Aaaaand justice has been served!'" thereupon. In response, Sheridan argues that another Facebook user "linked" the article and that user—not him—made the "justice has been served" comment. But this is of no moment, in that the record shows it was the "Thank God for Prison Justice" comment that was the basis for Sheridan's discipline.

t.   <u>William Young</u>

Corporal Young began working for the PPD in 1989.  In the Internal Affairs interview, Young was shown twenty-one posts and comments attributed to him in the Plain View database, none of which he denied making.

The PPD sanctioned Young for thirteen posts and comments.  As determined in Section IV.B *supra*, each of his posts dealt with a matter of public concern.

Eight posts involve Islam:





**Michael G Bottum**
December 2, 2015 · 🌐

It appears that the religion of peace is responsible for the most recent mass shooting in San bernardio, ca.

👍 4                                                                    1 Comment

🖒 Like                                 ⤳ Share

**Tom Young** That pesky Religion of Peace always up to something

Like · 2y                                                                    👍 3



**Michael G Bottum**
June 19, 2016 · 🌐

I see the gay community is buying more firearms for protection... Good for them!!!! Maybe they are starting realize the goverment can not protect them. And you safety is your personal responsibility.

👍 4                                                        1 Comment  1 Share

🖒 Like                                 ⤳ Share

**Tom Young** Protect us, under this president they are working against us importing thousands of Muslims into our country.

Like · 2y                                                                    👍 1

 **Laszlo Zsazados**
July 30, 2017 · 🌐

Green, green grass of home. Ruins of a medieval castle built long time ago to shelter people against the Ottoman Empire invasions.They were heavily fortified and built on high hills or mountains.



 Like           Comment           Share

 12

 **Tom Young** I hope the people of the West wake up to this Islamic Invasion before its too late!

Like · Reply · 34w



**William Sperber**
May 10, 2014 · 🌐

Our government really sucks sometimes.obama and his cohorts can't count to 2 without missing 3 numbers



are guaranteed to kill 330,000 Americans in a single hour.

TOPRIGHTNEWS.COM
300 Somali Terrorists Who Crossed the Border Still At Large Inside the U.S. (MUST SEE)

 Share

 2

 **Tom Young** Ban Islam from our country
3y







**Michael G Bottum**
November 13, 2015 · 🌐                                    •••

Another terrorist attack in Paris.... 30 dead so far..... I wonder if the religion of peace is responsible????

👍 1                                                          11 Comments

👍 Like                              ↪ Share

Yeah, makes you wonder.........
👍 1
Like · 2y

Wow how sad.
Like · 2y

**Marion McGinnis** No doubt about it.
Like · 2y

**Laszlo Zsazados** The multicultural paradise at its best.
👍 2
Like · 2y

**Michael G Bottum** You sow what you reap.... France let these animals in..... This is all coming to a city near you....
👍 1
Like · 2y · Edited

**Tom Young** Hey they're letting in here too
Like · 2y

**Michael G Bottum** The body count is up to 60......
👍 1
Like · 2y

**Michael G Bottum** Obama is on the air.now...... Should be insprarional.....
👍 1
Like · 2y

**Tom Young** Treasonous POS 👍 1
Like · 2y

**Michael G Bottum** Hey hillary!!!!!! I wonder if this attack is in response to another video????
👍 2
Like · 2y · Edited

**Laszlo Zsazados** They will blame the society for this. It was not sensitive enough for their cultural needs.
👍 1
Like · 2y · Edited

Four involved matters related to policing:











And one involves immigration:





The Outside Counsel Report concluded that these thirteen posts "would likely have a significant impact on policing based on advocacy of police brutality, a large number of anti-Muslim comments, as well as racial/ethnic stereotyping and anti-LGBTQ comments."  After the Internal Affairs interview, the Commissioner issued a Direct Action charging Young with Conduct Unbecoming and Neglect of Duty.  The District Attorney's Office also issued Young a *Giglio* letter which described his posts as exhibiting anti-Muslim bias.  Young was dismissed from the PPD, but retired before the dismissal became effective.

As stated, all of Young's posts touch on matters of public concern.  The question is whether "the interests of both [Young] and the public in the speech at issue" are outweighed by "the [City's] legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'"  *Dougherty*, 772 F.3d at 991 (quoting *McGreevy*, 413 F.3d at 364).

Here, the City's interest outweighs Young's and the public's.  Young's posts about immigrants and Muslims—calling the former "savages" and calling for nationwide bans on the religion of the latter—directed "invective . . . against the very persons that the governmental agency is meant to serve" and therefore "could be expected to have serious consequences for the performance of the [Young's] duties and the [PPD's] regular operations."  *Munroe*, 805 F.3d at 474.  This concern is validated by events that transpired following the database's revelation—as Deputy Commissioner Wimberly testified, a group representing the "Islamic community here in Philadelphia" met specifically with PPD and/or City leadership and "shared their concerns of how . . . police will treat them as people" based on the viewpoints expressed about Muslims in posts like Young's.  These comments could also be used to impeach Young's credibility in any case involving an immigrant or a Muslim person—a worry that the District Attorney's Office

recognized when it issued Young a *Giglio* letter concerning his posts' "anti-Muslim bias." The City has demonstrated that Young's posts were likely to cause significant interference with the PPD's operations. Because the City's interest in preventing this disruption outweighs Young's and the public's appreciable interest in his posts as public speech, Young's posts are not protected. Accordingly, for the reasons set forth above, summary judgment will be granted in favor of the City on Young's retaliation claim.

## V.    CONCLUSION

As set forth above, summary judgment will be granted in favor of the City on all Plaintiffs' First Amendment retaliation claims.

An appropriate order follows.

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**